**MCGRAIL & BENSINGER LLP**
888-C 8th Avenue #107
New York, New York 10019
Telephone: (201) 931-6910
Ilana Volkov, Esq.
Veronique A. Urban, Esq.
Email: ivolkov@mcgrailbensinger.com
Email: vurban@mcgrailbensinger.com

**JOSEPH & KIRSCHENBAUM LLP**
D.Maimon Kirschenbaum
Josef Nussbaum
Lucas C. Buzzard
32 Broadway, Suite 601
New York, New York 10004
Tel: (212) 688-5640
maimon@jk-llp.com
jnussbaum@jk-llp.com
lucas@jk-llp.com

*Counsel to Pavle Zivkovic, on behalf of himself and others similarly situated*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 23-22840-shl |
| DAVOUD GHATANFARD a/k/a DAVID GHATANFARD, | Chapter 11 |
| Debtor. | Subchapter V |

**MOTION OF PAVLE ZIVKOVIC, ON BEHALF OF HIMSELF AND OTHERS SIMILARLY SITUATED, FOR ENTRY OF AN ORDER <u>CONVERTING CASE TO CHAPTER 7 OF THE BANKRUPTCY CODE</u>**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.    RELEVANT BACKGROUND ........................................................................... 2

    A.    The *Zivkovic v. Laura Christy LLC*, et al Lawsuit.............................. 2

    B.    The Debtor's Fraudulent Conveyances to Rosey Kalayjian ....................... 4

    C.    The District Court's Orders of Attachment ............................................. 5

    D.    The Debtor Was Facing a Motion to be Held in Contempt in the District Court ......... 8

    E.    The Debtor Misstated and Concealed Assets and Debts in His Petition ..................... 8

    F.    2004 Discovery ................................................................................. 11

    G.    The Debtor and Ms. Kalayjian Disobey the Restraining Notice and Orders of
        Attachment ...................................................................................... 14

    H.    The Debtor's Monthly Operating Reports ................................................. 15

    I.    The Creditors ................................................................................... 16

    J.    The Debtor's Proposed Plan ................................................................. 16

III.    JURISDICTION AND VENUE ....................................................................... 17

IV.    RELIEF REQUESTED AND BASIS THEREFOR ........................................... 17

    A.    The Court Should Convert the Debtor's Case to Chapter 7 Under § 1112(b) of the
        Bankruptcy Code .............................................................................. 17

    1.    The Court should convert the Debtor's Petition as a bad faith filing under §
        1112(b)(4)(A) of the Bankruptcy Code ................................................. 21

        a)    Factors 1 and 9: Whether the debtor has only one asset, little or no cash
               flow, and no employees.................................................................. 22

        b)    Factors 2 and 4: Whether the debtor has few unsecured creditors and
               whether the debtor's financial condition is, in essence, a two party dispute ..... 22

        c)    Factor 5: Whether the timing of the debtor's filing evidences an intent
               to delay or frustrate the legitimate efforts of a debtor's creditors to enforce
               their rights ................................................................................. 23

i

d)    Factors 6 and 7: Whether the debtor has little or no cash flow and cannot meet current expenses ......................................................................................... 25

e)    The totality of the circumstances supports a finding of bad faith ...................... 25

2.    The Court should convert the Debtor's Petition as a bad faith filing under § 1112(b)(4)(A) of the Bankruptcy Code ........................................................ 29

a)    The Debtor's Estate is Being Diminished ............................................................ 29

b)    There is no reasonable likelihood of rehabilitation ............................................. 30

3.    The Court should convert the Debtor's Petition as a bad faith filing under § 1112(b)(4)(E) For Failure to Comply with the Court's 2004 Order .......................... 32

a)    This Case Should Be Converted To Chapter 7 Because It Is In The Best Interest Of The Creditors ..................................................................................... 32

V.    CONCLUSION ................................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*15375 Mem'l Corp. v. BEPCO, LP*,
   589 F.3d 605 (3d Cir. 2009) .................................................................................. 26

*Agra v. Dolci (In re Major Model Mgmt.)*,
   2023 Bankr. LEXIS 2037 (Bankr. S.D.N.Y. Aug. 18, 2023) ................................... 19

*Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*,
   931 F.2d 222 (2d Cir. 1991) ............................................................................... 18-19

*C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*,
   113 F.3d 1304 (2d Cir. 1997) ........................................................... 18, 19, 20, 21, 23

*Carolin Corp. v. Miller (In re Carolin Corp.)*,
   886 F.2d 693 (4th Cir. 1989) ................................................................................. 19

*Commodity Futures Trading Comm'n v. Weintraub*,
   471 U.S. 343 (1985) ............................................................................................... 26

*In re 210 W. Liberty Holdings, LLC*,
   No. 08–677, 2009 Bankr. LEXIS 1706 (Bankr. N.D.W. Va. May 29, 2009) ........... 28

*In re 221-06 Merrick Blvd. Assocs. LLC*,
   No. 1-10-45657-jbr, 2010 Bankr. LEXIS 4431 (Bankr. E.D.N.Y. Dec. 3, 2010) ..... 23

*In re 347 Linden LLC*,
   Nos. 11–CV–1990 (KAM), 11–CV–2201 (KAM), 11–CV–2202 (KAM),
   2011 U.S. Dist. LEXIS 78843 (E.D.N.Y. July 20, 2011) ........................................ 29

*In re 3868-70 White Plains Road, Inc.*,
   28 B.R. 515 (Bankr. S.D.N.Y. 1983) ...................................................................... 29

*In re Acme Cake Co., Inc.*,
   495 B.R. 212 (Bankr. E.D.N.Y. 2010) .................................................................... 18

*In re Adbrite Corp.*,
   290 B.R. 209 (Bankr. S.D.N.Y. 2003) ........................................................... 20, 29, 30

*In re Ameribuild Const. Mgmt., Inc.*,
   399 B.R. 129 (S.D.N.Y. Bankr. 2009) .................................................................... 18

*In re Ancona*,
   No. 14-10532 (MKV), 2016 Bankr. LEXIS 4114 (Bankr. S.D.N.Y. Nov. 30, 2016) ............. 26

iii

*In re Artisanal 2015, LLC*,
No. 17–12319 (JLG), 2017 Bankr. LEXIS 3813 (Bankr. S.D.N.Y. Nov. 3, 2017)........... 23, 25

*In re Babayoff*,
445 B.R. 64 (Bankr. E.D.N.Y. 2011)................................................................. 18, 33

*In re BH S & B Holdings, LLC*,
439 B.R. 342 (Bankr. S.D.N.Y. 2010) ..................................................................... 33

*In re Brutsche*,
476 B.R. 298 (Bankr. D.N.M. 2010) ....................................................................... 28

*In re C-TC 9th Ave.*,
193 B.R. 650 (Bankr. N.D.N.Y. 1995) ..................................................................... 24

*In re Carter*,
No. 23-54816-JWC, 2023 Bankr. LEXIS 3060 (Bankr. N.D. Ga. Dec. 13, 2023).................. 28

*In re Consol. Distribs.*,
2013 Bankr. LEXIS 3101 (Bankr. E.D.N.Y. July 23, 2013) ................................... 23

*In re CYMA Cleaning Contractors Inc.*,
No. 22-01377 (ESL), 2023 Bankr. LEXIS 2637 (Bankr. D.P.R. Oct. 27, 2023) ................. 28

*In re D&G Constr. Dean Gonzalez, LLC*,
635 B.R. 232 (Bankr. E.D.N.Y. 2021).................................................................... 22

*In re Dobson*,
2023 Bankr. LEXIS 2499 (Bankr. W.D. Va. Sep. 29, 2023).................................... 32

*In re Dunes Hotel Assocs.*,
1997 Bankr. LEXIS 2482 (Bankr. D.S.C. Sep. 26, 1997) ........................................ 24

*In re Encore Property Management of Western New York, LLC*,
585 B.R. 22 (Bankr. W.D.N.Y. 2018) ............................................................. 22, 25

*In re Fall Line Tree Serv.*,
No. 20-21548-C-11, 2020 WL 7082416 (Bankr. E.D. Cal. 2020) .......................... 31

*In re Fed. Roofing Co.*,
205 B.R. 638 (Bankr. N.D. Ala. 1996) .................................................................... 26

*In re Fisher*,
2008 Bankr. LEXIS 1247 (Bankr. D. Mont. Apr. 15, 2008) .................................... 28

*In re Gen. Growth Props., Inc.*,
  409 B.R. 43 (Bankr. S.D.N.Y. 2009) ................................................................. 19

*In re Halal 4 U LLC*,
  No. 08-15216 (MG), 2010 Bankr. LEXIS 3335 (Bankr. S.D.N.Y. Sep. 24, 2010) ................. 34

*In re Hampton Hotel Inv'rs L.P.*,
  270 B.R. 346 (Bankr. S.D.N.Y. 2001) ............................................................... 20

*In re Juarez*,
  836 Fed. App'x 557 (9th Cir. 2020) ................................................................ 31

*In re Kanterman*,
  88 B.R. 26 (Bankr. S.D.N.Y. 1988) ................................................................. 29

*In re Lin*,
  499 B.R. 430 (Bankr. S.D.N.Y. 2013) ........................................................... 22, 23

*In re National Small Business Alliances*,
  642 B.R. 345 (Bankr. D.D.C. 2022) ................................................................ 28

*In re Natrl Plants & Lands Mgmt. Co.*,
  68 B.R. 394 (Bankr. S.D.N.Y. 1986) ................................................................ 27

*In re Neilson*,
  2018 Bankr. LEXIS 4107 (Bankr. N.D.N.Y. Aug. 31, 2018) ............................... 20, 21, 22, 25

*In re No Rust Rebar, Inc.*,
  641 B.R. 412 (Bankr. S.D. Fla. 2022) .............................................................. 20

*In re Purpura*,
  170 B.R. 202 (Bankr. E.D.N.Y. 1994) .............................................................. 24

*In re RCM Global Long Term Capital Apprec'n Fund, LTD*,
  200 B.R. 514 (Bankr. S.D.N.Y. 1996) ........................................................... 19, 21

*In re Reliant Energy Channelview LP*,
  594 F.3d 200 (3rd Cir. 2010) ..................................................................... 25

*In re Sillerman*,
  605 B.R. 631 (Bankr. S.D.N.Y. 2019) ........................................................... 26, 28

*In re Spenlinhauer*,
  592 B.R. 1 (D. Mass. 2018) ....................................................................... 33

*In re SRJ Enterprises, Inc.*,
   151 B.R. 189 (Bankr. N.D. Ill. 1993) ........................................................ 26

*In re Staff Inv. Co.*,
   146 B.R. 256 (Bankr. E.D. Cal. 1993) ....................................................... 34

*In re Wally Findlay Galleries, Inc.*,
   36 B.R. 849 (Bankr. S.D.N.Y. 1984) .......................................................... 24

*In re W.R. Grace & Co.*,
   475 B.R. 34 (Bankr. D. Del. 2012) ............................................................ 31

*Red Bull Taxi Inc.*,
   2017 Bankr. Lexis 1209 (Bankr. S.D.N.Y. May 3, 2017) ......................... 18

*Squires Motel, LLC v. Gance (Squires Motel, LLC)*,
   426 B.R. 29 (Bankr. N.D.N.Y. 2010) ......................................................... 20

*St. Hous. Dev. Fund Corp.*,
   2018 Bankr. LEXIS 2909 (Bankr. S.D.N.Y. Sep. 25, 2018) ..................... 19

*Sullivan v. Harnisch (In re Sullivan)*,
   2014 Bankr. LEXIS 4985 (B.A.P. 9th Cir. Dec. 9, 2014) ......................... 23

*United States v. Scott Cable Communs., Inc. (In re Scott Cable Communs., Inc.)*,
   2007 U.S. Dist. LEXIS 65514 (D. Conn. Sep. 6, 2007) ........................... 26

**Statutes**

11 U.S.C. § 1112 .................................................................................................. 1

11 U.S.C. § 1112(b) .................................................................................... *passim*

11 U.S.C. § 1112(b)(1) ............................................................................... *passim*

11 U.S.C. § 1112(b)(2) .......................................................................................... 1

11 U.S.C. § 1112(b)(4) ............................................................................... *passim*

11 U.S.C. § 1112(b)(4)(A) ......................................................................... *passim*

11 U.S.C. § 1112(b)(4)(E) ................................................................................... 32

11 U.S.C. § 1112(b)(4)(F) ................................................................................... 30

11 U.S.C. §1129(a)(7)(A)(ii) .............................................................................. 31

11 U.S.C. § 1182 ........................................................................................................... 28

11 U.S.C. § 1182(1)(B) ................................................................................................ 28

11 U.S.C. § 1191 ........................................................................................................... 31

28 U.S.C. § 157 ............................................................................................................. 17

28 U.S.C. § 157(b) ....................................................................................................... 17

28 U.S.C. § 1334 ........................................................................................................... 17

28 U.S.C. § 1408 ........................................................................................................... 17

28 U.S.C. § 1409 ........................................................................................................... 17

**Rules**

C.P.L.R. § 5222 ............................................................................................................... 8

Fed. R. Bankr. P. 2004 ................................................................................................ 11

Fed. R. Civ. P. Rule 59 ............................................................................................... 3

Pavle Zivkovic, on behalf of himself and others similarly situated ("Movant"), by and through his undersigned counsel, hereby submits this motion (the "Motion") pursuant to § 1112 of Title 11, United States Code (the "Bankruptcy Code") converting case to Chapter 7 of the Bankruptcy Code (the "Motion").  In support of the Motion, Movant respectfully states as follows:

## I.    INTRODUCTION[1]

1.    Because "cause" exists to convert this case from Chapter 11 to Chapter 7, as required by Section 1112(b)(2) of the Bankruptcy Code, the Court shall convert this case.

2.    The Debtor—who is a judgment-debtor for more than $5 million in a class action—filed this case immediately after his life partner's "assets" were attached by a District Court to the tune of roughly $10 million in cash and assets that the *Debtor* transferred to her while the class action was pending.

3.    The filing of this bankruptcy also came on the eve of the Movant filing motions to avoid those transfers as well as being granted discovery in aid of collection.

4.    As set forth below, in attaching the Debtor's life partner, the District Court in the class action found that it was likely that Movant would establish the Debtor's actual and fraudulent intent to evade payment to the judgment-creditor class members in that case.

5.    The Debtor's true intentions in filing this bankruptcy have now become obvious as he is improperly using this case as a sword and a shield.  The Debtor is enjoying the benefits of the automatic stay of the District Court case, all while proposing a reorganization plan where—in complete disregard of the District Court's clear statements that the transfers to Ms. Kalayjian would likely be voided—he defiantly states that he will not pursue avoidance of any of those transfers because neither he nor Ms. Kalayjian believe they are fraudulent.  In fact, the transfers

---

[1] With this Motion, Movant appends the Declaration of Josef Nussbaum dated March 8, 2024 ("Nussbaum Decl."), with exhibits attached thereto cited as "Exs. A-R."

1

are a sham. The Debtor continues to use and enjoy all the money and assets he transferred to Ms. Kalayjian as if those transfers had never taken place. He lives in the house he transferred to her and uses her credit card (paid off with his money) to pay for his day-to-day expenses.

6.      Moreover, while taking advantage of the automatic stay of the District Court litigation, the Debtor has been less than truthful on his Petition, Schedules and Statement of Financial Affairs and flouted a discovery order entered by this Court.

7.      This is the height of bad faith and, for the reasons set forth below, this case must be converted to Chapter 7 to ensure the best interests of creditors are protected and championed. A Chapter 7 trustee, unlike the Debtor, will monetize the avoidable transfers for the benefit of creditors.

## II.      RELEVANT BACKGROUND

### A.      The *Zivkovic v. Laura Christy LLC*, et al Lawsuit

8.      In January 2017, Pavle Zivkovic filed a wage and hour class action against Laura Christy LLC, Laura Christy Midtown LLC and David Ghatanfard (collectively, the "Class Action Defendants") who collectively owned and operated two Manhattan restaurants called Valbella. The case was filed in United States District Court for the Southern District of New York (the "District Court") and is styled *Zivkovic v. Laura Christy LLC, et al.*, 17 CV 553 (S.D.N.Y.) (the "District Court Action"). Nussbaum Decl., ¶ 2.

9.      In the District Court Action, Mr. Zivkovic alleged—on behalf of himself and putative class of all tipped employees at the two Valbella restaurants—that the Class Action Defendants violated various provisions of the Fair Labor Standards Act and New York Labor Law. *Id.*, ¶ 3.

10.     In the same lawsuit, Mr. Zivkovic also brought individual claims whereby he alleged that that LCM and Ghatanfard discriminated against him in violation of New York State and New York City law. *Id*., ¶ 4.

11.     In November 2018, the case was certified as a class action on behalf of two subclasses of employees, including all tipped employees who worked for the Class Action Defendants at both Valbella restaurants between January 25, 2011 and November 30, 2018 (the "Class Members"). *Id*., ¶ 5.

12.     Trial in the District Court Action was held from March 30, 2022 to April 11, 2022, and ended in a jury verdict in favor of the Class Members and in favor of Mr. Zivkovic on his individual claims. *Id*., ¶ 6.

13.     On June 22, 2022, the District Court entered judgment in favor of the Class Members against the Class Action Defendants in the amount of $5,092,017.85. The Court also entered judgment in the amount of $687,060 in favor of Mr. Zivkovic. *Id*., ¶ 7.

14.     The Class Action Defendants filed a Fed. R. Civ. P. Rule 59 motion seeking a new trial. The District Court denied that motion with respect to the Class Members' claims but granted the motion, in part, with respect to Mr. Zivkovic's individual claims. *Id*., ¶ 8.

15.     On July 5, 2023, the District Court thus entered a partial judgment in favor of the Class Members and against the Class Action Defendants in the amount of $5,092,017.85 (the "Class Judgment"). *Id*., ¶ 9.

16.     The Court Ordered a new trial on Mr. Zivkovic's individual claims. That trial has yet to take place. *Id*., ¶ 10.

17.     The Class Judgment remains unpaid. *Id*., ¶ 11.

**B.     The Debtor's Fraudulent Conveyances to Rosey Kalayjian**

18.     As set forth below, in their post-judgment collections efforts, the Class Members discovered that the Debtor rendered himself insolvent by selling, transferring and/or encumbering his real property, liquidating and/or transferring his ownership shares in several LLCs, and transferring the resulting liquid assets to his life partner, Ms. Kalayjian.

19.     Ms. Kalayjian is the Debtor's "life partner." They have "lived and worked together for approximately the last 20 years." Ex. A at 2.  Ms. Kalayjian has worked in four restaurants partially owned by the Debtor. *Id*. at 7-12.

20.     Ms. Kalayjian and the Debtor currently live together, splitting their time between two residences – a rented apartment in Yonkers and a home in Southampton, New York (the "Southampton Property"). *Id*. at 4.

21.     Ms. Kalayjian and the Debtor share a joint checking account. *See generally*, *Id*.

22.     In their collections efforts, the Class Members discovered that from September 2020 to June 2022, the Debtor transferred to Ms. Kalayjian the following cash amounts (the "Transferred Cash Amounts") without consideration: (1) $1.2 million from the sale of a home that was owned solely by the Debtor; (2) $675,000 the Debtor received from Laura Christy Midtown LLC (an affiliated Chapter 11 debtor under Case No. 23-22845); (3) $600,000 the Debtor received from the sale of another restaurant he owned called One if by Land; and (4) $1.4 million the Debtor received from the refinance of a home he solely owned in Southampton, New York (the "Southampton Property"). Nussbaum Decl., ¶ 15.

23.     The Class Members also discovered that, in May 2022, the Debtor recorded a deed transferring title to the Southampton Property from his sole ownership to a joint tenancy with right of survivorship with Ms. Kalayjian. Ex. B.

24.     Finally, the Class Members discovered that, on June 16, 2022 (approximately two months *after* the jury verdict in District Court Action and days before the entry of the Class Judgment), the Debtor transferred 90% of his ownership in a company called Oak Grove Road LLC ("OGR") to Ms. Kalayjian (the "OGR Assignment"). OGR owns a 50% stake in a restaurant called Valbella at the Park ("VATP") located in Manhattan, which the Class Action Plaintiffs allege is the alter ego of Laura Christy Midtown LLC (an affiliated debtor).  Nussbaum Decl., ¶ 17, Ex. C.

25.     Before the OGR Assignment, the Debtor had deposited $1.85 million into an OGR bank account in 2021 and 2022.  OGR transferred those funds to VATP as purported startup capital. Ex. D.

26.     VATP commenced operating in March 2022. VATP has repaid to OGR at least $1.35 million of the $1.85 million startup capital (the "OGR Repayments"). Nussbaum Decl., ¶ 19.  It is unknown whether OGR, in turn, reimbursed the Debtor for the funds he provided to OGR.

27.     In addition, VATP reported over $11 million in gross sales and over $8 million in gross profit in 2022 and Ms. Kalayjian's counsel in the District Court Action represented that it is "a very profitable restaurant." Ex. E, Ex. F at 4.

C.     **The District Court's Orders of Attachment**

28.     On July 5, 2023, the District Court issued a temporary restraining order ("TRO") against Ms. Kalayjian: (A) temporarily restraining her from transferring, dissipating, or otherwise encumbering, without prior District Court approval: (1) funds or other assets without prior Court

5

approval, except for ordinary course transactions for living expenses that, in any event, shall not exceed $10,000 per transaction; (2) her ownership interest in OGR; and (3) her ownership interest in the Southampton Property, and (B) setting a date for a hearing on whether Ms. Kalayjian should have her assets attached (the "Attachment Hearing"). Ex. G.

29.     After several postponements, the Attachment Hearing was held on October 25, 2023.  At the Attachment Hearing, the District Court granted the Class Members' motion for an attachment against Ms. Kalayjian and extended the terms of the TRO (the "Attachment Order").

30.     In making its findings, the District Court noted the "suspicious nature of this flurry of activity that occurred between 2020 to early 2022, as Mr. Ghatanfard confronted the underlying litigation." The District Court held that the Class Members had "shown a likelihood of success of proving Mr. Ghatanfard's actual and fraudulent intent to engage in these transfers to Ms. Kalayjian to evade Judgment." Ex. H at 69, 65.

31.     Significantly, the District Court also found that the Debtor still lives in the Southampton Property to which he had added Ms. Kalayjian to the title and that he enjoys use of the money he transferred to Ms. Kalayjian as "he uses Ms. Kalayjian's credit card for personal expenses." *Id*. at 71.

32.     After granting the motion for an attachment, and in anticipation of the Class Members' contemplated motion to void the transfers from the Debtor to Ms. Kalayjian, the District Court ordered counsel for the Class Members and Ms. Kalayjian to meet and confer about the

6

scope of discovery the Class Members believed to be necessary to effectuate attachment and/or

seek avoidance.   Counsel for the Class Members and Ms. Kalayjian met and conferred several

times about the scope of discovery and, after reaching an impasse, asked the District Court for a

conference.   The District Court scheduled the conference for November 14, 2023. Nussbaum

Decl., ¶ 25.

33.     The day before that conference, on November 13, 2023 (the "Petition Date"), the

Debtor filed this bankruptcy case under Subchapter V of Chapter 11, Title 11 of the United States

Code (the "Bankruptcy Code"), thus staying all collections efforts in the District Court Action. *Id*.

at ¶ 26.

34.     In support of his filing of the Petition, the Debtor submitted an affirmation pursuant

to Local Bankruptcy Rule 1007-c. *See* Dkt. No. 4.

35.     In that affirmation, the Debtor curiously states that he "filed for Chapter 11 relief

on an emergency basis to, among other things, stay the aggressive collection efforts of the plaintiff

in the Class Action. Such efforts have interfered with my ability to earn a living and threatened the

viability of my business interests." *Id*. at 2.  At the time the Debtor filed this case, however, there

were no active collections efforts against him. The Class Members' only collections efforts were

taking place against Ms. Kalayjian and VATP. Nussbaum Decl., ¶ 29.

**D.   The Debtor Was Facing a Motion to be Held in Contempt in the District Court**

36.     After the Court entered the Class Judgment, in August 2022, the Class Members served a restraining notice pursuant to CPLR § 5222 on the Debtor. *Id*. at ¶ 30.

37.     The Class Members also served discovery demands, including an information subpoena and subpoena duces tecum, on the Debtor. *Id*. at ¶ 31.

38.     The Debtor provided incomplete and inaccurate answers to the information subpoena and ignored the subpoena duces tecum. *Id*. at ¶ 32.

39.     In August 2023, the District Court issued an Order to Show ("OSC") as to why the Debtor should not be held in civil contempt for failing to respond to Plaintiffs' document subpoena and for providing false responses to Plaintiffs' information subpoena. Ex. I.

40.     The hearing on that OSC was delayed due to the Debtor's counsel's alleged illness and was pending at the time the Debtor filed his bankruptcy Petition. Nussbaum Decl., ¶ 34.

**E.   The Debtor Misstated and Concealed Assets and Debts in His Petition**

41.     In Schedule A/B of the Petition, the Debtor lists the Southampton Property as having a value of $2.5 million. *See* Dkt. No. 32 at 3. The Debtor has not been able to substantiate that valuation.

42.     Specifically, in January 2024, this Court authorized the Class Members to serve discovery demands on the Debtor. In those requests, the Class Members ask the Debtor to provide all documents upon which he relied to set forth a $2.5 million valuation for the Southampton Property. The Debtor formally responded that he has no responsive documents to that request. Ex. J at 6.

43.     The Debtor's representation in his Schedules contradicts the appraisal of the Southampton Property that the Debtor *himself* used in his application to refinance that property.

Specifically, in post-judgment discovery, the Class Members received the Debtor's application to refinance the Southampton Property in early 2022. In that application, the property was appraised at $3.7 million. Ex. K. (In fact, according to one online realtor web site, the property is currently estimated to be worth nearly $4.3 million. *See* https://www.redfin.com/NY/Southampton/56-Oak-Grove-Rd-11968/home/21317955 accessed on March 4, 2024).

44.     Moreover, in his Schedules, the Debtor also understated the amount of debt he has by concealing the fact that he is the only individual responsible for the mortgage on the Southampton Property.

45.     Specifically, in Schedule J, the Debtor lists $5,500 in expenses under rental or home ownership expenses for his residence. At the 341(a) Meeting in this case, the Debtor testified that the $5,500 expense covered the rent at a property he also lives at in Yonkers, NY (the "Yonkers Apartment"). In other words, the Debtor did not list his monthly mortgage and real estate tax liability for the Southampton Property at all in his Schedules.

46.     Based on a mortgage statement the Debtor produced to Movant, the monthly mortgage and tax obligation appears to be $12,350.45. Ex. L.

47.     In addition, while the Debtor stated in his Schedules that he pays a $125 a month renters insurance policy for the Yonkers Apartment, he failed to state that he has a homeowners' insurance policy for the Southampton Property that costs him $5,515 annually (or $459 per month). *Compare* Line 4b of Schedule J *with* Ex. M.

48.     Accordingly, the Debtor has at least another $12,800 in monthly liabilities that he failed to list in his Schedules.

49.     To be sure, the Debtor listed his income in Schedule I as $10,954 and his monthly expenses as $9,170, for a monthly net income of $1,784, *i.e.*, far too little to cover his mortgage and homeowners' insurance policy.

50.     The insurance policy on the Southampton Property includes coverage of up to $976,00 for "Personal Property." *Id*. However, in his Schedules, the Debtor lists only $42,500 in cash and property and, other than cash and a vehicle, the Debtor list only $3,500 in personal and household items. Dkt. No. 32 at 1, 3-7.

51.     The Debtor also failed to include his ownership interest in OGR in Section 27 of the Statement of Financial Affairs ("SOFA"). *See* Dkt. No. 32 at 27.

52.     Moreover, in his SOFA, the Debtor conceals that he assigned 90% of his shares in OGR to Ms. Kalayjian. *Id*. at 25 (Section 18).  In discovery, the Debtor produced an Assignment and Assumption of Membership Interest agreement between the Debtor and Ms. Kalayjian dated June 16, 2022, *i.e.*, less than two years before the Petition Date. Ex. C at 15-16.  That agreement memorializes the Debtor's assignment of 90% of his shares in OGR to Ms. Kalayjian. For avoidance of doubt, in its Attachment Order, the District Court also found that the assignment took place in June 2022. Ex. H at 74 ("It is also particularly relevant here that the assignment of the 90% interest to Ms. Kalayjian occurred after a jury verdict was rendered in this case, with a sizeable amount against Mr. Ghatanfard").

53.     Finally, the Debtor appears to have loaned $40,000 in December 2022 from an account he holds at Connecticut Community Bank ("CCB")). Ex. N.  This loan or the loan receivable does not appear in the Debtor's Schedules.

54.     The Debtor also fails to state whether he is owed $1.8 million from OCR and if he is entitled to profit sharing from that entity.

### F.     2004 Discovery

55.     On January 29, 2024, the Court entered an Order for the production of documents by, and authorized oral examination of, the Debtor and Ms. Kalayjian pursuant to Fed. R. Bankr. P. 2004 (the "2004 Order"). Dkt. No. 50.

56.     In the 2004 Order, the Court instructed the Debtor and Ms. Kalayjian to provide all responsive documents to the list of requests listed in Exhibits A and B of the 2004 Order on a rolling basis, to be completed within 21 days, or by February 20, 2024. *Id*. at 1-2.

57.     The 2004 Order further required that the Debtor and Ms. Kalayjian appear for depositions by March 5, 2024. *Id*. at 2.

58.     As set forth below, both the Debtor and Ms. Kalayjian are flouting this Court's 2004 Order by (a) failing to produce all responsive documents by the February 20th deadline, and (b) not appearing for depositions by March 5, 2024 since they claim they are still in the process of gathering documents.

59.     Movant served deficiency letters on Ms. Kalayjian's counsel on February 26, 2024 and on the Debtor's counsel on February 27, 2024. *See* Exs. O and P.

60.     In a good faith effort to resolve the defective production, counsel for the Movant, Ms. Kalayjian and the Debtor held a meet and confer on February 27, 2024.

61.     Despite the meet and confer, the Debtor's and Ms. Kalayjian's productions remain incomplete.  Nussbaum Decl., ¶ 57.

62.     As an example, the Debtor has still not produced his tax returns for 2021. *Id.* ¶ 58.

63.     The Debtor has also not produced bank statements for 2023 and 2024 for a checking account he holds at Bank of America ("BOA"). *Id.* ¶ 59.

64.     Movant also asked the Debtor to produce documents concerning the transfer of his interest in the Oak Grove Property to Ms. Kalayjian, including information about any alleged consideration he received in exchange for the transfer. In response, the Debtor produced only a copy of the deed transferring title to Ms. Kalayjian and has stated that they are still searching for additional records. *Id.* ¶ 60.

65.     In terms of Ms. Kalayjian, Movant asked her to identify personal and investment accounts and produce records for those accounts from September 2020 to the present. *Id.* ¶ 61.

66.     In response, Ms. Kalayjian produced only statements from September 2020 to December 2023 for an individual Citibank account she has held, two quarterly statements for a Charles Schwab account, and statements for an LLC account for September 2023 to February 2024. *Id.* ¶ 62.

67.     Ms. Kalayjian did not produce any bank statements for VATP or OGR despite acknowledging that she has authority over those accounts. *Id.* ¶ 63.

68.     Ms. Kalayjian served formal responses and objections to the demands in the 2004 Order. *See* Ex. Q.

69.     In those responses, Ms. Kalayjian improperly objects to providing banking records for all accounts she owns and/or has control over on numerous grounds, including, for example, that such requests "seek[] documents that have no conceivable connection to the debtor's estate," are "designed to harass and burden" her, and that they seek information "that [has] no connection with the Debtor's affairs." *Id.* at 4-5.  This objection contravenes the 2004 Order and the Court's findings supporting it.  Moreover, it defies the facts that she and the Debtor are life partners, she is supposedly funding his plan of reorganization, and she received numerous avoidable transfers.

70. To be sure, in the Attachment Order, the District Court found that, between 2020 and 2022, the Debtor had transferred nearly $4 million in cash to Ms. Kalayjian in multiple transactions. *See generally*, Ex. H.

71. Despite this clear finding, Ms. Kalayjian has not produced any documents showing the accounts to which any of those funds were transferred. Nussbaum Decl., ¶ 67.

72. While Ms. Kalayjian provided a bank statement which shows that $2.6 million was deposited in a business account in September 2023, there is no evidence of what the source of those funds were and, more generally, she has not provided any evidence of where the proceeds of any transactions the District Court found to be "likely" voidable were deposited and/or transferred since their initial withdrawal by Ms. Kalayjian. *Id*. ¶ 68.

73. Ms. Kalayjian also has not provided any documents indicating where any of the OGR Repayments have been deposited. *Id*. ¶ 69.

74. Finally, despite the 2004 Order, neither the Debtor nor Ms. Kalayjian have been deposed. *Id*. ¶ 70. Counsel for Movant contacted counsel for the Debtor and Ms. Kalayjian on multiple occasions to try and schedule the depositions in accordance with the 2004 Order. *Id*. ¶ 71.

75. Ms. Kalayjian's counsel simply ignored all Movant's requests to schedule the deposition. *Id*. ¶ 72. On February 20, 2024, the Debtor's counsel finally offered March 4, 2024 as a deposition date. However, during the Parties' meet and confer on February 27, 2024, Debtor's counsel indicated that her client was unavailable then. In any event, a deposition before all documents have been produced would be futile. *Id*. ¶ 73.

**G.    The Debtor and Ms. Kalayjian Disobey the Restraining Notice and Orders of Attachment**

76.    Despite having been served with a restraining notice in August 2022, the Debtor appears to have loaned $40,000 in December 2022 from an account he holds at CCB. Ex. N.

77.    To be sure, in the Debtor's responses to the Class Members' post-judgment information subpoena for which the District Court issued an OSC as why the Debtor should not be held in contempt for false swearing, the Debtor failed to identify the CCB account despite his requirement to do in response to the subpoena. Accordingly, the Class Members were unable to restrain that account to ensure that transfer did not take place. Nussbaum Decl., ¶ 75.

78.    In any event, the fact that the account was not restrained does not absolve the Debtor from disobeying the restraining notice that was served on him.

79.    Ms. Kalayjian also appears to have violated the District Court's July 2023 TRO and October 2023 Attachment Order.

80.    Specifically, on September 10, 2023, Ms. Kalayjian issued a personal check payable to "Mr. & Mrs. John Castellana" in the amount of $500. The "Memo" section of the check appears to state: "Congratulations." Ex. R at 4.

81.    On October 9, 2023, Ms. Kalayjian issued a personal check payable to "Southampton Volunteer Ambulance" in the amount of $200. The "Memo" section of the check appears to state: "Donation." *Id*.

82.    Ms. Kalayjian also issued another check that same date payable to "North Sea Fire Department" in the amount of $200. The "Memo" section of the check appears to state: "2023 Donation." *Id*. at 7.

83.    None of these transactions are "ordinary course transactions for living expenses" that are permitted to Ms. Kalayjian under the terms of the TRO and Attachment Order, and Ms. Kalayjian did not receive Court approval prior to making any of these transactions.

84.    Significantly, Movant does not have all of the Debtor's and Ms. Kalayjian's bank and credit card records. Accordingly, there may be additional examples of the Debtor and/or Ms. Kalayjian flagrantly disregarding restraining orders which Movant has not been able to discover to date.

**H.    The Debtor's Monthly Operating Reports**

85.    The Debtor belatedly filed monthly operating reports ("MOR"s) for November and December 2023.  Dkt. Nos. 46, 47. The Debtor has failed to file his January MOR.

86.    The MORs include bank statements for the Debtor's BOA and CCB accounts.

87.    The MORs do not include bank statements for the joint account the Debtor holds with Ms. Kalayjian at Patriot Bank.

88.    In the November MOR, the Debtor's CCB account statement shows an opening balance of $16,040.40 and a closing balance of $1,040.40.

89.    In that same report, the Debtor's BOA account statement shows an opening balance of $28,125.80 and a closing balance of $24,704.41.

90.    In the December MOR, the Debtor's CCB account statement shows an opening and closing balance of $1,040.40.

91.    In that same report, the Debtor's BOA account statement shows an opening balance of $24,704.41 and a closing balance of $21,144.54.

92.    In other words, the Debtor has a negative cash flow.

### I.    The Creditors

93.     Three creditors filed proofs of claim in this case. *See* Claims Register.

94.     The Debtor's mortgage company, Select Portfolio Services, filed a claim for $2,120,975.90.

95.     A judgment-creditor from a 2009 judgment against the Debtor filed a claim for $187,375.05.

96.     The Movant filed claims totaling $6,706,267.38.

97.     Accordingly, the total amount of debt in this case is $9,014,618.33 and the Movant's claims represent more than 97% of the unsecured debt in this case.

### J.    The Debtor's Proposed Plan

98.     On February 12, 2024, the Debtor filed a proposed plan of reorganizing (the "Plan"). Dkt. No. 51.

99.     In the Plan, the Debtor states that he would settle the Chapter 5 causes of action against Ms. Kalayjian for $500,000 in order to fund the Plan.

100.    The Debtor provides no information as to how (and even whether) he evaluated the fraudulent transfer claims and how he arrived at the proposed settlement amount.  Instead, the Debtor simply states "Kalajian [sic] and the Debtor deny that any transfers made to Kalajian [sic] are avoidable. *Id*. at 7.

101.    To be sure, the voidable transfers include nearly (1) $4 million in cash, (2) a 50% ownership stake in a restaurant that had at least $11 in annual sales in 2022, and (3) equity of more than $775,000 in the Southampton Property.

102.    The liquidation analysis attached to the Plan is highly deficient.  First, the Debtor claims his 10% Interest in OGR (which has a 50% interest in VATP) has "Little or no Value" and

"cannot be monetized to fund a plan." *Id*. at 23. The Plan provides absolutely no basis for these naked assertions. As outlined above, VATP—which only operated for about three-quarters of 2022—had more than $11 in sales in that year and considers itself to be a "very profitable" business.

103.    In fact, Ms. Kalyjian's (former) counsel in the District Court Action represented to the Court that VATP is a "very profitable restaurant." Ex. F. at 4.  Moreover, VATP already has paid off $1.35 million of OGR's $1.85 million investment within the ten months of operating. Nussbaum Decl., ¶ 102.

104.    Next, the Debtor claims his interest in the Southampton Property is only $50,000. Dkt. No. 51 at 23. The true valuation of the Southampton Property is at least $3.7 million and it has a mortgage of less than $2.15 million. Thus, the property has approximately $1.55 million in equity, half of which Mr. Ghatanfard (fraudulently) transferred to Ms. Kalayjian on the eve of trial.

105.    Also, the Debtor fails to include significant assets of the estate which can be pursued and recovered/monetized for the benefit of creditors:  Chapter 5 avoidance actions, loan repayments, and profit sharing from OGR.

## III.    JURISDICTION AND VENUE

106.    This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV.    RELIEF REQUESTED AND BASIS THEREFOR

### A.    The Court Should Convert the Debtor's Case to Chapter 7 Under § 1112(b) of the Bankruptcy Code

107.    Section 1112(b)(1) of the Bankruptcy Code provides, in relevant part, that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this

17

chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." 11 U.S.C.
§ 1112(b)(1).

108.    The language of section 1112(b)(1) is mandatory such that, if cause is found, the
Court must convert or dismiss the case unless unusual circumstances can be established that
demonstrate the conversion or dismissal is not in the best interests of the estate. 11 U.S.C.
§ 1112(b)(1) and (b)(2); *see In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011); *In re Acme
Cake Co., Inc.*, 495 B.R. 212, 222 (Bankr. E.D.N.Y. 2010). "Bankruptcy courts have broad
discretion in determining whether cause exists for conversion or dismissal under section 1112(b)."
*In re Red Bull Taxi Inc.*, 2017 Bankr. Lexis 1209 *5 (Bankr. S.D.N.Y. May 3, 2017) (citations
omitted).

109.    Section 1112(b)(4) lists examples of "cause," but it is well recognized that the list
contained in section 1112(b)(4) is "illustrative, not exhaustive." *C-TC 9th Ave. P'ship v. Norton
Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997) (holding that the court may
dismiss a chapter 11 filing on motion or *sua sponte* upon finding that the filing was in "bad faith,"
even without consideration of factors set forth in Section 1112(b)); *accord Babayoff*, 445 B.R. at
76. The statute reflects Congress' determination that a case should not be permitted to linger in
Chapter 11 when there are grounds for conversion. *See In re Ameribuild Const. Mgmt., Inc.*, 399
B.R. 129, 132 (S.D.N.Y. Bankr. 2009) (citing 7 *Collier on Bankruptcy*, ¶ 1112.04 (15th ed. rev.
2005)).

110.    Put simply, a bankruptcy petition will be found to have been filed in bad faith "if it
is clear that on the filing date there was no reasonable likelihood that the debtor intended to
reorganize and no reasonable probability that it would eventually emerge from bankruptcy
proceedings." *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931

F.2d 222, 227 (2d Cir. 1991). Courts consider multiple factors when determining whether a filing

was made in bad faith, including whether "the timing of the debtor's filing evidences an intent to

delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights" and

the debtor's cash flow. *See C-TC 9th Ave. P'ship*, 113 F.3d at1311; *In re Gen. Growth Props., Inc.*,

409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) (noting that "[t]he standard in this Circuit is that a

bankruptcy petition will be dismissed if *both* objective futility of the reorganization process *and*

subjective bad faith in filing the petition are found"); *Agra v. Dolci (In re Major Model Mgmt.)*,

Nos. 22-10169 (MG), 23-1135 (MG), 2023 Bankr. LEXIS 2037, at *18 (Bankr. S.D.N.Y. Aug.

18, 2023) (applying this standard in the Subchapter V context).

111.    The "objective futility" standard focuses on "whether a reorganization is

realistically possible." *In re 167 W. 133rd St. Hous. Dev. Fund Corp.*, 2018 Bankr. LEXIS 2909,

*23 (Bankr. S.D.N.Y. Sep. 25, 2018) (quoting *Carolin Corp. v. Miller (In re Carolin Corp.)*, 886

F.2d 693, 700 (4th Cir. 1989)). A debtor will fail to satisfy that standard "[p]articularly when there

is no realistic possibility of an effective reorganization . . .[.]" *In re 167 W. 133rd St. Hous. Dev.*

*Fund Corp.*, 2018 Bankr. LEXIS 2909, at *23.

112.    "The subjective bad faith standard is meant to ensure that the Debtor actually

intends to use chapter 11 to reorganize and rehabilitate itself and not simply to cause hardship or

delay to its creditors by invoking the automatic stay." *In re RCM Global Long Term Capital*

*Apprec'n Fund, LTD*, 200 B.R. 514, 522 (Bankr. S.D.N.Y. 1996).

113.    In *C-TC 9th Ave. P'ship*, the Second Circuit articulated a multi-factor test to

determine whether a chapter 11 case was filed in bad faith.  *C-TC 9th Ave. P'ship*, 113 F.3d at

1311. Factors indicative of a bad faith filing include, but are not limited to, whether:

> (1) The debtor has only one asset; (2) The debtor has few unsecured creditors whose
> claims are small in relation to those of the secured creditors; (3) The debtor's one

asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) The debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) The debtor has little or no cash flow; (7) The debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) The debtor has no employees.

*Id.* (the "*C-TC* Factors").

114.    "A court should not apply the *C-TC* factors mechanically or in isolation, and may choose to consider any one or all in its effort of analyzing the totality of the circumstances." *In re Neilson*, 2018 Bankr. LEXIS 4107, at *6-7 (Bankr. N.D.N.Y. Aug. 31, 2018) (citations omitted). The *C-TC* Factors should not be considered in isolation since "a determination of bad faith requires a full examination of all the circumstances of the case." *C-TC 9th Ave. P'ship*, 113 F.3d at 1312. In the final analysis, the Court has broad discretion in determining whether a movant has established bad faith. *See In re Hampton Hotel Inv'rs, L.P.,* 270 B.R. 346, 359 (Bankr. S.D.N.Y. 2001).

115.    In addition, "bankruptcy courts have frequently identified other factors that support a finding of cause, including where the debtor in possession has a conflict of interest in properly investigating and pursuing potential fraudulent transfer and other claims of the estate." *In re No Rust Rebar, Inc.*, 641 B.R. 412, 423 (Bankr. S.D. Fla. 2022) (citation omitted).

116.    Finally, the moving party bears the burden of establishing "cause" under § 1112(b). *See In re Adbrite Corp.*, 290 B.R. 209, 214 (Bankr. S.D.N.Y. 2003). Once the movant has met its burden, "a rebuttable presumption of bad faith arises and the burden shifts to the debtor to establish good and sufficient reasons why the relief should not be granted." *Squires Motel, LLC v. Gance (Squires Motel, LLC)*, 426 B.R. 29, 34 (Bankr. N.D.N.Y. 2010) (citation omitted). That is to say that the "debtor must demonstrate that unusual circumstances exist establishing that dismissal is

not in the best interests of creditors and the estate." *Id.* at 35 (*quoting* 11 U.S.C. §§ 1112(b)(1)-(2)).

117.    Here, this case should be converted to Chapter 7 as the Debtor has filed this case in bad faith and solely to protect property he fraudulently transferred prepetition to his life partner, property he continues to enjoy. To make matters worse, the Debtor stated that he does not intend to pursue avoidance and recovery of that property despite a District Court finding those transfers would "likely" be avoided.  The inescapable conclusion from these facts is that the Debtor did not have an honest intention to reorganize when he filed this case.  Moreover, the Debtor and his life partner have continued their pre-petition refusal and delay in providing discovery to which the Movants are entitled and the Court has ordered. Lastly, the Debtor has been less than forthcoming on his Petition, Schedules and SOFA and late in filing his monthly operating reports.

### 1.    The Court should convert the Debtor's Petition as a bad faith filing under § 1112(b)(4)(A) of the Bankruptcy Code

118.    The "bad faith" standard is meant to "insure that the Debtor actually intends to use chapter 11 to reorganize and rehabilitate itself and not simply to cause hardship or delay to its creditors by invoking the automatic stay." *In re RCM Global Long Term Capital Apprec'n Fund, LTD*, 200 B.R. at 522. While Courts typically apply the 8-factor test set forth in *C-TC* to assess bad faith under §1112(b)," [t]he present case, consisting of an individual debtor and a judgment creditor, does not lend itself to a rigid application of *C-TC*[.]" *In re Neilson*, 2018 Bankr. LEXIS 4107, at *7.  In any event, analysis of the *C-TC* factors here leads to the inescapable conclusion that the Debtor's petition was filed in bad faith as this case meets 7 of the 8 *C-TC* badges of bad faith.[2]

---

[2] Factor 3, whether a debtor's sole asset is the subject of a foreclosure, may be inapplicable here.  To be sure, however, the Debtor's assets and those he transferred fraudulently are restrained, actually more significant than them being "subject to a foreclosure."

a)    **Factors 1 and 9: Whether the debtor has only one asset, little or no cash flow, and no employees**

119.    As outlined above, as a result of his multiple fraudulent transfers, the Debtor purports to have only one tangible asset (i.e., the Southampton Property).  As an individual, he has no employees, and he claims to have been earning a minimal salary over the last two years. Accordingly, these factors decidedly support finding the Debtor's filing to have been effectuated in bad faith. *See, e.g., In re Neilson*, 2018 Bankr. LEXIS 4107, at *10 ("where a debtor has minimal income, a court may find that such a case was filed as a litigation tactic and not in an effort to reorganize"); *In re Encore Property Management of Western New York, LLC*, 585 B.R. 22, 30 (Bankr. W.D.N.Y. 2018) (dismissing a case for bad faith where the debtor had "no cash flow and no employees" and where it appeared like the debtor's "only business [was] to litigate with [the judgment creditor] . . ."); *In re D&G Constr. Dean Gonzalez, LLC*, 635 B.R. 232, 239 (Bankr. E.D.N.Y. 2021).

b)    **Factors 2 and 4: Whether the debtor has few unsecured creditors and whether the debtor's financial condition is, in essence, a two party dispute**

120.    This Court has found that "bad faith exists where the Debtor's reorganization essentially involves the resolution of a two-party dispute." *In re Lin*, 499 B.R. 430, 437 (Bankr. S.D.N.Y. 2013) (citations and quotations omitted) (emphasizing that a "debtor's bad faith was apparent from a filing motivated by or targeted at one sole creditor").

121.    As outlined above, the Schedules and Claims Register in this case indicate that the Debtor has only two unsecured creditors, and the filing was targeted at the Class Members. Other than the Class Members—whose claims total $6.7 million representing $97% of the unsecured debt—only one other creditor filed a claim for $187,000, or roughly 3% of total amount of the claims filed. (That other creditor does not appear to have been pursuing its claim which has existed

for approximately 15 years.) In this regard, this factor decidedly weighs in favor of conversion.

*See, e.g., In re 221-06 Merrick Blvd. Assocs. LLC*, No. 1-10-45657-jbr, 2010 Bankr. LEXIS 4431,

at *7 (Bankr. E.D.N.Y. Dec. 3, 2010) (finding bad faith factor under 1112(b) met where "Debtor

has few unsecured creditors claiming small amounts").

122.    Moreover, the sole admitted reason for the Debtor's filing is to stay the District

Court litigation and Movant's collection efforts.  Thus, this case is all about a two-party dispute.

*See Lin*, 499 B.R.at 437 (cause found where "Debtor's bankruptcy case [was] a two-party

dispute").

<blockquote>

**c)**    **Factor 5: Whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of a debtor's creditors to enforce their rights**

</blockquote>

123.    While "[t]he majority of the *C-TC* factors are objective, in that they can be gauged

by objective facts. . . . [The] fifth factor, touches on subjective intent — the debtors 'intent.'" *In*

*re Consol. Distribs.*, 2013 Bankr. LEXIS 3101, at *23 (Bankr. E.D.N.Y. July 23, 2013). Where

"the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary,

if not sole, purpose of the filings was a litigation tactic, the petition may be dismissed as not being

filed in good faith." *In re Artisanal 2015*, *LLC*, No. 17–12319 (JLG), 2017 Bankr. LEXIS 3813,

at *39 (Bankr. S.D.N.Y. Nov. 3, 2017) (citation omitted).

124.    A bankruptcy filing is made in bad faith if the petition was found to have been

filed solely to avoid the consequences of adverse state court litigation. *See  C-TC 9th Ave.*, 113

F.3d at 1310; *Sullivan v. Harnisch (In re Sullivan)*, 2014 Bankr. LEXIS 4985, at *31 (B.A.P. 9th

Cir. Dec. 9, 2014) ("Typical bad faith two-party dispute cases may involve delays on

the eve of trial").

125.     Here, the Debtor filed his case just after the Attachment Order was issued on his

life and work partner and on the eve of the Class Members' anticipated motions to avoid roughly

$10 million in cash and assets the Debtor transferred to her. To be sure, the Debtor continues to

enjoy and use all the assets he transferred.

126.     This case also was filed while an OSC as to why the District Court should not

hold the Debtor in civil contempt for willfully failing to comply with Plaintiffs' post-judgment

subpoenas was pending in the District Court.

127.     Indeed, the Debtor concedes that he filed for Chapter 11 relief on an "emergency

basis" to, among other things, stay the "aggressive collection efforts" of the Class Members

(although those efforts were not directed at him, but at the assets he fraudulently transferred to Ms.

Kalayjian).  Accordingly, the timing and nature of this case leave no doubt that the Debtor is simply

trying to stave off litigation and is thus "frustrat[ing] the legitimate efforts of the debtor's creditors

to enforce their rights." *See In re Dunes Hotel Assocs.*, 1997 Bankr. LEXIS 2482, at *54 (Bankr.

D.S.C. Sep. 26, 1997) ("It is an abuse of bankruptcy to use a Chapter 11 case primarily as

a litigation tactic"); *In re C-TC 9th Ave.*, 193 B.R. 650, 654 (Bankr. N.D.N.Y. 1995) ("Where the

primary purpose of the filing of a Chapter 11 case is as a litigation tactic, the petition may be

dismissed for lack of good faith."), *aff'd*, 196 B.R. 666 (N.D.N.Y. 1996), *aff'd*, 113 F.3d 1304 (2d

Cir. 1997); *See In re Purpura*, 170 B.R. 202, 207 (Bankr. E.D.N.Y. 1994) (dismissing for bad faith

where "the filing for relief represented a litigation tactic to stall and impede the enforcement of

legal rights against the debtor . . ."); *In re Wally Findlay Galleries, Inc.*, 36 B.R. 849, 851 (Bankr.

S.D.N.Y. 1984) ("The debtor filed its petition herein to avoid the consequences of adverse state

court decisions while it continues litigation. This court should not, and will not, act as a substitute

for a supersedeas bond of state court proceedings").

24

### d) Factors 6 and 7: Whether the debtor has little or no cash flow and cannot meet current expenses

128.    As outlined above, the information in the Debtor's MORs indicate that not only does he have little or no cash flow but he actually has a negative cash flow. Specifically, as outlined above, in his Schedules, the Debtor concealed certain debt, including his mortgage and real estate taxes; factoring those into his monthly expense schedule unequivocally establishes that he has a negative cash flow. Accordingly, these factors are easily met. *In re Neilson*, 2018 Bankr. LEXIS 4107, at *10 ("where a debtor has minimal income, a court may find that such a case was filed as a litigation tactic and not in an effort to reorganize"); *In re Encore Property Management of Western New York, LLC*, 585 B.R. 22, 30 (Bankr. W.D.N.Y. 2018) (finding bad faith where the debtor had "no cash flow and no employees" and where it seemed like the debtor's "only business [was] to litigate with [the judgment creditor] . . ."); *In re Artisanal 2015, LLC*, 2017 Bankr. LEXIS 3813, at *40-41 (finding bad faith where the Debtor had no cash flow and the only purpose of the bankruptcy filing was "a hope to relitigate a state court action").

### e) The totality of the circumstances supports a finding of bad faith

129.    The Debtor's bad faith is also apparent from the totality of the circumstances of this case as he has (1) misrepresented his assets and liabilities, (2) submitted a proposed Plan that is premised on a $500,000 payment in "settlement" of fraudulent transfer claims totaling in excess of $6.7 million, and (3) filed a Subchapter V case despite his own Schedules stating that he has more than $7.5 million in debt.

130.    The Debtor's proposed Plan is the epitome of bad faith. "[D]ebtors-in-possession have a fiduciary duty to maximize the value of the estate." *In re Reliant Energy Channelview LP*, 594 F.3d 200, 210 (3rd Cir. 2010). "Indeed, the willingness of courts to leave debtors in possession is premised upon an assurance that [they] can be depended upon to carry out the fiduciary

responsibilities of a trustee." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355, (1985) (internal quotation omitted). "A dereliction [of fiduciary duties] could subject the case to dismissal or conversion." *In re Fed. Roofing Co.*, 205 B.R. 638, 640 (Bankr. N.D. Ala. 1996) (citation omitted).  "The duty to protect and conserve estate property includes the duty to conduct impartial investigations and decide whether to pursue claims on behalf of the estate." *In re Sillerman*, 605 B.R. 631, 648 (Bankr. S.D.N.Y. 2019) (citation omitted).

131.    Here, the Debtor's failure to pursue avoidance actions against his life partner Ms. Kalayjian would cause the estate to forfeit more than $10 million in cash and assets. Taken alone, the Debtor's failure to investigate avoidance actions signals a breach of fiduciary duty sufficient to justify a finding of "cause." *Id.* (finding cause where, as here, debtor did not bring or even investigate any avoidance actions); *see also In re SRJ Enterprises, Inc.*, 151 B.R. 189, 194 (Bankr. N.D. Ill. 1993) (cause to appoint a trustee may exist when the debtor-in-possession fails to perform its fiduciary duty to bring a suit to recover a voidable preference); *In re Ancona*, No. 14-10532 (MKV), 2016 Bankr. LEXIS 4114, at *32 (Bankr. S.D.N.Y. Nov. 30, 2016) ("A court may consider both pre-and post-petition misconduct of the current management when making a determination of whether "cause" exists […]").

132.    The conflict of interest and failure to comply with fiduciary duties seen here are often a key component of cases supporting conversion. *See, e.g., 15375 Mem'l Corp. v. BEPCO, LP*, 589 F.3d 605, 624 (3d Cir. 2009) (finding cause where "the Debtors' representative was primarily concerned with protecting the [other entities], not the Debtors" and "mixed allegiances prevented him from adequately protecting the Debtors' interests"); *United States v. Scott Cable Communs., Inc. (In re Scott Cable Communs., Inc.)*, 2007 U.S. Dist. LEXIS 65514, at *8 (D. Conn. Sep. 6, 2007) ("Where a debtor-in possession has a conflict of interest or may have failed to fulfill

its fiduciary responsibility to the estate, conversion of a Chapter 11 case to Chapter 7 may be appropriate"); *In re Natrl Plants & Lands Mgmt. Co*., 68 B.R. 394, 396 (Bankr. S.D.N.Y. 1986) (converting case where there was "a question as to whether the debtor would be as impartially motivated to collect the amounts due from its affiliates and to determine whether or not preferential or otherwise avoidable transfers had been made to these affiliates").

133.    Here, and not surprisingly given the history of this matter, the Debtor is not pursuing the fraudulent conveyances he made to his life partner. In fact, in his Plan, the Debtor states outright and without any legal analysis that he "den[ies] that any transfers made to Kalajian [sic] are avoidable." Dkt. No. 51 at 7, 8.[3]

134.    This statement is astounding and smacks of bad faith in light of the fact that, as outlined above, a District Court already noted the "suspicious nature" of the Debtor's transfers to Ms. Kalayjian and issued a ruling that there was "a likelihood of success of proving Mr. Ghatanfard's actual and fraudulent intent to engage in these transfers to […] evade Judgment" which would lead to avoidance.

135.    To be sure, the conflict of interest presented here between the Debtor and Ms. Kalayjian runs deeper than the typical conflicts of interest presented before bankruptcy courts. Whereas in most other scenarios a debtor's conflict of interest is presented in their desire to protect someone else, here, the conflict is essentially between the Debtor and himself as he continues to enjoy the money and real property he transferred to Ms. Kalayjian.

---

[3] The Debtor who owns LCM and owns part of VATP is also (unsurprisingly) not pursuing claims against VATP in the related LCM bankruptcy case.

136.    Finally, the Debtor's bad faith is exhibited in his intentional abuse of the bankruptcy filing rules.  In order for a debtor to be eligible under Bankruptcy Code § 1182, a debtor's aggregate debt as of the petition date cannot exceed $7.5 million. 11 U.S.C. § 1182(1)(B).

137.    Here, the Debtor's Petition explicitly states that he owes *more than* $7.5 million in debt. Dkt. No. 1 at 32. Moreover, the Claims Register in this case lists proofs of claim totaling more than $9 million in debt. Accordingly, the Debtor's filing under Subchapter V should be converted because, by his own admission, his debt exceeds $7.5 million. *See, e.g., In re Carter*, No. 23-54816-JWC, 2023 Bankr. LEXIS 3060 (Bankr. N.D. Ga. Dec. 13, 2023).[4]

138.    Under the totality of the circumstances, this case was not filed and is not being pursued in good faith and the Court should find cause to convert. *See, e.g.,  Sillerman*, 605 B.R. at 648 (finding cause where, as here, the debtor "defiantly declared that he will not consider bringing any avoidance actions" the court found "cause" as it had "serious reservations regarding the Debtor's ability to administer the estate for the benefit of his creditors and to preserve and protect estate property"); *In re Brutsche*, 476 B.R. 298, 309 (Bankr. D.N.M. 2010) (finding "cause" under § 1112(b) where the court had serious doubts "about whether [d]ebtor would adequately investigate ... and pursue potential [fraudulent transfer] claims against his spouse"); In re Fisher, 2008 Bankr. LEXIS 1247, at *38 (Bankr. D. Mont. Apr. 15, 2008) (remarking that conversion was appropriate because "a Chapter 7 would ... no doubt, investigate [d]ebtors' alleged fraudulent conveyances").[5]

---

[4] While the date by which objections to the Subchapter V designation has passed, the Court has the authority, at any time, *sua* sponte to revoke the Subchapter V designation made by a debtor in its petition under the Bankruptcy Code. *See e.g., In re CYMA Cleaning Contractors Inc.*, No. 22-01377 (ESL), 2023 Bankr. LEXIS 2637 (*sua sponte* revoking Subchapter V designation after objections deadline expired) (Bankr. D.P.R. Oct. 27, 2023) (citing *In re National Small Business Alliances*, 642 B.R. 345 (Bankr. D.D.C. 2022)). As the Debtor, whose *own* Petition states he has more than $7.5 million in debt, clearly filed this Subchapter V in bad faith, the Court should convert the case.

[5] The Debtor's failure to pursue avoidance of the transfers to Ms. Kalayjian also constitutes a "gross mismanagement of the estate" and necessitating conversion for cause under § 1112(b)(4)(B). *See, e.g., In re 210 W. Liberty Holdings,*

**2.** **The Court should convert the Debtor's Petition as a bad faith filing under § 1112(b)(4)(A) of the Bankruptcy Code**

139.    Cause to convert this case to Chapter 7 exists under § 1112(b)(4)(A) because there is a continuing diminution of the estate and there is no reasonable likelihood of rehabilitation.

140.    In establishing cause under section 1112(b)(4)(A) of the Bankruptcy Code, a court must "first determine whether the estate is suffering substantial or continuing losses or diminution, before also deciding whether there is a reasonable likelihood of rehabilitation." *In re 347 Linden LLC*, Nos. 11–CV–1990 (KAM), 11–CV–2201 (KAM), 11–CV–2202 (KAM), 2011 U.S. Dist. LEXIS 78843, at *15 (E.D.N.Y. July 20, 2011) (internal quotations, alterations and citation omitted).

**a)** **The Debtor's Estate is Being Diminished**

141.    To show continuing loss or diminution of assets of the estate, "[a]ll that need be found is that the estate is suffering some diminution in value." *In re Kanterman*, 88 B.R. 26, 29 (Bankr. S.D.N.Y. 1988); *see also In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) ("[A] negative cash flow postpetition and an inability to pay current expenses satisfy the elements of §1112(b)(1)"(citations omitted)); *In re 3868-70 White Plains Road, Inc.*, 28 B.R. 515, 518 (Bankr. S.D.N.Y. 1983) (highlighting fact that "debtor's cash flow is insufficient to pay its current obligation on [its] first mortgage" which debtor had failed to pay during pendency of case, as grounds to dismiss under section 1112(b) of the Bankruptcy Code).

142.    Here, as outlined above, the Debtor's MORs indicate that the estate is experiencing a negative cash flow.

---

*LLC*, No. 08–677, 2009 Bankr. LEXIS 1706 (Bankr. N.D.W. Va. May 29, 2009) (finding cause under § 1112(b)(4)(B) where debtor failed to pursue assets of the estate).

143.    Moreover, though the Debtor's Schedules indicate he expects to have approximately $1,700 in net income, those calculations conceal the fact that he is on the hook for more than $12,000 in monthly mortgage, tax and insurance costs which he did not list in his Schedules.

144.    The estate is also being diminished because the Debtor has not (directly) received anything from VATP (or OGR) despite the fact that that restaurant reported more than $11 million in revenue in 2022. To be sure, since the time the Debtor formalized his share assignment in June 2022, VATP has repaid OGR at least $1.35 of its initial investment in VATP. Those repayments were paid into OGR's accounts and subsequently almost immediately removed, however, no portions of them were provided to the Debtor (who was subject to post-judgment restraining notice). The Class Members also do not know how much, if any, of VATP/OGR's profits the Debtor is entitled to as the true owner of OGR.

145.    Thus, with every passing day, the creditors risk that VATP repayments and/or profits to OGR are not being provided to the Debtor thereby diminishing the estate. Accordingly, the first prong of section 1112(b)(4)(A) of the Bankruptcy Code is easily met.[6]

**b)    There is no reasonable likelihood of rehabilitation**

146.    The second prong of section 1112(b)(4)(A) of the Bankruptcy Code requires an "absence of a reasonable likelihood of rehabilitation". 11 U.S.C. § 1112(b)(4)(A).

147.    In this context, "rehabilitation" is not synonymous with "reorganization" which may include liquidation.  Rather "rehabilitation means to put back in good condition and reestablish on a sound basis . . . It signifies that the debtor will be reestablished on a secured

---

[6] The Debtors January 2024 MOR has still not been filed which provides further cause for conversion under § 1112(b)(4)(F) ("unexcused failure to satisfy timely any filing or reporting requirement").

financial basis, which implies establishing a cash flow from which its current obligations can be met." *AdBrite Corp.*, 209 B.R. at 216 (citations omitted).

148.   Based on the record in this case and the filings before the Court, there is not a reasonable likelihood of rehabilitation.

149.   "The essential elements for Chapter 11 Subchapter V plan confirmation are set forth at 11 U.S.C. § 1191, which incorporates with modifications 11 U.S.C. § 1129(a)-(b)." *In re Fall Line Tree Serv.*, No. 20-21548-C-11, 2020 WL 7082416, at *2 (Bankr. E.D. Cal. 2020).

150.   Here, because Movants will reject the Plan, the Plan can be confirmed only if the Debtor can demonstrate that creditors would receive at least as much under the Plan as in a hypothetical chapter 7 liquidation.   11 U.S.C. §1129(a)(7)(A)(ii); *accord*, Plan at p. 9 (**LIQUIDATION ANALYSIS**: "To confirm the Plan, the Bankruptcy Court must find that all holders of Allowed Claims will receive at least as much under the Plan as they would receive in a Chapter 7 liquidation).   The Debtor will be unable to carry his burden of proving that the Plan passes this "best interests of creditors" test. *See In re Juarez*, 836 Fed. App'x 557, 560 (9th Cir. 2020) (outlining the test); *In re W.R. Grace & Co.*, 475 B.R. 34, 142 (Bankr. D. Del. 2012) ("the plan proponent bears the burden of proof to establish by a preponderance of the evidence that its plan is within the creditors' best interests").[7]

151.   That is because the liquidation analysis attached as Exhibit B to the Plan does not account for any of the fraudulent transfers the Debtor made to Ms. Kalayjian, the $40,000 loan receivable, and reimbursements and profits from OGR.

---

[7] There may be other reasons upon which to object to confirmation of the Plan and the Movant reserves all rights in this regard.  The Movant wanted to highlight the most egregious defect in this Motion.

152.    Bizarrely, the liquidation analysis in the Plan states that the Debtor's shares in OGR have "Little or no Value." However, that is obviously false as OGR owns 50% of VATP and VATP is "very profitable" business that declared more than $11 million in revenue in 2022.

153.    Even more inexplicably, in the liquidation analysis, the Debtor lists his interest in the Southampton Property as only $50,000. That is facially absurd. The Debtor's own appraisal of the property in 2021 indicates that it was evaluated at $3.7 million. The property, which the Debtor owns one-half and the other one-half is subject to the potential voidance action—has a mortgage of $2.12 million, meaning the property has roughly $1.58 million in equity. Accordingly, the Debtor's equity in the property is far in excess of $50,000.

### 3.    The Court should convert the Debtor's Petition as a bad faith filing under § 1112(b)(4)(E) For Failure to Comply with the Court's 2004 Order

154.    Under section 1112(b)(4)(E), a court may find cause to convert or dismiss for "failure to comply with an order of the court." 11 U.S.C. § 1112(b)(4)(E). *In re Dobson*, 2023 Bankr. LEXIS 2499, at *24 (Bankr. W.D. Va. Sep. 29, 2023).

155.    Here, the Debtor and his life and business partner are clearly disobeying this Court's 2004 Order and, in turn, are continuing to frustrate and delay the Movants' legitimate discovery efforts.  As a result, the Debtor's estate is incurring additional unnecessary administrative expenses and being unreasonably delayed in its administration. Consequently, cause exists under § 1112(b)(4) to convert this case.

### a)    This Case Should Be Converted To Chapter 7 Because It Is In The Best Interest Of The Creditors

156.    This case should be converted rather than dismissed.  As set forth above, one factor the Court must considering in determining whether to convert a case to Chapter 7 is whether to do so is in the "best interests" of creditors and the estate.  11 U.S.C. §1112(b)(1).

157.    Appointing a Chapter 7 trustee will be in the creditors' best interest as it will enable an independent fiduciary, as opposed to a conflicted and self-interested debtor in possession, to pursue avoidance of the Debtor's fraudulent transfers to Ms. Kalayjian for the benefit of the estate. *See Babayoff*, 445 B.R. at 82. "Value also may be created where, by converting the case, an orderly liquidation of the debtor's assets will occur and a prompt conclusion to the bankruptcy process may be anticipated." *Id.* Movant already has seen that dismissal of the case will not serve the best interests of creditors as the Debtor and Ms. Kalajian have no regard for the rights of creditors or judicial orders.

158.    While the Bankruptcy Code does not define "best interests" for the purpose of 11 U.S.C. § 1112(b), courts typically consider the following factors:

1. Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal.
2. Whether there would be a loss of rights granted in the case if it were dismissed rather than converted.
3. Whether the debtor would simply file a further case upon dismissal.
4. The ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors.
5. In assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise.
6. Whether any remaining issues would be better resolved outside the bankruptcy forum.
7. Whether the estate consists of a "single asset."
8. Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests.
9. Whether a plan has been confirmed and whether any property remains in the estate to be administered.
10. Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*In re BH S & B Holdings, LLC*, 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010) (*quoting* 7 *Collier on Bankruptcy* ¶ 1112.04[7] (Alan N. Resnick & Henry J. Sommer eds, 16th ed. 2013)); *see also In re Spenlinhauer*, 592 B.R. 1, 7 (D. Mass. 2018).

159.    Here, none of the factors favors dismissal over conversion. Given that the Debtor

has no intention of avoiding any of the transfers he made to Ms. Kalayjian and/or recovering the value

thereof for the benefit of creditors, it is imperative that a Chapter 7 trustee be appointed to do so. A

Chapter 7 trustee will investigate and prosecute the avoidance actions which will increase the value

of the estate and recovery to creditors.

160.    Additionally, a Chapter 7 trustee will liquidate and pursue the Debtor's other assets

in a prompt fashion, thereby ensuring that the Debtor's creditors can realize the true value of those

assets. *See, e.g., In re Halal 4 U LLC*, No. 08-15216 (MG), 2010 Bankr. LEXIS 3335, at *12

(Bankr. S.D.N.Y. Sep. 24, 2010) (converting a case to Chapter 7 where, as her, "the exact nature

of the Debtor's assets remains unknown, and [thus] it makes sense to appoint a trustee to examine

exactly what assets are available for creditor distribution").

161.    In short, and as described above, the Debtor's estate is diminishing in value and the

Debtor will not be able to rehabilitate by confirming a plan that comports with the applicable

provisions of the Bankruptcy Code.   Therefore, the Court should convert the case to Chapter 7 so

that an independent fiduciary can be appointed to corral and monetize the Debtor's assets and

pursue estate causes of action for the benefit of creditors. *See, e.g., In re Staff Inv. Co.*, 146 B.R.

256, 261 (Bankr. E.D. Cal. 1993) (reasoning the "prime criterion for assessing the interest of the

estate [when weighing dismissal or conversion] is the maximization of its value as an economic

enterprise").

*[Remainder of page intentionally left blank]*

## V.    CONCLUSION

162.    WHEREFORE, for all these reasons and authorities, the Court should grant the

Motion and such other relief as this Court deems just and appropriate under the circumstances.


Dated:       March 8, 2024
             New York, New York

                                            Respectfully submitted,

                                            MCGRAIL & BENSINGER LLP
                                            *Attorneys for Pavle Zivkovic and the Class Member*
                                            *Creditors*

                                            */s/ Ilana Volkov*
                                                    Ilana Volkov

                                            JOSEPH & KIRSCHENBAUM LLP
                                            *Attorneys for Pavle Zivkovic and the Class Member*
                                            *Creditors*

                                            */s/ Josef Nussbaum*
                                                    Josef Nussbaum