**MCGRAIL & BENSINGER LLP**
888-C 8th Avenue #107
New York, New York 10019
Telephone: (201) 931-6910
Ilana Volkov, Esq.
Veronique A. Urban, Esq.
Email: ivolkov@mcgrailbensinger.com
Email: vurban@mcgrailbensinger.com

**JOSEPH & KIRSCHENBAUM LLP**
D.Maimon Kirschenbaum
Josef Nussbaum
Lucas C. Buzzard
32 Broadway, Suite 601
New York, New York 10004
Tel: (212) 688-5640
maimon@jk-llp.com
jnussbaum@jk-llp.com
lucas@jk-llp.com

*Counsel to Pavle Zivkovic, on behalf of himself and others similarly situated*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>DAVOUD GHATANFARD a/k/a DAVID GHATANFARD,<br><br>Debtor. | Case No. 23-22840-shl<br><br>Chapter 11<br><br>Subchapter V |

**DECLARATION OF JOSEF NUSSBAUM IN SUPPORT
OF MOTION OF PAVLE ZIVKOVIC, ON BEHALF OF HIMSELF
AND OTHERS SIMILARLY SITUATED, FOR ENTRY OF AN ORDER
CONVERTING CASE TO CHAPTER 7 OF THE BANKRUPTCY CODE**

TO:   HONORABLE SEAN H. LANE
      United States Bankruptcy Judge

I, Josef Nussbaum, declare under penalty of perjury that the following is true and correct:

1.     I am a partner with Joseph & Kirschenbaum LLP, counsel for Pavle Zivkovic and

the class members described below. I submit this Declaration in support of Mr. Zivkovic's motion to convert this case to a Chapter 7 bankruptcy.

A. **The *Zivkovic v. Laura Christy LLC, et al.* Lawsuit**

2. In January 2017, Pavle Zivkovic filed a wage and hour class action against Laura Christy LLC, Laura Christy Midtown LLC and David Ghatanfard (collectively, the "Class Action Defendants") who collectively owned and operated two Manhattan restaurants called Valbella. The case was filed in United States District Court for the Southern District of New York (the "District Court") and is styled *Zivkovic v. Laura Christy LLC, et al.*, 17 CV 553 (S.D.N.Y.) (the "District Court Action").

3. In the District Court Action, Mr. Zivkovic alleged—on behalf of himself and putative class of all tipped employees at the two Valbella restaurants—that the Class Action Defendants violated various provisions of the Fair Labor Standards Act and New York Labor Law.

4. In the same lawsuit, Mr. Zivkovic also brought individual claims whereby he alleged that that LCM and Ghatanfard discriminated against him in violation of New York State and New York City law.

5. In November 2018, the case was certified as a class action on behalf of two subclasses of employees, including all tipped employees who worked for the Class Action Defendants at both Valbella restaurants between January 25, 2011 and November 30, 2018 (the "Class Members").

6. Trial in the District Court Action was held from March 30, 2022 to April 11, 2022, and ended in a jury verdict in favor of the Class Members and in favor of Mr. Zivkovic on his individual claims.

2

7. On June 22, 2022, the District Court entered judgment in favor of the Class Members against the Class Action Defendants in the amount of $5,092,017.85. The Court also entered judgment in the amount of $687,060 in favor of Mr. Zivkovic.

8. The Class Action Defendants filed a Fed. R. Civ. P. Rule 59 motion seeking a new trial. The District Court denied that motion with respect to the Class Members' claims but granted the motion, in part, with respect to Mr. Zivkovic's individual claims.

9. On July 5, 2023, the District Court thus entered a partial judgment in favor of the Class Members and against the Class Action Defendants in the amount of $5,092,017.85 (the "Class Judgment").

10. The Court Ordered a new trial on Mr. Zivkovic's individual claims. That trial has yet to take place.

11. The Class Judgment remains unpaid.

**B.    The Debtor's Fraudulent Conveyances to Rosey Kalayjian**

12. As set forth below, in their post-judgment collections efforts, the Class Members discovered that the Debtor rendered himself insolvent by selling, transferring and/or encumbering his real property, liquidating and/or transferring his ownership shares in several LLCs, and transferring the resulting liquid assets to his life partner, Ms. Kalayjian.

13. Ms. Kalayjian is the Debtor's "life partner." They have "lived and worked together for approximately 20 years." Ex. A at 2. Ms. Kalayjian has worked in four restaurants partially owned by the Debtor. *Id.* at 7-12.

14. Ms. Kalayjian and the Debtor currently live together, splitting their time between two residences – a rented apartment in Yonkers and a home in Southampton, New York (the "Southampton Property"). *Id.* at 4.

3

15.     Ms. Kalayjian and the Debtor share a joint checking account. *See generally*, *Id*.

16.     In their collections efforts, the Class Members discovered that from September 2020 to June 2022, the Debtor transferred to Ms. Kalayjian the following cash amounts (the "Transferred Cash Amounts") without consideration: (1) $1.2 million from the sale of a home that was owned solely by the Debtor; (2) $675,000 the Debtor received from Laura Christy Midtown LLC (an affiliated Chapter 11 debtor under Case No. 23-22845); (3) $600,000 the Debtor received from the sale of another restaurant he owned called One if by Land; and (4) $1.4 million the Debtor received from the refinance of a home he solely owned in Southampton, New York (the "Southampton Property").

17.     The Class Members also discovered that, in May 2022, the Debtor recorded a deed transferring title to the Southampton Property from his sole ownership to a joint tenancy with right of survivorship with Ms. Kalayjian. Ex. B.

18.     Finally, the Class Members discovered that, on June 16, 2022 (approximately two months *after* the jury verdict in District Court Action and days before the entry of the Class Judgment), the Debtor transferred 90% of his ownership in a company called Oak Grove Road LLC ("OGR") to Ms. Kalayjian (the "OGR Assignment"). OGR owns a 50% stake in a restaurant called Valbella at the Park ("VATP") located in Manhattan, which the Class Action Plaintiffs allege is the alter ego of Laura Christy Midtown LLC (an affiliated debtor). Ex. C at 15-16.

19.     Before the OGR Assignment, the Debtor had deposited $1.85 million into an OGR bank account in 2021 and 2022. Ex. D.  OGR transferred those funds to VATP as purported startup capital.

4

20. VATP commenced operating in March 2022. VATP has repaid to OGR at least $1.35 million of the $1.85 million startup capital (the "OGR Repayments"). It is unknown whether OGR, in turn, reimbursed the Debtor for the funds he provided to OGR.

21. In addition, VATP reported over $11 million in gross sales and over $8 million in gross profit in 2022 and Ms. Kalayjian's counsel in the District Court Action represented that it is "a very profitable restaurant." Exs. E, F.

C. **The District Court's Orders of Attachment**

22. On July 5, 2023, the District Court issued a temporary restraining order ("TRO") against Ms. Kalayjian: (A) temporarily restraining her from transferring, dissipating, or otherwise encumbering, without prior District Court approval: (1) funds or other assets without prior Court approval, except for ordinary course transactions for living expenses that, in any event, shall not exceed $10,000 per transaction; (2) her ownership interest in OGR; and (3) her ownership interest in the Southampton Property, and (B) setting a date for a hearing on whether Ms. Kalayjian should have her assets attached (the "Attachment Hearing"). Ex. G.

23. After several postponements, the Attachment Hearing was held on October 25, 2023. At the Attachment Hearing, the District Court granted the Class Members' motion for an attachment against Ms. Kalayjian and extended the terms of the TRO (the "Attachment Order").

24. In making its findings, the District Court noted the "suspicious nature of this flurry of activity that occurred between 2020 to early 2022, as Mr. Ghatanfard confronted the underlying litigation." The District Court held that the Class Members had "shown a likelihood of success of proving Mr. Ghatanfard's actual and fraudulent intent to engage in these transfers to Ms. Kalayjian to evade Judgment." Ex. H at 69, 65.

5

25. Significantly, the District Court also found that the Debtor still lives in the Southampton Property to which he had added Ms. Kalayjian to the title and that he enjoys use of the money he transferred to Ms. Kalayjian as "he uses Ms. Kalayjian's credit card for personal expenses." *Id*. at 71.

26. After granting the motion for an attachment, and in anticipation of the Class Members' contemplated motion to void the transfers from the Debtor to Ms. Kalayjian, the District Court ordered counsel for the Class Members and Ms. Kalayjian to meet and confer about the scope of discovery the Class Members believed to be necessary to effectuate attachment and/or seek avoidance. *Id*. Counsel for the Class Members and Ms. Kalayjian met and conferred several times about the scope of discovery and, after reaching an impasse, asked the District Court for a conference. The District Court scheduled the conference for November 14, 2023.

27. The day before that conference, on November 13, 2023 (the "Petition Date"), the Debtor filed this bankruptcy case under Subchapter V of Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code"), thus staying all collections efforts in the District Court Action.

28. In support of his filing of the Petition, the Debtor submitted an affirmation pursuant to Local Bankruptcy Rule 1007-c. *See* Dkt. No. 4.

29. In that affirmation, the Debtor states that he "filed for Chapter 11 relief on an emergency basis to, among other things, stay the aggressive collection efforts of the plaintiff in the Class Action. Such efforts have interfered with my ability to earn a living and threatened the viability of my business interests." *Id*. at 2.

30. As outlined below, however, at the time the Debtor filed this case, there were no active collections efforts against him. The Class Members' only collections efforts were taking place against Ms. Kalayjian and VATP.

6

**D.    The Debtor Was Facing a Motion to be Held in Contempt in the District Court**

31. After the Court entered the Class Judgment, in August 2022, the Class Members served a restraining notice pursuant to CPLR § 5222 on the Debtor.

32. The Class Members also served discovery demands, including an information subpoena and subpoena duces tecum, on the Debtor.

33. The Debtor provided incomplete and inaccurate answers to the information subpoena and ignored the subpoena duces tecum.

34. In August 2023, the District Court issued an Order to Show ("OSC") as to why the Debtor should not be held in civil contempt for failing to respond to Plaintiffs' document subpoena and for providing false responses to Plaintiffs' information subpoena. Ex. X.

35. The hearing on that OSC was delayed due to the Debtor's counsel's alleged illness and was pending at the time the Debtor filed his bankruptcy Petition.

**E.    The Debtor Misstated and Concealed Assets and Debts in His Petition**

36. In Schedule A/B of the Petition, the Debtor lists the Southampton Property as having a value of $2.5 million. Dkt. No. 32 at 3.  The Debtor has not been able to substantiate that valuation.

37. Specifically, in January 2024, this Court authorized the Class Members to serve discovery demands on the Debtor. In those requests, the Class Members ask the Debtor to provide all documents upon which he relied to set forth a $2.5 million valuation for the Southampton Property. The Debtor formally responded that he has no responsive documents to that request. Ex. J at 6.

38. The Debtor's representation in his Schedules contradicts the appraisal of the Southampton Property that the Debtor *himself* used in his application to refinance that property.

7

Specifically, in post-judgment discovery, the Class Members received the Debtor's application to refinance the Southampton Property in early 2022. In that application, the property was appraised at $3.7 million. Ex. K. (In fact, according to one online realtor web site, the property is currently estimated to be worth nearly $4.3 million. *See* https://www.redfin.com/NY/Southampton/56-Oak-Grove-Rd-11968/home/21317955 accessed on March 4, 2024).

39. Moreover, in his Schedules, the Debtor also understated the amount of debt he has by concealing the fact that he is the only individual responsible for the mortgage on the Southampton Property.

40. Specifically, in Schedule J, the Debtor lists $5,500 in expenses under rental or home ownership expenses for his residence. At the 341(a) Meeting in this case, the Debtor testified that the $5,500 expense covered the rent at a property he also lives at in Yonkers, NY (the "Yonkers Apartment"). In other words, the Debtor did not list his monthly mortgage liability for the Southampton Property at all in his Schedules.

41. Based on a mortgage statement the Debtor produced to Movant, the monthly mortgage and tax obligation appears to be $12,350.45. Ex. L.

42. In addition, while the Debtor stated in his Schedules that he pays a $125 a month renters insurance policy for the Yonkers Apartment, he failed to state that he has a homeowners insurance policy for the Southampton Property that costs him $5,515 annually (or $459 per month). *Compare* Line 4b of Schedule J *with* Ex. M.

43. Accordingly, the Debtor has at least another $12,800 in monthly liabilities that he failed to list in his Schedules.

8

44.     To be sure, the Debtor listed his income in Schedule I as $10,954 and his monthly expenses as $9,170, for a monthly net income of $1,784, *i.e.*, far too little to cover his mortgage and homeowners' insurance policy.

45.     The insurance policy on the Southampton Property includes coverage of up to $976,00 for "Personal Property." *Id*. However, in his Schedules, the Debtor lists only $42,500 in cash and property and, other than cash and a vehicle, the Debtor list only $3,500 in personal and household items. Dkt. No. 32 at 1, 3-7.

46.     The Debtor also failed to include his ownership interest in OGR in Section 27 of the Statement of Financial Affairs ("SOFA"). *See* Dkt. No. 32 at 27.

47.     Moreover, in his SOFA, the Debtor also conceals that he assigned 90% of his shares in OGR to Ms. Kalayjian. *Id*. at 25 (Section 18).

48.     In discovery, the Debtor produced an Assignment and Assumption of Membership Interest agreement between the Debtor and Ms. Kalayjian dated June 16, 2022, *i.e.*, less than two years before the Petition Date. Ex. C. That agreement memorializes the Debtor's assignment of 90% of his shares in OGR to Ms. Kalayjian.

49.     For avoidance of doubt, in its Attachment Order, the District Court also found that the assignment took place in June 2022. Ex. H at 74 ("It is also particularly relevant here that the assignment of the 90% interest to Ms. Kalayjian occurred after a jury verdict was rendered in this case, with a sizeable amount against Mr. Ghatanfard").

50.     Finally, the Debtor appears to have loaned $40,000 in December 2022 from an account he holds at Connecticut Community Bank ("CCB"). Ex. N. This loan does not appear in the Debtor's Schedules.

9

51. The Debtor also fails to state whether he is owed $1.8 million from OCR and if he is entitled to profit sharing from that entity.

**F.    2004 Discovery**

52. On January 29, 2024, the Court entered an Order for the production of documents by, and authorized oral examination of, the Debtor and Ms. Kalayjian pursuant to Fed. R. Bankr. P. 2004 (the "2004 Order"). Dkt. No. 50.

53. In the 2004 Order, the Court instructed the Debtor and Ms. Kalayjian to provide all responsive documents to the list of requests listed in Exhibits A and B of the 2004 Order on a rolling basis, to be completed within 21 days, or by February 20, 2024. *Id*. at 1-2.

54. The 2004 Order further required that the Debtor and Ms. Kalayjian appear for depositions by March 5, 2024. *Id*. at 2.

55. As set forth below, both the Debtor and Ms. Kalayjian are flouting this Court's 2004 Order by (a) failing to produce all responsive documents by the February 20th deadline, and (b) not appearing for depositions by March 5, 2024 since they claim they are still in the process of gathering documents.

56. Movant served deficiency letters on Ms. Kalayjian's counsel on February 26, 2024 and on the Debtor's counsel on February 27, 2024. *See* Exs. O and P.

57. In a good faith effort to resolve the defective production, counsel for the Movant, Ms. Kalayjian and the Debtor held a meet and confer on February 27, 2024.

58. Despite the meet and confer, the Debtor's and Ms. Kalayjian's productions remain incomplete.

59. As an example, the Debtor has still not produced his tax returns for 2021.

10

60. The Debtor has also not produced bank statements for 2023 and 2024 for a checking account he holds at Bank of America ("BOA").

61. Movant also asked the Debtor to produce documents concerning the transfer of his interest in the Oak Grove Property to Ms. Kalayjian, including information about any alleged consideration he received in exchange for the transfer. In response, the Debtor produced only a copy of the deed transferring title to Ms. Kalayjian and has stated that they are still searching for additional records.

62. In terms of Ms. Kalayjian, Movant asked her to identify personal and investment accounts and produce records for those accounts from September 2020 to the present.

63. In response, Ms. Kalayjian produced only statements from September 2020 to December 2023 for an individual Citibank account she has held, two quarterly statements for a Charles Schwab account, and statements for an LLC account for September 2023 to February 2024.

64. Ms. Kalayjian did not produce any bank statements for VATP or OGR despite acknowledging that she has authority over those accounts.

65. Ms. Kalayjian served formal responses and objections to the demands in the 2004 Order. *See* Ex. Q.

66. In those responses, Ms. Kalayjian improperly objects to providing banking records for all accounts she owns and/or has control over on numerous grounds, including, for example, that such requests "seek[] documents that have no conceivable connection to the debtor's estate," are "designed to harass and burden" her, and that they seek information "that [has] no connection with the Debtor's affairs." *Id*. at 4-5. This objection contravenes the 2004 Order and the Court's findings supporting it. Moreover, it defies the facts that she and the Debtor are life partners, she

11

is supposedly funding his plan of reorganization, and she received numerous avoidance transfers.

67. To be sure, in the Attachment Order, the District Court found that, between 2020 and 2022, the Debtor had transferred nearly $4 million in cash to Ms. Kalayjian in multiple transactions. *See generally*, Ex. H.

68. Despite this clear finding, Ms. Kalayjian has not produced any documents showing the accounts to which any of those funds were transferred.

69. While Ms. Kalayjian provided a bank statement which shows that $2.6 million was deposited in a business account in September 2023, there is no evidence of what the source of those funds are and, more generally, she has not provided any evidence of where any of the transactions that the District Court found to be "likely" voidable were deposited and/or transferred since their initial withdrawal by Ms. Kalayjian.

70. Ms. Kalayjian has also not provided any documents indicating where any of the OGR Repayments have been deposited.

71. Finally, despite the 2004 Order, neither the Debtor nor Ms. Kalayjian have been deposed.

72. Counsel for Movant contacted counsel for the Debtor and Ms. Kalayjian on multiple occasions to try and schedule the depositions in accordance with the 2004 Order.

73. Ms. Kalayjian's counsel simply ignored all Movant's requests to schedule the deposition.

74. On February 20, 2024, the Debtor's counsel finally offered March 4, 2024 as a deposition date. However, during the Parties meet and confer on February 27, 2024, Debtor's counsel indicated that her client was unavailable then. In any event, a deposition before all documents have been produced would be futile.

### G. The Debtor and Ms. Kalayjian Disobey the Restraining Notice and Orders of Attachment

75. Despite having been served with a restraining notice in August 2022, the Debtor appears to have loaned $40,000 in December 2022 from an account he holds at Connecticut Community Bank ("CCB"). Ex. N.

76. To be sure, in the Debtor's responses to the Class Members' post-judgment information subpoena for which the District Court issued an OSC as why the Debtor should not be held in contempt for false swearing, the Debtor failed to identify the Connecticut Community Bank account despite his requirement to do in response to the subpoena. Accordingly, the Class Members were unable to restrain that account and ensure that transfer did not take place.

77. In any event, the fact that the account was not restrained does not absolve the Debtor from disobeying the restraining notice that was served on him.

78. Ms. Kalayjian also appears to have violated the District Court's July 2023 TRO and October 2023 Attachment Order.

79. Specifically, on September 10, 2023, Ms. Kalayjian issued a personal check payable to "Mr. & Mrs. John Castellana" in the amount of $500. The "Memo" section of the check appears to state: "Congratulations." Ex. R at 4.

80. On October 9, 2023, Ms. Kalayjian issued a personal check payable to "Southampton Volunteer Ambulance" in the amount of $200. The "Memo" section of the check appears to state: "Donation." *Id*.

81. Ms. Kalayjian also issued another check that same date payable to "North Sea Fire Department" in the amount of $200. The "Memo" section of the check appears to state: "2023 Donation." *Id*. at 7.

13

82. None of these transactions are "ordinary course transactions for living expenses" that are permitted to Ms. Kalayjian under the terms of the TRO and Attachment Order, and Ms. Kalayjian did not receive Court approval prior to making any of these transactions.

83. Significantly, Movant does not have all of the Debtor's and Ms. Kalayjian's bank and credit card records. Accordingly, there may be additional examples of the Debtor and/or Ms. Kalayjian flagrantly disregarding restraining orders which Movant has not been able to discover yet.

### H. The Debtor's Monthly Operating Reports

84. The Debtor filed monthly operating reports ("MOR"s) for November and December 2023. Dkt. Nos. 46, 47. The Debtor has failed to file his January MOR.

85. The MORS include bank statements for the Debtor's BOA and CCB accounts.

86. The MORS do not include bank statements for the joint account the Debtor holds with Ms. Kalayjian at Patriot Bank.

87. In the November MOR, the Debtor's CCB account statement shows an opening balance of $16,040.40 and a closing balance of 1,040.40.

88. In that same report, the Debtor's BOA account statement shows an opening balance of $28,125.80 and a closing balance of 24,704.41.

89. In the December MOR, the Debtor's CCB account statement shows an opening and closing balance of $1,040.40.

90. In that same report, the Debtor's BOA account statement shows an opening balance of $24,704.41 and a closing balance of $21,144.54.

91. In other words, the Debtor has a negative cash flow.

14

**I.  The Creditors**

92.   Three creditors filed proofs of claim in this case. *See* Claims Register.

93.   The Debtor's mortgage company, Select Portfolio Services, filed a claim for $2,120,975.90.

94.   A judgment-creditor from a 2009 judgment against the Debtor filed a claim for $187,375.05.

95.   The Movant filed claims totaling $6,706,267.38.

96.   Accordingly, the total amount of debt in this case is $9,014,618.33 and the Movant's claims represent more than 97% of the unsecured debt in this case.

**J.  The Debtor's Proposed Plan**

97.   On February 12, 2024, the Debtor filed a proposed plan of reorganizing (the "Plan"). Dkt. No. 51.

98.   In the Plan, the Debtor states that he would settle the Chapter 5 causes of action against Ms. Kalayjian for $500,000 in order to fund the Plan.

99.   The Debtor provides no information as to how (and even whether) he evaluated the fraudulent transfer claims and how he arrived at the proposed settlement amount. Instead, the Debtor simply states "Kalajian [sic] and the Debtor deny that any transfers made to Kalajian [sic] are avoidable. *Id*. at 7.

100.   To be sure, the voidable transfers include nearly (1) $4 million in cash, (2) a 50% ownership stake in a restaurant that had at least $11 in annual sales in 2022, and (3) equity of more than $775,000 in the Southampton Property.[1]

---

[1] The true valuation of the Southampton Property is at least $3.7 million and it has a mortgage of less than $2.15 million. Thus, the property has approximately $1.55 million in equity, half of which Mr. Ghatanfard (fraudulently) transferred to Ms. Kalayjian on the eve of trial.

15

101. Finally, in the liquidation analysis in the Plan, the Debtor claims his 10% Interest in OGR (which has a 50% interest in VATP) has "Little or no Value" and "cannot be monetized to fund a plan." *Id*. at 23. The Plan provides absolutely no basis for these naked assertions. As outlined above, VATP—which only operated for about three-quarters of 2022—had more than $11 in sales in that year and considers itself to be a "very profitable" business.

102. In fact, Ms. Kalyjian's (former) counsel in the District Court Action represented to the Court that VATP is a "very profitable restaurant." Ex. F. at 4.

103. VATP has already paid off $1.35 million of OGR's $1.85 million investment within the ten months of operating.

104. Finally, in the liquidation analysis, the Debtor claims his interest in the Southampton Property is only $50,000. Dkt. No. 51 at 23.

105. The Debtor fails to include other assets of the estate which can be pursued and recovered/monetized for the benefit of creditors: Chapter 5 avoidance actions, loan repayments, and profit sharing from OGR.

K. **Exhibits**

106. Attached hereto as Exhibit A is a true and correct copy of the Declaration of Rosey Kalayjian in Opposition to Plaintiffs' Motion For Attachment filed by Ms. Kalayjian in the District Court Action at Dkt. No. 471.

107. Attached hereto as Exhibit B is a true and correct copy of a deed which purports to memorialize the Debtor changing title to the Southampton Property from a sole ownership to a joint tenancy with right of survivorship with Ms. Kalayjian which was produced by the Debtor.

16

108. Attached hereto as Exhibit C is a true and correct copy of an Assignment and Assumption of Membership Interest agreement between the Debtor and Ms. Kalayjian dated June 16, 2022 relating to OGR.

109. Attached hereto as Exhibit D is a true and correct copy of the First Amendment to the Operating Agreement of Oak Grove Road LLC dated June 16, 2022 which was produced by the Debtor.

110. Attached hereto as Exhibit E is a true and correct copy of a document that purports to be VATP's 2022 tax return which was produced by the Debtor in this case.

111. Attached hereto as Exhibit F is a true and correct copy of a letter filed by Ms. Kalayjian's (former) counsel in the District Court Action. Dkt. No. 530 in the District Court Action.

112. Attached hereto as Exhibit G is a true and correct copy of the TRO entered by the District Court on July 5, 2023. Dkt. No. 438 in the District Court Action.

113. Attached hereto as Exhibit H is a true and correct copy of transcript of the Attachment Hearing before the District Court on October 25, 2023.

114. Attached hereto as Exhibit I is a true and correct copy of the District Court's Order to show cause as to why the Debtor should not be held in civil contempt. Dkt. No. 459 in the District Court Action.

115. Attached hereto as Exhibit J is a true and correct copy of the Debtor's Response to First Request for Production of Documents of Certain Shareholders dated March 1, 2024.

116. Attached hereto as Exhibit K is a true and correct copy of the cover page of an appraisal the for the Southampton Property dated December 4, 2021.

117. Attached hereto as Exhibit L is a true and correct copy of mortgage statement for the Southampton Property dated June 14, 2023 which was produced by the Debtor in this case.

118. Attached hereto as Exhibit M is a true and correct copy of an insurance policy for the Southampton Property dated June 14, 2023 which was produced by the Debtor in this case.

119. Attached hereto as Exhibit N is a true and correct copy of a December 2022 bank statement produced by the Debtor for an account he holds at CCB.

120. Attached hereto as Exhibit O is a true and correct copy of a February 26, 2024 deficiency served by the Movant on Ms. Kalayjian.

121. Attached hereto as Exhibit P is a true and correct copy of a February 27, 2024 deficiency served by the Movant on the Debtor.

122. Attached hereto as Exhibit Q is a true and correct copy of Rosey Kalayjian's Supplemental Responses and Objections to Zivkovic's Rule 2004 Demands dated March 1, 2024.

123. Attached hereto as Exhibit R are a true and correct copy of October 2023 and November 2023 statements for the joint account held by the Debtor and Ms. Kalayjian which were produced by the Debtor in this case.

Dated: March 8, 2024

**JOSEPH & KIRSCHENBAUM LLP**

By: /s/ *Josef Nussbaum*
Josef Nussbaum
32 Broadway, Suite 601
New York, NY 10004
212-688-5640