# EXHIBIT H

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   PAVLE ZIVKOVIC, *et al.*,

4                   Plaintiffs,

5           v.                              17 CV 553 (GHW)

6   LAURA CHRISTY LLC, doing
    business as Valbella, *et al.*,
7
                    Defendants.            Hearing
8   ------------------------------x
                                           New York, N.Y.
9                                          October 25, 2023
                                           10:15 a.m.
10
    Before:
11
                        HON. GREGORY H. WOODS,
12
                                           District Judge
13

14                      APPEARANCES

15  JOSEPH & KIRSCHENBAUM LLP
        Attorneys for Plaintiffs
16  BY:  D. MAIMON KIRSCHENBAUM
        LUCAS BUZZARD
17
18  BAKER & HOSTETLER LLP
        Attorneys for Interested Party Rosey Kalayjian
    BY:  MAXIMILLIAN S. SHIFRIN
19      MICHAEL S. GORDON

20

21

22

23

24

25

```
 1              (Case called)

 2              MR. KIRSCHENBAUM:  Good morning, your Honor, Maimon

 3   Kirschenbaum and Lucas Buzzard for plaintiff.

 4              THE COURT:  Good.  Thank you very much.  Good morning.

 5              MR. SHIFRIN:  Good morning, Max Shifrin and Michael

 6   Gordon for Ms. Kalayjian.

 7              THE COURT:  Thank you very much.  Good morning.

 8              First, thank you all for being here.  We are here for

 9   a hearing with respect to the plaintiffs' application for an

10   order of attachment as to the assets of Ms. Kalayjian.

11              Counsel, thank you for the written submissions in

12   connection with this application.  I have reviewed them.

13              Before we proceed, let me just ask counsel, does

14   either side wish to or expect to present any evidence to the

15   Court in connection with this application beyond the materials

16   that have been submitted in writing in connection with your

17   briefing of the matter?

18              Counsel, first, for plaintiff.

19              MR. KIRSCHENBAUM:  Not for plaintiff, your Honor.

20              THE COURT:  Thank you.

21              Counsel for Ms. Kalayjian.

22              MR. SHIFRIN:  No, your Honor.

23              THE COURT:  Thank you very much.

24              I have reviewed the materials that the parties have

25   submitted.  I have some questions for you, counsel.  If there
```

1   is anything that either side would like to add to your written

2   submissions to the Court, however, I'm happy to hear from you.

3   As I say, I have reviewed the written submissions to date.

4   Still, if there is anything that you'd like to highlight before

5   I ask you a handful of questions, I'm happy to hear from you.

6          Let me start, if I can, first, with counsel for the

7   plaintiff.

8          Is there anything that you would like to add?

9          MR. KIRSCHENBAUM:  Your Honor, a couple of quick

10   points without making the full presentation, because it sounds

11   like your Honor has questions lined up.

12          Obviously, there are three statutes here at play.  For

13   all of them I think one of the important questions is -- one of

14   the important recognitions is we are not talking about, was

15   there consideration, like is there consideration for a

16   contract.

17          The question is, for each of them, was there

18   reasonably equivalent value, and for each of the transactions

19   there is not a shred of evidence that either there was value

20   that was taken into account or that the -- not that there was

21   an antecedent debt that David owed Rosey any money.  There is

22   no record of that.  There is no evidence of that.  There is

23   certainly no evidence that any of the many transfers in

24   question were to satisfy any kind of antecedent debt.  There is

25   plenty of case law that hold defendant -- that would hold the

1    transferee to that kind of standard.

2         I think it's also an important recognition that this

3    is not a punishment to the transferee for receiving these

4    things.  It's simply the protection of the creditors who had a

5    right to this money and have now had it all dissipated.

6         Another important point is, the issue of joint

7    tenancy.  I am not sure where the Kalayjian party is, what they

8    are trying to argue.  I think that the law is clear that joint

9    tenancy means that while they both have access to the funds,

10   the creditors can levy an entirely joint account.  The relevant

11   analysis here is before the money went into the joint account,

12   it was collectible by a plaintiff.  After the money went into

13   the joint account, it was collectible by plaintiff.  After the

14   money left the joint account, it was not collectible -- it is

15   not collectible by plaintiff unless this levy is issued.

16        Another important theme, and I could go through this

17   in more detail, but I am sure your Honor is familiar with this,

18   is the total contradictions between Ms. Kalayjian's testimony

19   at her deposition, at times not even knowing what these

20   transfers were about, and at other times having a completely

21   full picture of what the transactions were based on.

22        Oak Grove Road.  The shares in Oak Grove Road is a

23   great example.  At times she said she owned the whole 90

24   percent.  At other times she said she was promised 66.  In her

25   deposition she said the 66 recitation in the amendment was a

1    mistake.  It's all over the place.

2        Then, to make things even worse and possibly even most

3    significantly, is David Ghatanfard's story totally doesn't line

4    up with her story at all.

5        I think those are our main points.  I'm happy to

6    address that specifically, if your Honor wants, or to answer

7    whatever questions your Honor has ready for me.

8        THE COURT:  Thank you.

9        Let me turn to counsel for Ms. Kalayjian.

10        Counsel, is there anything that you'd like to add to

11    your written submissions or focus on, or is there anything that

12    you would like to say in response to counsel for plaintiffs'

13    remarks?

14        MR. SHIFRIN:  Thank you, your Honor.

15        I am certainly prepared to address the Court's

16    questions and to talk about the issues and the transfers in

17    detail.  This is, after all, a transfer-by-transfer analysis.

18        But what I'd like to do at the moment, if I may, just

19    to take a minute and step back and look at this motion

20    holistically.  I do not mean to besmirch opposing counsel when

21    I say this, but I do think that there is a certain callousness

22    to this motion.  There is a certain scorched-earth nature to

23    it.  There is an indifference to the last 20 years of Rosey

24    Kalayjian's life, which she has submitted to the Court in

25    painstaking, highly personal detail.

1          Plaintiffs are going after virtually every asset Rosey

2   has, liquid and illiquid alike, without regard to any of the

3   context that establishes her rights to those assets without any

4   regard to her life.

5          What are we talking about here, your Honor?  We are

6   talking about Rosey's rights to two of the homes that she has

7   poured her life into over nearly two decades, homes that she

8   has paid for, homes that were hers, homes that she has improved

9   dramatically over many years.  Plaintiffs want to take that

10  from her.  We are talking about Rosey's livelihood, her

11  interests in a restaurant that she envisioned, spearheaded,

12  invested in, developed, and for which she serves as the

13  director of operations.  Plaintiffs want to take that from her

14  as well.

15         What else are we talking about?  We are talking about

16  the proceeds of a sale of a business that she herself ran and

17  operated without any help from Mr. Ghatanfard.  Plaintiffs want

18  to take that income from her as well.

19         Your Honor, I get it.  Plaintiffs are judgment

20  creditors.  Judgment creditors have rights.  But Rosey isn't a

21  judgment debtor.  Rosey Kalayjian isn't David Ghatanfard.  She

22  has her own identity, she has her own history, she has earned

23  her own keep, and she has her own rights.  And implicit in

24  plaintiffs' motion is that Rosey isn't her own person, that she

25  doesn't have her own rights, that she is just David, that

1   everything that she has is David's.  That's at odds with

2   reality, that's at odds with the evidence, it's at odds with

3   the law.  Plaintiffs' inability in three briefs, your Honor, to

4   meaningfully address the substance of Rosey's argument, to

5   meaningfully rebut the evidence Rosey offered spanning two

6   decades of her professional and personal life proves the point.

7          Now, as I said at the outset, your Honor, at the end

8   of the day the disposition of plaintiffs' motion requires a

9   transfer-by-transfer analysis.  They need to show a probability

10  of success on the merits to support an attachment, not

11  generally by creating this vague specter of impropriety with

12  respect to everything under the sun.  But on a

13  transfer-by-transfer basis they need to show that they are

14  probably going to be successful.  It is 50/50 or less with

15  respect to any of these transfers or any component of them.

16  The motion has to be denied and the restraints on her assets

17  lifted.

18          I submit to the Court that they have fallen well short

19  of carrying their burden on any of these transfers.  They have

20  painted a misleading picture devoid of the relevant context,

21  and they fail to adequately rebut the arguments Rosey has made

22  and the evidence that she has provided in her opposition.  An

23  order of attachment, your Honor, demands more.

24          I'm happy to go into the relevant details of the

25  transfers here, I am happy to address any questions the Court

1    has, or I'm happy to turn it back over to plaintiffs' counsel

2    and we can take it from there.

3          THE COURT:  If you would like to talk about each of

4    the transfers, I'm happy to hear from you, and then I'll hear

5    from counsel for plaintiff.

6          MR. SHIFRIN:  Certainly, your Honor.

7          There are certain things that I think are worth

8    responding to that plaintiffs' counsel said at the outset.

9          Let's talk about these depositions that appear to be

10   the elephant in the room.  The depositions that they are

11   pointing to were taken in the companion case, the 2022 action,

12   which is a successor liability action.  This case was recently

13   reassigned from this Court to Judge Subramanian.

14         The depositions at issue there pertain to whether

15   Valbella At The Park was a successor entity to Valbella

16   Midtown.  It did not pertain to any of these transfers, and the

17   depositions in those cases took place well before the temporary

18   restraining order application was filed, the motion for an

19   attachment was filed.

20         Counsel to Ms. Kalayjian had no opportunity to

21   prepare, to discuss these issues.  She had no idea what was

22   coming her way at the time.  It was a completely different

23   issue in those cases.  So I don't think that the deposition

24   testimony from an unprepared witness, who is blindsided by

25   these transfers, in a case where frankly they weren't relevant,

1   your Honor -- if we were counsel at the time, I think we would

2   have objected to the questioning all together, because it

3   simply had nothing to do with whether Valbella At The Park was

4   a successor entity to Valbella Midtown.  No objections were

5   made.

6           Putting that aside, your Honor, there are other things

7   that I can respond to plaintiffs' counsel about, but let's get

8   into some of the details here in terms of what we think is the

9   way to approach the analysis.

10          I think the starting point of the analysis has to be

11  the following reality.  At an absolute minimum here, we are

12  talking about joint assets to which Rosey has a 50 percent

13  entitlement, at an absolute minimum.  The transfers in this

14  case not only passed through a joint account, which, as we say

15  in our papers, your Honor, absolutely has legal significance,

16  the assets themselves that were deposited into the joint

17  account were the type of joint assets that you would expect to

18  be deposited into the joint account.

19          What do I mean by that?  For example, we are talking

20  about the proceeds from the sale of the Canterbury House in

21  Harrison, New York that Rosey and David shared for 12 years.

22  Why wouldn't be that deposited into the joint account.  Why

23  wouldn't that be a joint asset, given her payment of the

24  mortgage on that house from the joint account, which by the

25  way, your Honor, was opened in 2011, years before this lawsuit

1    was brought.

2         Her contribution to the deposit when they bought the

3    house.  The house was half hers, for all intents and purposes,

4    and there was nothing unusual about depositing the proceeds of

5    a joint house that she poured her life into over the course of

6    12 years, including personal tragic detail that she recounted

7    in her declaration.  There is no reason that such an asset,

8    that the sale of such an asset wouldn't be a joint asset,

9    wouldn't be deposited into a joint account, and wouldn't be 50

10   percent Rosey's.  That's the starting point.

11        The same goes for the refinancing of the Southampton

12   house and the transfer of title on that house.  That house is

13   Rosey's.  David testified that it was a joint house.  He

14   testified that the Harrison house was a joint house as well.

15   They had an understanding.  They had a handshake agreement.

16   This is how people live their lives.

17        Title is not dispositive here.  It just isn't,

18   especially in the context of a fraudulent transfer action.  She

19   contributed blood, sweat, and tears to that house in the form

20   of gut renovations.  She paid the mortgage of that house from

21   the joint account, just as she did for the Canterbury House,

22   and the same thing goes for the other cash deposits, including

23   income from the various restaurants deposited into the joint

24   account.  These were the joint assets of life partners, and the

25   statutory rights that the New York banking law gives Rosey to

1    these assets cannot just be stripped.

2          THE COURT:  Can I pause you on the deposits from the

3    businesses.

4          MR. SHIFRIN:  Sure.

5          THE COURT:  What was the nature of the transfers from

6    the businesses?  Were they equity distributions?

7          MR. SHIFRIN:  They were income -- our understanding

8    was, it was income, presumably equity distributions.

9          THE COURT:  Thank you.

10         Please proceed.

11         MR. SHIFRIN:  These deposits of income were joint

12   assets that belonged to both of them as a starting point, and

13   the New York banking law gives Rosey a statutory right to these

14   assets that cannot be stripped away.  We understand that

15   judgment creditors have rights, but Rosey has rights too.

16   Judgment creditors' rights don't supersede other rights that

17   people have to property.  They have rights to David's property,

18   but not to Rosey's property.  That is the absolutely key

19   distinction here with respect to every dollar that passed

20   through the joint account.

21         Again, your Honor, I just want to just flag one issue

22   here.  It seems like the right point to do it.  Certainly there

23   are situations where you can imagine a joint account being

24   opened after a judgment has been entered and the joint

25   account -- the joint account holders are insiders, but they

1    have no history of using a joint account and it was clearly

2    done for fraudulent purposes, and the money that went into the

3    joint account was clearly not a joint asset. It was just some

4    other money that clearly belonged to the judgment debtor. In

5    those situations it's an entirely different story and, under

6    New York law, there is a fraud exception to these types of

7    transfers using a joint account in that way, and the case law

8    that we cite explains that.

9         But that's not what we are dealing with here, your

10   Honor. We are dealing with ordinary deposits from a life and

11   business partnership into a joint account. Rosey is entitled

12   to that.

13        The Connecticut case that plaintiffs' counsel cited in

14   their reply brief provides, frankly, a great example of a type

15   of scenario where disregarding the joint account, significance

16   of the joint account makes sense. In that case, the joint

17   account was opened after the claims were brought. In that

18   case, the spouse admitted that she transferred the money to her

19   account in order to avoid judgment creditors getting that

20   money. She admitted that. There was zero evidence of

21   consideration. There was all sorts of discovery in proprieties

22   and failures that eventually resulted in a default judgment

23   against her.

24        In short, the situation is completely different than

25   the situation here. The joint account has significance. We

1    can't just disregard it.  And more to the point, the money, the

2    types of assets that are deposited into the joint account here

3    are clearly valid and not fraudulent on their face because they

4    have a history of being -- we have a history of similar

5    deposits preceding the lawsuit in this case.

6        Most significantly, as we spend some considerable time

7    in our briefing emphasizing, is the sale of the restaurant to

8    Valbella in January of 2016.  That mirrored, mirrored the

9    transfers that plaintiffs are seeking to deem fraudulent here

10   and turn over.  There was no lawsuit.  There was no debt.  How

11   is a deposit and a transfer prelawsuit that mirrors subsequent

12   transfers, how does that -- let me rephrase, your Honor.  Is

13   that fraudulent too?  How do we distinguish between these?  How

14   did they coexist?

15       At the end of the day, if they did it before the

16   lawsuit and it was consistent with their pattern and practice,

17   that means the subsequent transfers after the lawsuit, which we

18   can defend and we do defend through a 14-page affidavit and

19   multiple, multiple exhibits, 43 exhibits, they are the same.

20   It had nothing to do with the lawsuit.  It had to do with their

21   pattern of practice of reimbursing each other, of sharing their

22   assets, pooling their assets as life and business partners.

23       Those are the big-picture items I wanted to raise, but

24   I'm happy to delve deeper into the individual transfers.  I

25   think with respect to the OGR transfer specifically, which I

1    think is kind of separate and distinct from the others, in that

2    this wasn't an antecedent debt issue; this was just a

3    straight-up consideration issue that was provided and reflected

4    in detail in the amendment to the operating agreement that

5    plaintiffs themselves attached and then proceeded to ignore

6    and, in three briefs, have yet to rebut in any way, shape, or

7    form.  Instead they are relying on a boilerplate articulation

8    of 10 percent -- $10 worth of consideration that contracts

9    often include, and we have cited cases, your Honor, frankly,

10    that are completely dispositive, holding that this sort of

11    reliance on a boilerplate consideration provision of $10 is

12    inadequate and is meritless.

13            I just want to reemphasize the quote from the case

14    that we cited, which is *Motorola v. Abeckaser*.  It's Eastern

15    District of New York case, 2010.  Plaintiff's sole asserted

16    basis for questioning that fair consideration was paid is the

17    fact that the deed states that the property was transferred,

18    quote, in consideration of $10 and other valuable

19    consideration.  Absent some further ground for doubting the

20    veracity of the records indicating that the property was sold

21    for $400,000 and the statements in defendant's answer

22    confirming the same, the plaintiff has not met its burden of

23    demonstrating consideration was lacking.

24            Your Honor, that parallels the facts here perfectly.

25    That is what we are dealing with here.  We have express

1    evidence of specific consideration, specific money transfers

2    from Ms. Kalayjian, and we have a contract that acknowledges

3    the receipt and the transfer of those records in exchange for

4    the ownership interest.

5        So all this side show about Ms. Kalayjian –- of

6    plaintiffs emphasizing Ms. Kalayjian's mistake, which they, for

7    some reason, spent three pages addressing, while not addressing

8    the actual consideration argument that we were making, it is a

9    side show.

10        The reason we included it, your Honor, was not to

11    distract, but to simply convey to the Court that this was the

12    intention all along, and the formalization of that longstanding

13    intention, i.e., to make Rosey the principal stakeholder in OGR

14    and make Rosey the principal member or individual operating

15    Valbella At The Park, the subsequent amendments to the

16    agreements were done to effectuate and honor that longstanding

17    commitment.  That was our purpose of just emphasizing the

18    mistake, but we then proceeded to address the

19    lack-of-consideration argument that plaintiff was making for

20    the transfer, and we did that by offering evidence.  We offered

21    bank statements supporting the transfers in the operating

22    agreement, and they have not responded to it.

23        THE COURT:  Let's walk through that.  Looking at page

24    21 of your opposition brief, where you describe this transfer,

25    you describe a consideration in three parts.  What I'd like to

1    do is to walk through each of those, if we can.

2         The first thing that you mentioned is the $600,000

3    payment from the Kalayjian Patriot account.

4         Can I just ask for you, counsel for Ms. Kalayjian, to

5    just summarize what you understand the evidence to be regarding

6    the source of the funds in the Patriot account, and then also

7    to whom that payment was made.

8         MR. SHIFRIN:  Your Honor, I don't know that we have a

9    position or if there is evidence that dispositively resolves

10    the principal source or the original source of that money, and

11    there is no argument from plaintiff to that effect either.  All

12    we know is that Rosey Kalayjian had a bank account, her own

13    individual bank account, and she transferred $600,000 from that

14    account.

15         And the second part of your question was who received

16    it?

17         THE COURT:  Yes.

18         MR. SHIFRIN:  That money went into the OGR operating

19    account.  It was used to pay for the capital contributions of

20    OGR.

21         THE COURT:  Thank you.

22         Understood.

23         Let's talk about the second piece of consideration

24    that's described here, which is $1.3 million from the joint

25    account.  What's your response to each of those same questions

1    with respect to this payment?

2           MR. SHIFRIN:  So you're talking about, your Honor, the

3    balance of the payments for the OGR interest?

4           THE COURT:  Yes.

5           MR. SHIFRIN:  That came from the joint account, which,

6    again, half of which belongs to Rosey, but was clearly done

7    with David Ghatanfard's consent to provide that money in

8    exchange for her interest, which joint account holders are 100

9    percent entitled to do.  Again, that's in the cases that we

10   cite, *In Re Leff* specifically.  So the source of that money was

11   the couple's joint account and the money went, just as I said

12   before, your Honor, to OGR for purposes of funding the capital

13   contributions to OGR and VATP.

14          THE COURT:  Thank you.

15          Did the OGR shares have any value prior to these

16   contributions?

17          MR. SHIFRIN:  Yes.  Why wouldn't they, your Honor.

18   Yes, they absolutely did.  I don't mean to ask the Court a

19   question, but of course they did.  They were interests in a

20   soon-to-be very profitable restaurant that is operating right

21   now on the corner of Sixth Avenue and Bryant Park.

22          THE COURT:  Thank you.

23          You appreciate the issue.  If those payments were made

24   to pay into a capital contribution for operating or other

25   expenses of the business and the shares had value previously as

1   equity in this successful business, then these payments did not

2   reflect arguably the preexisting value of those shares.

3   Instead, they were used to fund the operating accounts, as you

4   just described.

5        So let me put it differently.  If you have a

6   successful business and it's worth $100,000, you put in $50,000

7   of capital contributions, you would expect that your equity

8   would then be one-third of the value of the company.  That's

9   because $100,000 is the value before the equity contributions,

10  50 is the amount of the equity contributions.  50 over 150 is

11  one-third.

12       Here, you have said that the value of the company was

13  X, something substantially greater than zero, and she got 90

14  percent of the equity interest in that company as a result of

15  the 1.9 million plus category 3.

16       The question is, as counsel for plaintiff articulated,

17  why is this reasonably equivalent value?

18       MR. SHIFRIN:  Your Honor, I admit that was challenging

19  for me to follow from beginning --

20       THE COURT:  Let me do it again.

21       MR. GORDON:  Your Honor, is it OK if I respond to

22  that?  Because I think I can clarify it.

23       THE COURT:  Thank you.  If you'd like.

24       MR. GORDON:  The 1.9 million did come from the joint

25  account.  Those payments all came from various prior

1  restaurants: Valbella Midtown, Valbella Meatpacking, One If By

2  Land, restaurants into which Rosey poured herself. She got

3  little to no money as compensation.

4          THE COURT: Thank you.

5          Let me just pause you. I appreciate that. You're

6  focused on the source of the contribution.

7          MR. GORDON: Then the monies were used to make OGR as

8  the 50 percent comanaging member of VATP, Valbella At The Park.

9  The 1.9 million was made as a capital contribution before the

10 business even began, as the, I guess, starting capital. Rosey

11 put in 1--

12         THE COURT: Thank you. I'm sorry. I appreciate it.

13         The prior response was that the equity interest had

14 value prior to the capital contribution. I understand that

15 your proffer now is that that's basically the starter capital.

16 So the value of the equity is the 1.9, plus category 3.

17         MR. GORDON: That is correct.

18         THE COURT: I appreciate it. Please proceed.

19         MR. SHIFRIN: Your Honor, are there any other

20 questions with respect to the OGR transfer interests

21 specifically?

22         THE COURT: Only to the extent that you can help me

23 trace the source of the $1.3 million that was held in the joint

24 account. Can you comment on that.

25         MR. SHIFRIN: Where did that money come from? How was

1    it deposited into the joint account to begin with?

2              THE COURT:  Yes.

3              MR. SHIFRIN:  Your Honor, frankly, I don't think that

4    I am prepared to say where it came from other than that it was

5    income from both Mr. Ghatanfard -- it was the result of their

6    commingling of assets over many years and it's hard to unwind

7    that, unpack that.  Obviously that included deposits of income

8    from David's other restaurants.  That included perhaps other

9    deposits of income that Ms. Kalayjian had.  It was a commingled

10   joint account where money was deposited from different sources,

11   presumably, so it's hard to say where that specific money came

12   from, but presumably a fair chunk of it came from Mr.

13   Ghatanfard's capital ownership interest in other restaurants.

14             THE COURT:  Thank you.

15             Anything else, counsel for Ms. Kalayjian?

16             MR. SHIFRIN:  There are certain other transfers here,

17   your Honor.  I don't want do belabor and repeat what we say in

18   our papers, but just to emphasize a bit more what Mr. Gordon

19   just said, these transfers to Ms. Kalayjian -- putting aside

20   the OGR transfer, which we just discussed, the money that was

21   transferred to Ms. Kalayjian was to discharge antecedent debts

22   that she was owed for years of contributions to all the

23   restaurants that Mr. Ghatanfard owned, sometimes as a phantom

24   owner, but nevertheless owned, and Ms. Kalayjian consistently

25   contributed her efforts well beyond whatever nominal

1    compensation that she was paid.

2         This is an important distinction, your Honor, again,

3    from the Connecticut case where spouses who have no argument

4    and no involvement in any of the money that the debtor

5    transfers to them through a joint account.  This is

6    considerably different.  This is compensation for prior

7    services in the form of a discharge of an antecedent debt.

8         This is exactly how they did it, your Honor, again,

9    just to reemphasize, with respect to the TuttaBella sale in

10    January of 2016.  The transfers of income, the sale of One If

11    By Land specifically, your Honor, which was another restaurant.

12    This is something I should probably emphasize more.  The One If

13    By Land specifically, your Honor, was exactly analogous to

14    TuttaBella.

15         So TuttaBella, in 2010, Ms. Kalayjian came in, took

16    over that restaurant, made it profitable with zero help from

17    Mr. Ghatanfard.  In 2016, January 2016, Mr. Ghatanfard sold the

18    business and said, here you go, you earn this.  Based on your

19    efforts, you are entitled to keep this.  The exact same thing

20    happened with One If By Land.  Ms. Kalayjian ran that

21    restaurant without Mr. Ghatanfard's contributions at all.  He

22    was the phantom owner.  Then when he sold that restaurant, he

23    transferred, just like he did with TuttaBella, the proceeds of

24    that sale to Ms. Kalayjian in discharge of the antecedent debt

25    that Mr. Ghatanfard owed Ms. Kalayjian.

1          Your Honor, again, I can go into the details.  Our

2   briefs go into it.  But context is king here.  No matter what

3   statute we are talking about, whether it's 273(a), 273(a)(1),

4   273(a)(2), or 274, under the New York Debtor Creditor Law,

5   context matters.  These are fraudulent transfer statutes or

6   constructive fraudulent transfer statutes, and the purpose is

7   to ascertain whether there are other explanations for these

8   transfers.

9          I think we have provided the Court an extensive record

10   that demonstrates there are other reasons for these transfers,

11   reasons that preexist the lawsuit, reasons, of course, that

12   existed after the lawsuit.  But people have to live their

13   lives, whether they are sued or not, and they don't have to

14   change what they do and how they do it and how they do business

15   just because they have been sued.  As we say in our papers,

16   your Honor, a lawsuit does not turn the ordinary into the

17   suspect in and of itself.  We have to consider the context

18   here.

19          Plaintiffs' submissions have not done that.  That's

20   the key thing.  They have a burden on a motion for an order of

21   attachment to consider the context.  They have just ignored it

22   all together.  I don't think I'm overstating it.  They really

23   have.

24          All they are focusing on is the transfers in a very,

25   very narrow vacuum.  They are ignoring all the evidence that

1   Ms. Kalayjian submitted.  They are saying it's not to be

2   believed on the basis of deposition testimony in another case

3   with separate irrelevant issues.  I don't think that's fair to

4   Rosey.  Rosey has rights and those rights should be vindicated

5   and protected.

6           Thank you.

7           THE COURT:  Thank you.

8           MR. GORDON:  Your Honor, with respect to the context,

9   also, as your Honor knows, Mr. Ghatanfard is critically ill.

10  He was aware of his cancer diagnosis at least a year or two

11  ago, but it metastasized most recently.

12          But at the time that he first became aware of his

13  cancer diagnosis, he began, in effect, estate planning.  He

14  even testified to that during his deposition.  I am not going

15  to be around forever and I'd like to provide for her.  That is

16  an additional context.  He's 20 years older than she is, and he

17  wanted to make -- ensure that she had monies for when he was no

18  longer with her.

19          THE COURT:  Thank you.

20          Counsel for plaintiff, any response?

21          MR. KIRSCHENBAUM:  Your Honor, I am going to start

22  with a couple of responses to the points that defendants make

23  and then, if it's OK with your Honor, just make a couple of

24  points with respect to each transfer.

25          First of all, just in order of some of the points that

1  defendants made, with respect to Ms. Kalayjian having been

2  deposed in another matter, first of all, she testified under

3  oath.  I think what happens, especially the starkness and

4  contradictions between her testimony at her deposition and what

5  she submitted to the Court in this motion indicates that, yes,

6  she testified what she could remember.  We are talking about a

7  transfer of 4 plus million dollars in assets.  She remembered

8  very little about them, and then now has a totally full-blown

9  fantastical story about each of the transfers.  That's point

10 one.  Her deposition testimony should absolutely be considered

11 to show that she is not testifying truthfully now.

12      Secondly, with respect to joint tenancy law, I am not

13 sure if defendants simply don't understand what joint tenancy

14 law is about or if they are just misapplying it.  There is no

15 question that while the money is in a joint bank account, both

16 parties are in possession.

17      But the relevant point for our purposes is that the

18 money is entirely leviable, and there is a ton of law

19 supporting that which we have cited in our brief.  The point of

20 the case in Connecticut, which has almost an identical -- which

21 is dealing with a statute that is an almost identical

22 definition of what a transfer means for the purpose of being a

23 voidable transfer is that when something goes from being

24 leviable to being unleviable, that is the fraudulent transfer

25 and that should be voidable.

1          THE COURT:  Can I just pause you on that.  I

2    apologize.  I saw that in your brief.

3          In the circuit's decision, I think as fairly

4    represented in your brief, they focus on, as you say in your

5    brief, the transfer out of the joint account.

6          What is your position regarding whether or not the

7    gift into the joint account is itself a transfer?

8          MR. KIRSCHENBAUM:  Two things.

9          First of all, I don't know that the answer to that

10   question is necessarily dispositive of the current motion.  I

11   think at a turnover proceeding once the money -- the transfer

12   is voided, at a transfer -- at a turnover proceeding

13   Ms. Kalayjian could then somehow try and make an argument that

14   the joint tenancy is not really joint tenancy.  That's why I'm

15   confused by the argument she is making.  If it were in fact a

16   joint tenancy, then again the law is clear, and we have cited a

17   ton of law on this, that all of the money is collectible.

18   There are state court decisions from virtually every

19   department.

20         She can rebut the presumption, but then what I believe

21   that her counsel is misapplying here is that then she would

22   actually be having to make the opposite argument and be saying

23   that this arrangement was an arrangement for convenience and

24   really all of the money was my, Rosey Kalayjian's money, not

25   Mr. Ghatanfard's money.  Absent being able to prove that, I

1    think that if the money were in the joint account, we would be

2    able to not only levy all of it, but we would also be able to

3    turn it over in a turnover proceeding.

4              THE COURT:  Thank you.

5              MR. KIRSCHENBAUM:  Does that answer --

6              THE COURT:  Yes.  You can proceed.

7              MR. KIRSCHENBAUM:  And I should point out that if we

8    would not be able to get that money in the joint account, then

9    the very entry of the money -- of Mr. Ghatanfard's money into

10   the joint account would be a voidable transaction, because a

11   judgment debtor cannot simply purify half of their assets by

12   putting it -- putting them into your joint account, no matter

13   how they lived their life with a spouse.  These laws were

14   intended to protect creditors, not to give -- the point of the

15   banking law Section 675 was not to give any spouse the

16   opportunity to sort of protect half their money from

17   collection.

18            Moving to the consideration of Oak Grove Road, it is

19   not the case that we are resting our argument completely on the

20   recitation of a $10 consideration.  The standard here is

21   reasonably equivalent value.  Defendants have provided not a

22   shred of evidence as to what the source of the funds were.  In

23   fact, just a simple inference from following the transactions

24   that took place, it's a very easy inference that the money that

25   funded -- the money that funded the so-called consideration for

1   the transfer of Oak Grove Road is exactly the money that we

2   were saying either belonged to Mr. Ghatanfard in the first

3   place or was inappropriately transferred to Ms. Kalayjian.

4           THE COURT:  Thank you.  Let me just ask you to pause

5   on that, counsel.

6           You have a view regarding the question that I posed to

7   counsel for Ms. Kalayjian, which is, what's your view regarding

8   tracing the source of the 1.3 million and $600,000 payments?

9   What's the evidence that you point to to support the position

10  that the likely source of those funds were the assets for Mr.

11  Ghatanfard that you seek to attach?

12          MR. KIRSCHENBAUM:  First of all, the timing of the

13  transfers that went from the joint account out -- out of the

14  joint account to Ms. Kalayjian and then within two years they

15  all come back, that's A.  B is, the ones that came from the

16  joint account, I don't know how important is the source.  The

17  sourcing is, on its face, money that belonged to the two of

18  them, absent any showing that Ms. Kalayjian either won the

19  lottery or inherited a ton of money or just had her own money

20  to pay for it.  I think really the burden falls on her at that

21  point.

22          Another point is that, as your Honor touched upon,

23  there is absolutely no recitation of value that the company has

24  been valued at this amount and, therefore, I am paying this

25  amount in exchange for that, and that is their burden to prove

1   here.  They have got to prove there was reasonably equivalent

2   value.

3          More importantly, there was no -- one would think that

4   if somebody was buying back a company for 1.9 million or buying

5   into a company for 1.9 million, there would be some record of,

6   I am paying this money with an expectation that this will be

7   transferred to me, but, instead, the entire record is created

8   backward looking after the jury verdict or right around the

9   time of the jury verdict and the judgment, when OGR is

10  transferred.  Then there is this entire backwards-looking

11  recitation of the events to make it look as though it was in

12  exchange for transfers of money.

13         Since we are starting with OGR, I'll point out a

14  couple of other points with respect to OGR that I think are

15  relevant.  Ms. Kalayjian's testimony was all over the place.

16  She testified at her deposition that 90 percent -- that the

17  entire OGR was hers from the beginning.  Then she testified

18  that there was -- when confronted with a recitation in the

19  agreement, that there was a prior 66 percent transfer.  She

20  said -- the questioner asks:  Do you recall Mr. Ghatanfard ever

21  agreeing to transfer you 60 percent of Oak Grove Road?  And she

22  responded:  No.  It is supposed to be 90 because that's what I

23  am, 90.  He was 10.  Yet in her own declaration, in paragraph

24  37, she testifies that in fact the 66 percent transfer is

25  exactly what happened.  She made an initial transfer for 66

1   percent and then got an additional percent as compensation for

2   her contemplated director of operations role.  Her own story

3   contradicts itself right on its face, which calls into question

4   any representations she is now making about what the

5   consideration was.

6          I think we have touched on most of the points other

7   than one other crucial point, is that Mr. Ghatanfard himself

8   doesn't remember that there was ever an operating agreement or

9   and that he ever transferred any money from Oak Grove Road, and

10  Mr. Ghatanfard's position on this is possibly the most

11  important.  He is the transferor.  He is the one whose assets

12  we are assessing were fraudulently transferred.

13         In reality, there is an operating agreement.  The

14  operating agreement was executed in May of 2021.  In the

15  operating agreement Mr. Ghatanfard is appointed at that time

16  manager of the company.  Mr. Ghatanfard signed the lease for

17  the place.  The story that defendants --

18         THE COURT:  Can I just ask about that.  When did OGR

19  begin operations relative to the timing for the alleged

20  payments by Ms. Kalayjian?

21         MR. KIRSCHENBAUM:  OGR began operation in or about May

22  of 2021 -- February of 2021.  The transfers are stated -- you

23  got February 2021.  There is a $500,000 transfer by the two of

24  them.  April 2021, $600,000 by Rosey herself.  July from the

25  joint account.  September from the joint account.  February

1  2022 from the joint account.  So it's over the course of that

2  year.

3          THE COURT:  Thank you.

4          You take issue with Ms. Kalayjian's counsel's proffer

5  that the contributions happened as startup capital before there

6  was an operating business with any independent value?

7          MR. KIRSCHENBAUM:  I'm sorry.

8          THE COURT:  You take issue with counsel for

9  Ms. Kalayjian's proffer that the contributions were made as

10  startup counsel before the business had any independent value?

11          MR. KIRSCHENBAUM:  It's a little bit of a term of art.

12  I don't think it was evaluated by a third party.  I think they

13  probably pumped money into the company on an as-needed basis,

14  but the shares certainly had value.  If Ms. Kalayjian is

15  testifying that she was exchanging money for value, there is

16  absolutely no record of that or indication of that.

17          THE COURT:  They had a leasehold interest before some

18  of these payments were made?

19          MR. KIRSCHENBAUM:  They did.  They had a leasehold, I

20  believe, in --

21          THE COURT:  Did the company have other physical assets

22  before any of these payments were made?

23          MR. KIRSCHENBAUM:  They had all the goodwill of moving

24  the operation from midtown to downtown.  They had an ongoing

25  agreement with the other partners in Valbella At The Park to

1   move forward and to open the restaurant and certain commitments

2   that are all recited in the operating agreement dated before

3   then.  Sure, they had an entire business plan underway at that

4   point.

5          THE COURT:  Thank you.  Please proceed.

6          MR. KIRSCHENBAUM:  Moving to the proceeds of

7   Canterbury -- I do want to make one more point.  With respect

8   to TuttaBella -- and this is by way of introduction to the rest

9   of these transfers.  Yes.  He may have lived his life that way

10  in 2016 and moved $600,000 to her.  But as defendants say -- as

11  the Kalayjian party says, the important point here is context.

12  Over here -- over there they could do whatever they want.  Over

13  here there are creditors, and there is an entire slew of

14  transactions and a period of two years that we see clearly have

15  stripped Mr. Ghatanfard of his assets completely.  He has

16  testified he has got nothing.  The purpose of the series of

17  transactions is incredibly clear.

18         The Canterbury transfer, September 2020, 1.23 million,

19  all went to Rosey's account.  They talk about a longtime

20  understanding about how they would apportion the assets.  That

21  is the epitome of unfalsifiable testimony.  There is not a

22  shred -- there is not a shred of evidence.  Many people own

23  homes with their lives, with their spouses, with their life

24  mate, with their partners.  They set something up in order to

25  do that.

1    Here, there is nothing. There is no statement that I

2    am giving you $1.23 million because I owe it to you or why I am

3    giving it to you. There is totally not a shred of evidence

4    that what the value of her work was or that the transfer was

5    made in consideration for that value. All there is is that

6    this lucky end result is all the money I transferred to you

7    equals about all the money that I think we should value -- we

8    should value your work at.

9    One more crucial point is that Mr. Ghatanfard himself,

10   after repeated questioning, could not even remember what he did

11   with the money. He thought he may have sent it to family in

12   Iran. It was only after several rounds of questioning that

13   Mr. Nussbaum asked him, suggested, maybe you gave the money to

14   Rosey, that he acknowledged that that might be a possibility.

15   Those are -- that is hardly the indicia of someone who owed his

16   life partner all of his assets and was now diagnosed with

17   cancer and is trying to set up his estate so that she could

18   have all his money. He could not even acknowledge that he gave

19   her the money, to be clear, let alone why he gave her the

20   money.

21   With respect to the Southampton property, in January,

22   1.4 goes to Rosey. In May, the house is deeded to them

23   jointly. They say that it was the result again of a joint

24   understanding between the parties, of work that she did, of

25   mortgage payments that she made, which it should be noted that

1   she didn't start making mortgage payments until after the house

2   was deeded to her in May of 2022, not a shred of evidence that

3   that was the purpose of the money.

4          At her deposition it is not clear that she even knew

5   that the refinance happened.  She testified in her declaration

6   to the Court that because of favorable mortgage rates, her and

7   Mr. Ghatanfard decided to refinance.  At her deposition it was

8   not clear to her that it had even been refinanced, and she

9   testified that when she saw a new bank, when she saw a new

10  bank's mail coming in the mail, she thought that maybe the

11  reason that was happening was because a new bank had purchased

12  the mortgage from her own bank.  That's hardly the way someone

13  would testify if, again, her life mate was suffering from

14  cancer and transferred to her $1.4 million because he was

15  trying to settle on his estate.

16         Next question.  She lived in the house all this time.

17  She did improvements.  She is saying that this is how they

18  lived their life as a couple.  They share the house.  Why would

19  she have a $1.4 million debt or what they want to call a

20  $700,000 debt for fixing the very house in which she is lives.

21  The reality is, Mr. Ghatanfard makes a lot of money, she lived

22  with him, and she chose to do this work on the house.

23         There was absolutely no resolution that she was owed

24  any money or that giving her this property, this very

25  significant amount of property, was in payment for that money.

1   Same thing goes for Valbella Midtown.

2          One thing to point out for Valbella Midtown and One If

3   By Land is, there is not a shred of income reported.  She is

4   now telling us that this was payment to her for all her work.

5   Does she report any income that she got from the sale of

6   Valbella?  Does she report any income that she got from the

7   sale of One If By Land?  Absolutely not.  She does not.  Why?

8   Because it was not -- because it was not income.  It was an

9   illegal transfer.

10          Besides for all of these points, which mostly revolve

11   around reasonably equivalent value, it's crucial to take into

12   account, with respect to at least 273(a)(1), the other factors

13   that are indicia of fraud.

14          THE COURT:  Thank you.  I think I have heard enough

15   for now.

16          Let me turn to counsel for Ms. Kalayjian just with a

17   couple of brief questions, if I can.

18          First off, you have heard counsel for plaintiff make

19   the assertion that the entirety of a joint account may be

20   seized by a judgment creditor; in other words, that by

21   transferring money to a joint account, a debtor does not

22   protect half of the value of the assets.  They point to the

23   circuit's decision that they have identified in their brief.

24   There are New York State appellate division cases that support

25   that conclusion.

1    What's your view?  Is it your view that the law

2    supports the argument that once funds are placed in a joint

3    bank account by a judgment debtor, the entirety of the funds in

4    the joint account may not be seized, but rather that only 50

5    percent may be seized.  Perhaps I made that too complicated.

6    If a judgment debtor has a joint account, is it not the case

7    that a hundred percent of the funds in the joint account can

8    presumptively be seized by the judgment debtors' creditors?

9        MR. SHIFRIN:  We don't dispute that, your Honor.  That

10   is the law.  The cases we cite said as much, but it's not just

11   the issue.

12       The issue is, can they go after that money once the

13   joint account holder exercises their right to alienate their

14   own one-half interest, which they have, and we have cited cases

15   and language that specifically say this.  Can they go after

16   that money once it's out of the joint account.  The answer to

17   that, I think, is no, absent, of course, some kind of fraud.

18   But that's not what we are dealing with here.  We are dealing

19   with her interests in a house that they shared, in income that

20   she earned, etc.

21       THE COURT:  Thank you.  Let me pause you.

22       In your briefing -- I'm looking to page 24 of your

23   opposition.  You argue that plaintiffs cannot rely on the UVTA,

24   which implicates David's intent to discharge their heightened

25   burden of proving Rosey's intent to attach her assets.

1          Can you expand on that.  What's your view?  I'll give

2     you a hypothetical that's a little simpler.  A judgment

3     creditor concededly fraudulently provides to his daughter

4     money.  She has no idea that the father is doing that as a

5     matter of fraud.  Are you saying that the statute does not

6     permit a judge debtor to seize the assets from the daughter

7     because the daughter does not have fraudulent intent?

8          MR. SHIFRIN:  Your Honor, I think the point that we

9     were trying to make at that part of the brief is simply that

10    the operative inquiry is the judgment debtor's intent.  That's

11    the simple point that we are making, and it seemed in

12    plaintiffs' briefing that they were focused a lot on Rosey's

13    intent.

14          THE COURT:  Thank you.  Good.  Understood.

15          One other brief question, counsel.

16          Again, looking to your opposition at page 23, one of

17    the factors is, of course, whether or not this is based on a

18    judgment of a court of the United States.  In your brief it

19    appears that you are arguing that this precondition is not

20    satisfied because the person whose assets are sought to be

21    attached is not themselves -- is not herself the judge debtor.

22          Can you expand on that argument if I'm interpreting it

23    properly.

24          MR. SHIFRIN:  I think you said it perfectly, your

25    Honor.  I don't think they have cited any cases to suggest

1   otherwise.  I am not sure there are cases that suggest

2   otherwise.  We are not aware of any.  But under that specific

3   provision, under that specific justification for an order of

4   attachment, it seems a stretch to extend it here in this way,

5   in the way that you just stated, your Honor.

6           THE COURT:  Thank you.

7           Is there a textual basis for that construction of the

8   statute?  In other words, where it says, based on a judgment of

9   a court of the United States, that it should be read to mean,

10  based on a judgment against the person whose assets are sought

11  to be seized of a court of the United States.

12          Where does that restriction reside in either the text

13  or the case law?

14          MR. SHIFRIN:  It was based on our evaluation of the

15  case law and us not being able to find a single instance where

16  it was applied in this matter against a nonjudgment debtor.

17          I understand that the language says what it says and

18  you can give it a broad gloss or a narrow gloss, but the

19  plaintiffs, whose burden it is to obtain an attachment, an

20  order of attachment, have not pointed to any cases where this

21  has been applied to a judgment debtor's spouse.

22          THE COURT:  Can I just pause on that.  Your proffer to

23  the Court is that there are no cases in which a third-party's

24  assets have been attached in support of a judgment against a

25  judgment debtor?

1        MR. SHIFRIN:  No.  I want to be careful not to

2   overstate it.  We have not found -- plaintiffs did not cite a

3   case and our review of the cases did not find a case, did not

4   result in a case where this provision was specifically asserted

5   as a basis to go after a nonjudgment debtor's assets.  It's a

6   narrow point, your Honor, and I'm very careful not to overstate

7   for fear of not knowing what might be in the U.S. reports, but

8   that's my understanding of the case law.  Again, plaintiffs

9   have pointed to no case stating the contrary.

10       THE COURT:  Thank you.

11       MR. GORDON:  Your Honor, may I just close a loop.  I

12  wanted to close a loop on the OGR question that you had asked,

13  which is that OGR was formed in February of 2021, and

14  thereafter OGR and Alpine Pike Investments entered into an LLC

15  agreement for Valbella At The Park.  Each of Oak Grove Road LLC

16  and Alpine Pike Investments LLC are 50 percent managing members

17  of Valbella At The Park.  Each of OGR, through Rosey, and

18  Alpine Pike Investments through a gentleman named Robert Daleo,

19  invested 1.9 million into Valbella At The Park as starting

20  capital.  At the time of that investment, there was no value.

21  It was startup capital.

22       Mr. Kirschenbaum made reference to goodwill.  Our

23  position is this restaurant was an entirely new entity and a

24  completely different concept from Valbella Midtown, and this

25  was just starting capital to get the restaurant off the ground.

1        THE COURT:  Thank you.  Good.  That's helpful.

2        I just have one brief question I think before I'd like

3   to take a short recess.  That pertains to the underlying issue

4   here.  The request for attachment of assets is, I'll call it, a

5   request for the Court to protect the prospect of a decision

6   supporting the plaintiffs' claim that these are fraudulently

7   transferred assets.  That's an issue that we are not ultimately

8   deciding here.  Instead, I'm determining whether or not the

9   provisional relief that the plaintiffs have sought is

10  appropriate here.

11       What I'd like to do is just to hear from each of you

12  about your view regarding the process for plaintiffs' turnover

13  proceedings eventually.  As you know, the CPLR provides a

14  judgment creditor to bring a special proceeding against someone

15  with money or other personal property the judgment debtor has

16  interest in.  A special proceeding is not a proceeding that's

17  recognized with those words under the Federal Rules of Civil

18  Procedure.  As you know, Rule 2 only provides for a single form

19  of action.

20       What I'd like to do is just to hear what the parties

21  expect the process to be for the Court to ultimately resolve

22  the question of the turnover motion.  Here, plaintiffs have

23  suggested that it's essentially a summary judgment motion in

24  that I can grant relief when there are no material questions of

25  fact, but, as I understand it, there are some disputed issues

1    of fact presented by Ms. Kalayjian through her counsel.

2         Let me hear from you about how you anticipate that

3    these issues will ultimately be resolved.  I'm particularly

4    interested in your views as to whether or not this is an issue

5    that will be tried to the Court or if it is something that

6    requires a jury as the finder of fact.  These are

7    considerations that I want to think about as we are thinking

8    about the propriety of the provisional relief requested here.

9         Let me turn first to counsel for plaintiffs.

10        Counsel, what's your thinking on this procedural

11   question?

12        MR. BUZZARD:  I think the Court summarized exactly the

13   procedural posture.  I think that to initiate this turnover

14   proceeding, we would file a motion like a summary judgment

15   motion.  If there were disputed issues of fact that are

16   material -- and, again, I am not sure that any of the factual

17   issues that have been identified here are necessarily

18   material -- then there would have to be a trial.  As to whether

19   this trial would be jury or bench, I would have to -- I would

20   have to honestly look into that a little bit more.  I believe

21   it would be -- I think I would have to look into that a little

22   bit more.  My sense tells me that it may be a bench trial

23   issue.

24        THE COURT:  Thank you.  That's fine.

25        I appreciate the request for additional time to think

1    about the issue.  It is an important one for us to resolve

2    going forward, but we don't need to resolve it here.

3            Counsel for Ms. Kalayjian, do you have a view on those

4    questions?

5            MR. SHIFRIN:  I think I ultimately agree with

6    Mr. Buzzard that we probably all want to think about it some

7    more, but I think it's important to point out that there is no

8    turnover application that has been brought here, so this is

9    somewhat, I think, at the moment academic.

10           The other point I want to make, your Honor, is that

11   this motion for an order of attachment is preliminary relief,

12   as this Court is well aware, as plaintiffs, I'm sure, won't

13   dispute.  But once there is another application, there needs to

14   be additional briefing, perhaps a trial, additional evidence,

15   additional record developing.  So we are operating from a

16   preliminary record here.  And I think that's just worth

17   emphasizing, that there may be more facts that come to light

18   that are relevant to the ultimate disposition of plaintiffs

19   yet-to-be-filed turnover application.

20           THE COURT:  Good.  Thank you.

21           Counsel for plaintiffs, anything else on that point?

22           MR. BUZZARD:  Just very quickly, your Honor.

23           One of the forms of relief we are seeking in

24   connection with the attachment is discovery in aid of

25   attachment.  That necessarily will encompass some discovery in

1  aid of execution.  We need to know if the Court grants

2  attachment.  And if we are to move to turn over funds held by

3  Ms. Kalayjian, we need to know, first, where those funds are,

4  which we have not been able to do.  That is why we have not

5  brought a formal turnover as of yet.  We do not know where the

6  funds are, and we need those funds in order to have them turned

7  over.

8          I think, based on what Mr. Shifrin just said, both

9  parties agree that there should be discovery if attachment is

10  granted.

11          MR. GORDON:  Your Honor, with respect to the

12  discovery, plaintiffs' counsel, the same counsel who represents

13  Mr. Zivkovic in the 2022 action before Judge Subramanian that

14  previously was before your Honor, between that action and this

15  action they have served countless discovery demands to which we

16  have responded.  We have produced, I think at this juncture, in

17  excess of 45,000 pages of discovery.  We have answered

18  information subpoenas on behalf of Ms. Kalayjian, on behalf of

19  OGR, on behalf of VATP.  They have asked every conceivable

20  question not only twice, sometimes three times, so I cannot

21  imagine what additional discovery plaintiffs need that they

22  have not already sought and obtained.

23          THE COURT:  Thank you.

24          MR. KIRSCHENBAUM:  Your Honor, can I respond to that

25  briefly?

1           THE COURT:  Yes.

2           MR. KIRSCHENBAUM:  The discovery we need is, where is

3    the money?  Where is Ms. Kalayjian's money?  Defendants two

4    minutes ago, in addition to that, just said that the record may

5    more fully develop before a turnover proceeding.  Certainly if

6    there is something we don't know that defendants are going to

7    use to defend themselves, then obviously that's something we

8    need to know if we did take their depositions.  We are ready to

9    put them on the stand.  But, A, if Ms. Kalayjian is going to

10   come up with yet a new argument, I think we need to know what

11   that is and, B, if we are going to execute on her assets, we

12   need to know what her assets are.

13          THE COURT:  Counsel, thank you much for your

14   arguments.  I am going to step down.  I expect that I am going

15   to step down for a relatively extended period of time to

16   contemplate your arguments.  It's about 11:20 now.  My proposal

17   would be that we, by default, reconvene at 11:45.  My deputy

18   will let you know if we need additional time.  I will step down

19   now.  Please, unless you hear more from Ms. Joseph, be prepared

20   to start again at that time.  Thank you all very much.

21          (Recess)

22          THE COURT:  Counsel, thank you very much for your

23   indulgence.  We are back on the record after an extended

24   recess, about 50 minutes long.

25          Let me just say that I appreciate the parties'

1    arguments and your respective briefing.  I think that I'm in a

2    position now to resolve the application.  With your indulgence,

3    I am going to do that now.

4              I am going to begin with an introduction.

5              I. INTRODUCTION.

6              I scheduled this conference to discuss Plaintiffs'

7    June 29, 2023 motion for an order of attachment against the

8    assets and property transferred from Defendant David Ghatanfard

9    to non-party Rosey Kalayjian.  Dkt. No. 420-34.

10             The defendants in this action are Laura Christy LLC

11   (doing business as "Valbella"), Laura Christy Midtown LLC (or

12   "Valbella Midtown"), David Ghatanfard, and Genco Luca.  See

13   Dkt. No. 424 (partial judgment).  The plaintiffs in this case

14   are Mr. Pavle Zivkovic and a class of plaintiffs who are

15   similarly situated.  *See id.*  For the purposes of today's

16   conference, when I refer to "Plaintiff" in the singular, I am

17   referring to Mr. Zivkovic.  When I refer to "Defendants," I am

18   referring to the defendants I just listed, except Mr. Luca, who

19   is not relevant to Plaintiffs' motion.

20             I have reviewed the extensive briefing and

21   accompanying factual evidence to assess Plaintiffs'

22   application.  Because Mr. Ghatanfard transferred virtually all

23   of his assets to Ms. Kalayjian's personal account with the

24   threat of a multi-million dollar judgment hanging over his

25   head, I am going to grant Plaintiffs' motion and issue an order

1   of attachment on Ms. Kalayjian's assets.

2           II.   BACKGROUND.

3           I assume all the litigants here today are familiar

4   with the underlying basic facts and procedural history of this

5   six-year case, so I will not recite them here in full.  Because

6   Ms. Kalayjian is not a party to the litigation and Plaintiffs'

7   motion involves a fairly tangled web of events, however, I will

8   highlight the facts, including the procedural history, that are

9   the most relevant to my decision.

10          These facts are not disputed and are drawn from the

11  supporting declarations to the briefing and what I've heard

12  today in court, unless otherwise noted.

13          First, I will go over a few events from this

14  litigation.  This commenced on January 25, 2017.  Dkt. No. 1.

15  Plaintiffs, as food-service employees at Defendants'

16  restaurants, asserted class claims of various wage-and-hour

17  violations and individual claims of discrimination on the basis

18  of national origin.  Fact discovery, with some limitations,

19  closed in February 2018, and expert discovery closed in April

20  2018.  Dkt. No. 62.

21          The COVID-19 pandemic interfered with the scheduling

22  of a trial in this matter, but, on November 10, 2021, I

23  scheduled trial to begin at the end of March.  Dkt. No. 248.

24  A jury trial began on March 31, 2022, resulting in an April 11,

25  2022 jury verdict against Defendants.  Dkt. No. 283.  I entered

1  judgment against Defendants Valbella, Valbella Midtown, and Mr.

2  Ghatanfard on June 22, 2022.  Dkt. No. 324.

3         After further motion practice and procedural history

4  that I don't think are particularly relevant here, I

5  subsequently entered partial judgment against the same

6  Defendants, jointly and severally, in the amount of

7  $5,092,017.85.  Dkt. No. 424.  Plaintiffs have yet to recover

8  any of that amount.  Accordingly, Plaintiffs have been pursuing

9  extensive enforcement proceedings, including by filing the

10  motion for attachment of Ms. Kalayjian's assets.  Dkt. No.

11  420-34.  Plaintiffs' theory is, in a nutshell, that Mr.

12  Ghatanfard has transferred substantially all of his assets to

13  Ms. Kalayjian to avoid paying the judgment.

14         This motion was accompanied by an *ex parte* motion for

15  a temporary restraining order, or a "TRO," which I granted on

16  July 5, 2023.  Dkt. Nos. 420, 438.  In doing so, I found in

17  part that Plaintiffs had demonstrated a likelihood of success

18  on pursuing turnover proceedings for those assets.  Dkt. No.

19  438.  The TRO permitted Ms. Kalayjian to maintain

20  "normal-course transactions for living expenses," not to exceed

21  $10,000 per transfer.  *Id.*  At Ms. Kalayjian's request, I later

22  expanded the uses to which she could apply her assets without

23  prior leave of the court-including to pay tax obligations.  I

24  also ordered Ms. Kalayjian to show cause why an order should

25  not be issued attaching her various assets connected with Mr.

1   Ghatanfard, as I will detail in a moment.  *Id.*  Plaintiffs and

2   Ms. Kalayjian have engaged in extensive briefing on this issue,

3   including in a supplemental round of briefing.  Dkt. Nos. 420,

4   446, 470, 492, 497, 499, 504, 515.  These were accompanied by

5   declarations and other supporting materials.

6          I note that Plaintiffs and Ms. Kalayjian have filed

7   other motions related to Plaintiffs' enforcement efforts,

8   including two motions to quash subpoena *duces tecum* served on

9   Ms. Kalayjian's banks and motions to hold Mr. Ghatanfard and

10  Oak Grove Road LLC in contempt.  Dkt. Nos. 364, 405, 449, 461;

11  *see also* Dkt. No. 361 (order directing third-party Milton J.

12  Pirsos, CPA, to comply with Plaintiffs' subpoena).  I will not

13  be addressing or resolving these motions today.  I also note

14  that Plaintiff is separately pursuing litigation against

15  Valbella at the Park, LLC, to recover from it the judgment

16  against Valbella Midtown, which has now ceased its operations.

17  This is Zivkovic v. Valbella at the Park, case number

18  1:22-cv-7344.

19          Second, I will summarize the nature of Ms. Kalayjian's

20  personal relationship with Defendant Mr. Ghatanfard, including

21  the various transactions at issue in this motion.

22          Ms. Kalayjian and Mr. Ghatanfard are, in Ms.

23  Kalayjian's words, "longtime life and business partners who

24  have lived and worked together for approximately 20 years."

25  Dkt. No. 471 at 2.  They met in 2004, when Ms. Kalayjian was

1    working in an unspecified position at a hedge fund and took on

2    a part-time job as a hostess at a restaurant owned by Mr.

3    Ghatanfard named Valbella Greenwich in Greenwich, Connecticut.

4    *Id.*

5         In 2008, Ms. Kalayjian took on another position, as a

6    part-time real estate agent, for the two of them to purchase a

7    house on Canterbury Road in Harrison, New York.  *Id.* at 2-3;

8    Dkt. No. 471-1.  I will refer to this house as the "Canterbury

9    House."  Ms. Kalayjian represents that "David and I had an

10   understanding that the Canterbury House was a joint house into

11   which we both invested."  Dkt. No. 471 at 3.

12        On June 28, 2011, the couple opened a joint account at

13   Patriot Bank (the "Joint Account") to "pool our assets and

14   provide a shared security."  *Id.*; Dkt. No. 471-2.  Over the

15   next decade, the couple made deposits into the Joint Account

16   and paid joint expenses out of it.  Dkt. No. 471 at 3.

17   Separately, Ms. Kalayjian opened a separate individual market

18   account at Patriot Bank, which I will refer to as the Kalayjian

19   Account.  Dkt. No. 420-5.

20        Starting in or around 2011, Ms. Kalayjian and Mr.

21   Ghatanfard repeatedly put the Canterbury House on the market

22   for sale.  Dkt. No. 471 at 3; Exh. 4 (listed for sale in 2011,

23   2012, 2014, 2016, 2017 x2, 2020).  The house was finally sold

24   on September 11, 2020 for a total sale price of $1,237,762.50,

25   which was deposited into the Joint Account.  Dkt. No. 420-8.

1   Over the next five days, $1.25 million was transferred into the

2   Kalayjian Account.  Dkt. No. 471 at 6; Dkt. No. 420-4 at 2.

3        Ms. Kalayjian and Mr. Ghatanfard's primary residence

4   then became a house on Oak Grove Road in Southampton, New York.

5   Dkt. No. 471 at 4.  I will refer to this house as the

6   Southampton House.  Ms. Kalayjian again asserts that she and

7   Mr. Ghatanfard "treated the Southampton House as a joint

8   asset," although Mr. Ghatanfard was the sole owner on paper, as

9   was the case with the Canterbury House.  *Id.*  Ms. Kalayjian

10  represents that she took the lead on managing and overseeing

11  significant repairs and renovations to the Southampton House.

12  *Id.* at 4; Dkt. Nos. 471-5 to -15.

13       Ms. Kalayjian took on the task of supervising the

14  contractors, making design choices for the renovations, and

15  working with the insurance company for reimbursements for

16  significant water damage that occurred at the Southampton

17  House.  Dkt. No. 471 at 5; Dkt. No. 471-10.  Ms. Kalayjian

18  asserts that if they had outsourced her work in picking out the

19  design elements of the renovations, they would have paid at

20  least $150,000.  Dkt. No. 471 at 5.  She also asserts that

21  outsourcing the project management would have required

22  "substantial six-figure compensation."  *Id.*

23       On January 3, 2022, Ms. Kalayjian and Mr. Ghatanfard

24  refinanced the Southampton House.  Dkt. No. 471 at 5; Dkt. No.

25  420-16 and -17.  On January 10, 2022, refinancing proceeds in

1  the amount of $1,422,798.18 was deposited into the Joint

2  Account.  Dkt. Nos. 420-17, 420-18.  Two days later, Ms.

3  Kalayjian withdrew these funds, though it is not clear whether

4  this was deposited into the Kalayjian Account or a different

5  account.  Dkt. No. 420-19 (showing back of cashier's check with

6  Ms. Kalayjian's endorsement and redacted account number ending

7  in -3510).

8        On or around March 25, 2022, about a week prior to the

9  commencement of the trial in this case, the title of the

10  Southampton House was changed from a sole ownership in Mr.

11  Ghatanfard's name into a joint tenancy with right of

12  survivorship between Ms. Kalayjian and Mr. Ghatanfard.  Dkt.

13  No. 471 at 5-6; Dkt. No. 420-20.  Ms. Kalayjian represents that

14  this was done out of concern for Mr. Ghatanfard's age and in

15  recognition of her contributions to the house.  Dkt. No. 471 at

16  6; *see also* Dkt. No. 472-1 at 10-14 (Ghatanfard Deposition

17  Transcript).  In July 2022, Ms. Kalayjian began to make

18  automatic monthly mortgage payments out of a separate

19  individual Citibank account, ending in -1520.  Dkt. No. 420-2

20  at 20; Dkt. No. 420-21.

21        Finally, I will summarize the business relationship

22  and related transactions between Mr. Ghatanfard and Ms.

23  Kalayjian:

24        In 2005, Mr. Ghatanfard opened Valbella Meatpacking,

25  his first New York restaurant.  Ms. Kalayjian represents that,

1    "[f]orsaking my career at a hedge fund to pour myself into my

2    budding business and personal relationship with David," she

3    began to work at Valbella Meatpacking.  While her formal title

4    was "hostess" and other "entry-level positions," Ms. Kalayjian

5    represents that she did more substantial work and was a "core

6    member of the restaurant's management team."  Dkt. No. 471 at

7    7; Dkt. No. 471-24.

8           In 2008, Ms. Kalayjian worked to significantly change

9    Valbella Steakhouse, another restaurant located in Eastchester,

10   New York, including by changing its name to "TuttaBella."  Dkt.

11   No. 471 at 8; Dkt. No. 471-25.  TuttaBella allegedly made

12   substantial profits for several years afterwards.  Dkt. No. 471

13   at 8.

14          In 2011, Ms. Kalayjian helped Mr. Ghatanfard open up

15   another New York City restaurant named Valbella Midtown.  Dkt.

16   No. 471 at 10.

17          In 2015, Mr. Ghatanfard became the owner of a

18   pre-existing restaurant named "One if by Land," and Ms.

19   Kalayjian again agreed to help, working as "essentially the

20   director of operations."  Dkt. No. 471 at 8; *see also* Dkt. No.

21   471-26 to -34.  In 2016, she put herself on the payroll for

22   $600/week, which she represents was an underpayment for her

23   labor and was done "with the understanding that [she] would

24   eventually be repaid."  Dkt. No. 471 at 9.

25          In January 2016, Mr. Ghatanfard sold TuttaBella and

1    deposited the proceeds of $788,430 into the Joint Account.

2    This was then transferred to a different individual account

3    belonging to Ms. Kalayjian, ending in -0612.  Dkt. No. 471 at

4    8; Dkt. No. 471-3 at 2.

5         In 2019, Ms. Kalayjian opened a new restaurant for Mr.

6    Ghatanfard called Bellasera in Larchmont, New York.  Dkt. No.

7    471 at 10.  She "did everything at Bellasera" but was not "paid

8    a dime."  *Id.*; Dkt. No. 471-36 to -37.  Mr. Ghatanfard "decided

9    to eliminate his stake" in Bellasera in 2020.  Dkt. No. 471 at

10   10.  I am not aware of any details provided as to how Mr.

11   Ghatanfard's interest was disposed of, much less what payment

12   he received and where it went.

13        From September 2020 to September 2021, Mr. Ghatanfard

14   deposited his distributions from Valbella Midtown for a total

15   of $800,000 into the Joint Account.  Dkt. No. 420-10.  Within

16   days–often within 2 days–after each deposit, all or a majority

17   of each deposit was transferred to the Kalayjian Account, for a

18   total of $675,000 out of the $800,000.  Dkt. No. 471 at 11;

19   Dkt. Nos. 420-4.  Ms. Kalayjian asserts that she was entitled

20   to half of the $800,000 by nature of the Joint Account being a

21   jointly shared account, and that the additional $275,000 was

22   "compensation" for her work on Bellasera and the other

23   restaurants over the years.  Dkt. No. 471 at 11.

24        Separately, Ms. Kalayjian decided to open a new

25   restaurant with Robert Daleo, but their plans were delayed due

1    to the COVID-19 pandemic.  Dkt. No. 471 at 11-12.  Finally, in

2    February 2021, Ms. Kalayjian allegedly formed an LLC called Oak

3    Grove Road, LLC (which I will refer to as "OGR") and handled

4    the Department of State filings herself without consulting an

5    attorney or accountant.  *Id.* at 12.  "As a result," she

6    asserts, the OGR Operating Agreement originally filed with the

7    New York Department of State "mistakenly reflect David as the

8    sole member, when in fact, [Ms. Kalayjian] held a majority

9    interest in the LLC."  Dkt. No. 471 at 12; Dkt. No. 420-22 at

10   2, 3, 11.

11          In April 2021, OGR and another company now fully owned

12   by Mr. Daleo formed Valbella at the Park, LLC (which I will

13   refer to as "VATP"), to open a new "Valbella at the Park"

14   restaurant in the City.  Dkt. No. 471 at 12.  Ms. Kalayjian

15   asserts that she has been serving as VATP's Director of

16   Operations, while Mr. Daleo has been the one to negotiate the

17   lease for the restaurant and deal with its finances.  *Id.* at

18   13.  From February 2021 to February 2022, four payments from

19   the Joint Account totaling $1.3 million and one payment of

20   $600,000 from the Kalayjian Account were made as contributions

21   to OGR.  Dkt. No. 471 at 12; Dkt. No. 420-23; Dkt. Nos. 471-38

22   to -42.  Ms. Kalayjian alternatively asserts that she made

23   these payments, including those from the Joint Account, to be

24   "[c]onsistent with our longstanding aim of making me the

25   majority stakeholder of OGR," Dkt. No. 471 at 12, but also

1   argues that only half of the payments from the Joint Account is

2   from her, Dkt. No. 515 at 9, 13.

3        On November 17, 2021, Mr. Ghatanfard sold his stake in

4   the restaurant One if by Land, and the $600,000 in proceeds was

5   deposited into the Joint Account.  Dkt. Nos. 420-12 to -13.

6   Two days later, this money was transferred to the Kalayjian

7   Account.  Dkt. No. 420-4 at 23.  Ms. Kalayjian asserts that she

8   withdrew this money as compensation for six years of running

9   One if by Land.  Dkt. No. 471 at 9-10.

10        As I've already noted, trial commenced in this case at

11   the end of March 2022 and resulted in a jury verdict in April

12   2022.  On June 16, 2022, Ms. Kalayjian represents that she and

13   Mr. Ghatanfard acted "out of an abundance of caution" to

14   "formalize [her] ownership interests in OGR by amending the OGR

15   Operating Agreement" to transfer 90% of Mr. Ghatanfard's

16   interest in OGR to Ms. Kalayjian.  Dkt. No. 471 at 13; Dkt.

17   Nos. 420-23 to -24.  During his deposition in the separate

18   litigation against VATP, Mr. Ghatanfard did not recall this

19   assignment of his interests and amendment of OGR's operating

20   agreement.  Dkt. No. 420-11 at 13-14, 16, 18-19, 20-21.  Ms.

21   Kalayjian testified at her deposition that she could recognize

22   both her and Mr. Ghatanfard's signatures on the OGR assignment

23   agreement and amendment to the operating agreement.  Dkt. No.

24   420-27 at 12-15.  I also note that OGR's 2021 K-1, which

25   Plaintiffs assert was filed in August 2022, lists Ms. Kalayjian

1    as a 90% member of OGR.  Dkt. No. 471-43.

2         As of his May 4, 2023, deposition, Mr. Ghatanfard,

3    previously a multi-millionaire, represented that he essentially

4    has no assets other than "some clothes and an old car."  Dkt.

5    No. 420-11 at 6.

6         In total, Plaintiffs assert that a sum of

7    $3,935,555.68 was deposited by Mr. Ghatanfard into the Joint

8    Account and then transferred to Ms. Kalayjian's personal

9    accounts over the course of the period from September 2020 to

10   June 2022.  This figure does not include the change in title

11   for the Southampton House, the 90% of interest in OGR, and the

12   unknown disposal of Mr. Ghatanfard's interests in the

13   restaurant Bellasera.

14        III.  ANALYSIS.

15        Plaintiffs seek the following relief: (1) an order

16   attaching certain of Ms. Kalayjian's assets, which Plaintiffs

17   value up to $3,935,555.68, her ownership interest in OGR, and

18   her joint tenancy with a right of survivorship in the

19   Southampton House; and (2) an order permitting Plaintiffs to

20   discover additional assets of Ms. Kalayjian.  Dkt. No. 420-34.

21   Plaintiffs request that the Court direct Plaintiffs to provide

22   an undertaking, if the order of attachment is granted, in a

23   fixed amount no greater than $13,000.  *Id.* at 30.  These orders

24   would, absent a change in circumstances, remain in place

25   pending the resolution of Plaintiffs' turnover proceedings, as

1  they attempt to actually recover on Ms. Kalayjian's assets as

2  voidable transactions under New York law.

3          A.   Order of Attachment.

4          Plaintiffs seek to enforce the partial judgment and

5  damages award in this case through an order of attachment.

6          Federal Rule of Civil Procedure 69(a)(1) provides:

7          "A money judgment is enforced by a writ of execution,

8  unless the court directs otherwise.  The procedure on

9  execution-and in proceedings supplementary to and in aid of

10 judgment or execution-must accord with the procedure of the

11 state where the court is located . . . ."

12         Turning then to New York law, CPLR § 6212(a) requires

13 that the plaintiff seeking an order of attachment "show, by

14 affidavit and such other written evidence as may be submitted,

15 that there is a cause of action, that it is probable that the

16 plaintiff will succeed on the merits, that one or more grounds

17 for attachment provided in [CPLR] section 6201 exist, and that

18 the amount demanded from the defendant exceeds all

19 counterclaims known to the plaintiff."

20         CPLR § 6201, in turn, provides that:

21         "An order of attachment may be granted in any action .

22 . . where the plaintiff has demanded and would be entitled . .

23 . to a money judgment against one or more defendants, when:

24         . . .

25             (3) the defendant, with intent to defraud his

1   creditors or frustrate the enforcement of a judgment that might

2   be rendered in plaintiff's favor, has assigned, disposed of,

3   encumbered or secreted property, or removed it from the state

4   or is about to do any of these acts; or

5          . . .

6          (5) the cause of action is based on a judgment, decree

7   or order of a court of the United States . . . ."

8          Whether to grant or deny an order of attachment is a

9   matter of the Court's discretion, even when the statutory

10   requirements are met.  *See Iraq Telecom Limited v. IBL Bank

11   S.A.L.*, 43 F.4th 263, 272 (2d Cir. 2022) (holding that courts

12   have discretion in deciding motions for attachment, including

13   by considering extraordinary circumstances, even when statutory

14   requirements are met); *see also Bollenbach v. Haynes*, 2018 WL

15   4278347, at *2 (S.D.N.Y. May 29, 2018).  In particular, the

16   Court must ensure that "the remedy is needed to secure payment

17   or obtain jurisdiction." *Capital Ventures International v.

18   Republic of Argentina*, 443 F.3d 214, 222 (2d Cir. 2006) ("It

19   has discretion to the extent that these determinations require

20   weighing of evidence and also in balancing competing

21   considerations."); *see also BSH Hausgerate, GmbH v. Kamhi*, 282

22   F. Supp. 3d 668, 671 (S.D.N.Y. 2017).  If the statutory

23   grounds-including likelihood of success on the merits-are met

24   and the necessity of the attachment is shown, however, the

25   Court ordinarily must grant the order of attachment.  *Capital

1    *Ventures International*, 443 F.3d at 222 (noting a court's

2    "discretion does not permit denial" once these requirements are

3    met, "at least absent extraordinary circumstances and perhaps

4    even then").  Finally, because an order of attachment "is an

5    extraordinary remedy created by statute in derogation of common

6    law," it is "strictly construed in favor of those against whom

7    it is employed." *Brastex Corp. v. Allen International, Inc.*,

8    702 F.2d 326, 332 (2d Cir. 1983); *accord Bollenbach*, 2018 WL

9    4278347, at *2.  But *see, e.g., DLJ Mortgage Capital, Inc. v.*

10   *Kontogiannis*, 594 F. Supp. 2d 308, 319 (E.D.N.Y. 2009) ("[A]ll

11   legitimate inferences should be drawn in favor of the party

12   seeking attachment…").

13         I will now proceed to analyze whether Plaintiffs have

14   shown, by the declarations and other written materials

15   submitted in support of their motion, that the elements of the

16   CPLR § 6212(a) test are met and that the order of attachment is

17   necessary.  I find that Plaintiffs have done so.

18         1.  CPLR § 6212(a).

19         Elements.

20         The only elements of CPLR § 6212(a) that require close

21   analysis are whether there is a cause of action and Plaintiffs'

22   probability of success on the merits, which here requires the

23   Court to examine the merits of Plaintiffs' anticipated turnover

24   proceedings against Ms. Kalayjian's assets from Mr. Ghatanfard.

25   *See DLJ Mortgage Capital, Inc.*, 594 F. Supp. 2d at 320

1    ("[P]roof of the merits of a plaintiff's claim, by definition,

2    helps satisfy the first two elements for attachment ….").

3           The other elements are clearly satisfied.  I will

4    review them now.  One or more grounds of CPLR § 6201 exists

5    here.  From my perspective, most obviously, "the cause of

6    action is based on a judgment . . . of a court of the United

7    States," given that Plaintiffs are seeking to enforce and

8    recover on this Court's judgment against Defendants.  *See* CPLR

9    § 6201(5).  Ms. Kalayjian argues that this provision is not

10   applicable here because Ms. Kalayjian herself is not a

11   judgment-debtor, but this is not a requirement under the plain

12   text of the statute and is not adequately supported in Ms.

13   Kalayjian's briefing.  I note, if it were, such proceedings

14   against any third party would not be permitted under the

15   statute.

16           Alternatively, for the reasons I will explain,

17   Plaintiffs have shown that "the defendant, with intent to

18   defraud his creditors or frustrate the enforcement of a

19   judgment . . . , has assigned, disposed of, encumbered or

20   secreted property."  *Id.* § 6201(3).  And because there are no

21   counterclaims asserted against Plaintiffs, "the amount demanded

22   from the defendant" naturally exceeds the counterclaims.  *Id.* §

23   6212(a).

24           Proceeding to the remaining CPLR § 6212(a) elements, I

25   note that Plaintiffs principally rely on the recently enacted

1   New York Uniform Voidable Transactions Act ("UVTA"), including

2   the provision for voidable fraudulent transfers in the New York

3   Debtor and Creditor Law ("DCL") § 273(a)(1).

4        DCL § 273(a)(1) provides:

5        "(a) A transfer made or obligation incurred by a

6   debtor is voided as to a creditor, whether the creditor's claim

7   arose before or after the transfer was made or the obligation

8   was incurred, if the debtor made the transfer or incurred the

9   obligation:

10        (1) with actual intent to hinder, delay or defraud any

11   creditor of the debtor."

12        A creditor making a claim for relief under § 273(a)

13   must prove the elements of the claim by a preponderance of the

14   evidence.  *Id.* § 273(c).

15        As an initial matter, Plaintiffs and Ms. Kalayjian

16   dispute whether all of the transactions in question constitute

17   "transfers" under the UVTA.  "Transfer" is defined by the UVTA

18   as "every mode, direct or indirect, absolute or conditional,

19   voluntary or involuntary, of disposing of or parting with an

20   asset or an interest in an asset, and includes payment of

21   money, release, lease, license, and creation of a lien or other

22   encumbrance."  DCL § 270(p).

23        Plaintiffs assert that the change in the title to the

24   Southampton House from sole ownership to a joint tenancy shared

25   by Mr. Ghatanfard and Ms. Kalayjian constitutes a "transfer."

1    Dkt. No. 420-34 at 21-22.  They do not dedicate briefing space

2    to explain that argument.  Nonetheless, the Court concludes

3    that they have adequately established that it constituted a

4    transfer under the UVTA.  "A joint tenancy is an estate held by

5    two or more persons jointly, with equal rights to share in its

6    enjoyment during their lives, and creating in each joint tenant

7    a right of survivorship." *Goetz v. Slobey*, 908 N.Y.S.2d 237,

8    239 (1st Dept. App. Div. 2010).  By changing the title to the

9    Southampton House, Mr. Ghatanfard parted with half of his

10   interest in the property almost immediately, as well as others

11   of his rights and interests, such as the right to dispose of

12   the property without the consent of Ms. Kalayjian.  And, of

13   course, the result of the transaction is that 100% of the value

14   of the property would be transferred automatically to Ms.

15   Kalayjian on her death.

16        Given his partner joint tenancy in the property

17   constitutes a transfer of an "interest in an asset."  Again,

18   "transfer" includes every mode of transfer, whether direct or

19   indirect, or conditional, and it includes encumbrances, such as

20   limitations on the right of the owner to make unitary decisions

21   regarding the asset, as the statute provides.  The transfer

22   includes the creation of a lien or other encumbrance.

23        The other "transfers" at issue are the numerous

24   deposits Mr. Ghatanfard made into the shared Joint Account that

25   were then substantially or in whole transferred to Ms.

1   Kalayjian's personal accounts as well as the assignment of 90%

2   of the interest in OGR to Ms. Kalayjian.  On their face, these

3   constitute "transfers" under the UVA.

4          Ms. Kalayjian objects that half of the funds at issue

5   that were moved from the Joint Account into her personal

6   accounts are rightfully hers and therefore are not part of a

7   "transfer."  Dkt. No. 470 at 8.  Plaintiffs respond that the 2d

8   Cir. expressly rejected this argument in the context of a

9   Connecticut statute that is similar in text.  Plaintiffs also

10  argue, as I understand it, undisputedly, that Ms. Kalayjian's

11  idea of the immediate half-split is incorrect, because each

12  tenant is presumed to possess the entirety of a joint account,

13  not just half, and Ms. Kalayjian has failed to rebut that

14  presumption.  *See Viggiano v. Viggiano*, 523 N.Y.S.2d 874, 874

15  (2d Dep't 1988) ("The opening of a joint bank account creates a

16  rebuttable presumption that each named tenant is possessed of

17  the whole of the account so as to make the account vulnerable

18  to the levy of a money judgment by the judgment creditor of one

19  of the joint tenants.");  *See also Mirlis v. Greer*, 80 F.4th

20  377, 384 (2d Cir. Aug. 30, 2023) (holding that a "transfer"

21  under Connecticut's UVTA equivalent occurred when debtor's wife

22  withdrew funds deposited by debtor into joint account).  The

23  Court is inclined to agree with Plaintiffs as a result.  But in

24  any case, to some degree, when the transfers happened is not

25  fully dispositive here, as Ms. Kalayjian does not dispute that

1   what she describes as "her half" of the funds in question is

2   now in her personal accounts.  Since that half derived from

3   transfers of assets from Mr. Ghatanfard, that is, the

4   collective assets of DG's assets in the joint account, it is

5   subject to attachment.

6           Proceeding to the remaining elements of DCL §

7   273(a)(1), the only truly disputed element is whether

8   Plaintiffs have demonstrated that Mr. Ghatanfard made the

9   transfers in question with the requisite "actual intent."  And,

10  despite the high bar required to show such actual intent, I

11  find that Plaintiffs have shown a likelihood of success on

12  their claim here; that is, that they have shown that it is

13  sufficiently probable.

14          "Because 'fraudulent intent is rarely susceptible to

15  direct proof,' courts in the Second Circuit have examined

16  whether allegedly suspicious transactions exhibit 'badges of

17  fraud' that give rise to a sufficient inference of intent."

18  *Yong Xiong He v. China New Star Restaurant, Inc.*, 2020 WL

19  6202423, at *6 (E.D.N.Y. Oct. 22, 2020) (quoting *DLJ Mortgage*

20  *Capital, Inc.*, 594 F. Supp. 2d at 320) (analyzing CPLR §

21  6201(3) showing).  "The existence of several badges of fraud

22  can constitute clear and convincing evidence of actual intent

23  to defraud creditors."  *Id.* (quoting *In re MarketXT Holdings*

24  *Corp.*, 376 B.R. 390, 405 (Bankr. S.D.N.Y. 2007)).  These

25  "badges of fraud" include:

1    (1) [T]he lack or inadequacy of consideration; [(2)]

2    the family, … friendship or close associate relationship

3    between the parties; (3) the retention of possession, benefit

4    or use of the property in question; (4) the financial condition

5    of the party sought to be charged both before and after the

6    transaction in question; (5) the existence or cumulative effect

7    of a pattern or series of transactions or course of conduct

8    after the incurring of debt, onset of financial difficulties,

9    or pendency or threat of suits by creditors; and (6) the

10    general chronology of the events and transactions under

11    inquiry.  *Id.* (quoting *CF 135 Flat LLC v. Triadou SPV N.A.*,

12    2016 WL 5945912, at *10 (S.D.N.Y. June 24, 2016)).

13    Notably, these significantly overlap with the 11

14    non-exclusive factors provided in DCL § 273(b) for the

15    determination of the debtor's actual intent under § 273(a)(1).

16    These factors are:

17    (1) the transfer or obligation to an insider;

18    (2) the debtor retained possession or control of the

19    property transferred after the transfer;

20    (3) the transfer or obligation was disclosed or

21    concealed;

22    (4) before the transfer was made or obligation was

23    incurred, the debtor had been sued or threatened with suit;

24    (5) the transfer was of substantially all the debtor's

25    assets;

1              (6) the debtor absconded;

2              (7) the debtor removed or concealed assets;

3              (8) the value of the consideration received by the

4    debtor was reasonably equivalent to the value of the asset

5    transferred or the amount of the obligation incurred;

6              (9) the debtor was insolvent or became insolvent

7    shortly after the transfer was made or the obligation was

8    incurred;

9              (10) the transfer occurred shortly before or shortly

10   after a substantial debt was incurred; and

11             (11) the debtor transferred the essential assets of

12   the business to a lienor that transferred the assets to an

13   insider of the debtor.

14             DCL § 273(b).

15             I find that Plaintiffs have shown a likelihood of

16   success of proving Mr. Ghatanfard's actual and fraudulent

17   intent to engage in these transfers to Ms. Kalayjian to evade

18   judgment.  Before I proceed to the analysis, I want to

19   emphasize that I am not making ultimate findings of fact or

20   determinations of liability under DCL § 273, and that I am

21   making these determinations today based on the preliminary

22   facts before me regarding the attachment request presented

23   here.  I also fully understand Ms. Kalayjian's overarching

24   point that many people live the way she does, or did, with Mr.

25   Ghatanfard, without formalizing the nature of their shared

1    lives.

2          Turning to the "badges of fraud" present here, I note

3    that Plaintiffs and Ms. Kalayjian do not dispute the basic

4    nature, amount, and timing of the transactions at issue, which

5    are also supported by declarations and other written materials

6    submitted to the Court.  I will go over each of these

7    transactions briefly.  Then I will comment on some of the

8    additional badges of fraud.

9          The Canterbury House sale occurred in 2020, three

10   years into this lawsuit, and the entirety of the $1,237,762.50

11   was deposited into the Joint Account and then, within the next

12   5 days, $1.25 million, which includes the full sale proceeds of

13   the Canterbury House, was deposited into Ms. Kalayjian's

14   personal account and out of Mr. Ghatanfard's reach.  I

15   acknowledge Ms. Kalayjian may have put in a lot of work into

16   the house, but the evidence that this transfer was actually

17   intended to be compensation for that work does not outweigh the

18   other indicia of fraud; nor does it sufficiently establish that

19   the transfer was made for a reasonably equivalent value.  That

20   the entire proceeds were transferred so quickly out of Mr.

21   Ghatanfard's reach, rather than remaining in the commingled

22   Joint Account that Ms. Kalayjian's counsel emphasizes as

23   representing the shared, joint lives the two lead together

24   supports the conclusion that the initiative here was motivated

25   by an intent to defraud the judgment creditors.  Therefore, and

1    for the other reasons that I am going to describe, I find that

2    plaintiffs have shown a likelihood of success with respect to

3    showing fraudulent intent with respect to this transfer.

4         Valbella Midtown distributions:  From Sept. 2020 to

5    Sept. 2021, a series of deposits totaling $800,000 were

6    deposited into the Joint Account.  Within a few days after each

7    transfer, again often within two days but sometimes a few more,

8    $675,000 in total out of that $800,000 was transferred to Ms.

9    Kalayjian.  Ms. Kalayjian asserts that she is entitled to $400k

10   by law, by virtue of her entitlement to half the joint account

11   and otherwise justifies the $275,000.  The law is that

12   Plaintiffs, as creditors, may seek the entirety of the

13   $800,000, and again, the timing, nature, and lack of evidence

14   as to this being compensation for a reasonably equivalent value

15   is sufficient, together with the other factors that I will

16   describe, to show that Plaintiffs have a likelihood of success

17   in demonstrating fraudulent intent with respect to this

18   transfer.

19        Southampton House refinancing:  This occurred in

20   January 2022, five years into the litigation.  I acknowledge

21   the alternative explanation presented by Ms. Kalayjian

22   regarding the timing of this transaction, namely, that the

23   concern was rising floating interest rates at the time.  But,

24   again, $1,422,798.18 was deposited into the Joint Account and

25   then, two days later, the exact amount was transferred into Ms.

1   Kalayjian's personal account.  For the same reasons as the

2   Canterbury House sale proceeds, this is indicative of

3   fraudulent intent.

4         One if by Land proceeds:  In November 2021, $600,000

5   of the proceeds were deposited into the Joint Account and then

6   again, two days later, the same amount was transferred to the

7   Kalayjian Account.  Ms. Kalayjian asserts that this is

8   compensation for her prior work on the restaurant, but there is

9   insufficient evidence that this represented a reasonably

10  equivalent value for that labor.  Again, on the facts before

11  me, Plaintiffs have shown a likelihood of success in showing

12  that this transfer was accomplished with fraudulent intent.

13        There are two other transfers that are not strictly

14  monetary that I will address.

15        The Southampton House title transfer:  This transfer

16  occurred in late March 2022, about a week before trial in this

17  case.  The timing is suspect, again.  I appreciate that Ms.

18  Kalayjian had been living in this house for a long time with

19  Mr. Ghatanfard as his partner at this point.  But in changing

20  the title of the house to a joint tenancy, Mr. Ghatanfard

21  transferred an interest in his right to the property to Ms.

22  Kalayjian at least equivalent to a lien as a joint tenant.

23  This encumbrance, coupled with the timing of the event, is

24  strongly indicative of fraudulent intent, together with the

25  other badges of fraud that I will describe in a moment.

1        With respect to the OGR interest transfer, I also find

2   a likelihood of fraudulent -- that the plaintiffs will be able

3   to show fraudulent intent because the OGR equity was solely in

4   Mr. Ghatanfard's name and because of the timing of the transfer

5   and the other indicia of fraud.  I understand that there are

6   competing narratives as to why things were done in this way,

7   but the fact is that Mr. Ghatanfard was the owner of OGR on

8   paper when it was formed in February 2021, and there is nothing

9   to show that the $1.3 million paid to OGR out of the Joint

10  Account in the following year was directed by or from Ms.

11  Kalayjian's personal funds.  I acknowledge that $600,000 was

12  paid out of Ms. Kalayjian's account, though it's not clear

13  where the source of that money is from.  It is also

14  particularly relevant here that the assignment of the 90%

15  interest to Ms. Kalayjian occurred after a jury verdict was

16  rendered in this case, with a sizeable amount against Mr.

17  Ghatanfard.

18        I will add a few points about all of these transfers.

19  The only comparable transfer from Mr. Ghatanfard outside of

20  this period, as far as I am aware, is that of the January 2016

21  proceeds from a restaurant sale.  This one sale, however, does

22  not diminish the suspicious nature of this flurry of activity

23  that occurred between 2020 to early 2022, as Mr. Ghatanfard

24  confronted the underlying litigation.  Notably, courts have

25  recognized that the "badges of fraud" include the "pendency or

1    threat of suits," even if no verdict or judgment has yet been

2    issued.  *See, e.g., Yong Xiong He*, 2020 WL 6202423, at *6; *see*

3    *also* NY DCL § 273(b)(4) ("before the transfer was made …, the

4    debtor had been sued or threatened with suit").

5            Let me turn to some of the other badges of fraud.

6    These factors, as well as the close personal and business

7    partnership between Ms. Kalayjian and Mr. Ghatanfard, which I

8    do not believe is disputed, support the conclusion that Mr.

9    Ghatanfard acted in an attempt to defraud Plaintiffs or, at the

10   very least, to hinder, delay, or otherwise frustrate the

11   enforcement of the money judgment against Defendants and in

12   Plaintiffs' favor.  Ms. Kalayjian also does not provide an

13   alternate explanation for the timing of these transactions.

14   She points to Mr. Ghatanfard's older age and that she is being

15   "compensated" or "reimbursed" for her own contributions, but

16   these reasons do not touch upon why these transactions happened

17   when they did.  Mr. Ghatanfard's unfortunate recent medical

18   diagnosis, of course, occurred after the transactions and

19   therefore also cannot be part of a counter-explanation.  Dkt.

20   No. 471 at 6 (diagnosis was in July 2023); today, however, I

21   recognize that counsel has represented that the diagnosis came

22   a year earlier.  But again, that doesn't explain the timing of

23   all these transfers.

24           Adding to the badges of fraud is the fact that Mr.

25   Ghatanfard testified that, as of May of this year, he is now

1    essentially insolvent.  This is one of the specific badges of

2    fraud that is the condition of Mr. Ghatanfard's position

3    following these transactions.  He went from a multi-millionaire

4    to, in his words, a pauper.  This is a fact that is a badge of

5    fraud recognized by the case law.

6            The record also suggests that Mr. Ghatanfard continues

7    to live as he did before, namely, in that he and Ms. Kalayjian

8    still live in the Southampton House as their primary residence,

9    with Ms. Kalayjian now paying the monthly mortgage on the house

10   out of her personal account, and that he uses Ms. Kalayjian's

11   credit card for personal expenses.  Here, the third badge of

12   fraud is "the retention of possession, benefit, or use of the

13   property in question."  Mr. Ghatanfard, despite these

14   transactions, is, as I understand it, still undisputably

15   obtaining the benefit of the transferred assets, including

16   living in this house in the Hamptons.  Also, Ms. Kalayjian's

17   continuous emphasis on her shared and commingled finances and

18   the fact that she lives with Mr. Ghatanfard actually makes it

19   suspect that the approximately $4 million at issue were

20   deposited into the Joint Account and then almost immediately

21   transferred out into Ms. Kalayjian's personal accounts, which

22   again is not disputed.

23           So considering all the facts and the various badges of

24   fraud, including the timing of the transfers, Mr. Ghatanfard's

25   financial condition following the transfers, Mr. Ghatanfard's

1   continued beneficial use of the assets, as a result of his

2   strong, personal relationship with Ms. Kalayjian, these are all

3   badges of fraud that support Plaintiffs' application for an

4   order of attachment here.

5        Accordingly, I find that Plaintiffs have shown a

6   likelihood of success on the merits of their cause of action

7   under DCL § 273(a)(1) to recover on Mr. Ghatanfard's voidable

8   fraudulent transfers to Ms. Kalayjian.  This satisfies the

9   remaining elements of CPLR § 6212(a) for showing entitlement to

10  an order of attachment.

11       Plaintiffs also assert they could recover Ms.

12  Kalayjian's assets under DCL § 273(a)(2), which provides for a

13  claim of constructive fraudulent transfer, rather than actual

14  fraudulent transfer.  Specifically, § 273(a)(2) requires a

15  showing that: "without receiving a reasonably equivalent value

16  in exchange for the transfer or obligation, . . . the debtor: .

17  . . (ii) intended to incur, or believed or reasonably should

18  have believed that the debtor would incur debts beyond the

19  debtor's ability to pay as they became due."

20       I do not have to reach this basis for Plaintiffs'

21  motion for an attachment, as I have already found that

22  Plaintiffs have shown a likelihood of success on their §

23  273(a)(1) claim.  Of course, my reasoning as to whether Mr.

24  Ghatanfard received consideration of a "reasonably equivalent"

25  value for his transfers to Ms. Kalayjian likely applies to this

1  basis as well.  Plaintiffs may choose to re-assert this claim

2  upon further discovery and resolution of their turnover

3  proceedings.  For now, I will leave open the question of

4  whether it can be said that the potential, arguably likely,

5  judgment against Mr. Ghatanfard was a "debt" that Mr.

6  Ghatanfard "intended to incur, or believed or reasonably should

7  have believed that [he] would incur" at the time of these

8  transfers.

9         Finally, Plaintiffs assert they could recover Ms.

10  Kalayjian's assets at issue under DCL § 274(a), which provides:

11        "A transfer made or obligation incurred by a debtor is

12  voidable as to a creditor whose claim arose before the transfer

13  was made or the obligation was incurred if the debtor made the

14  transfer or incurred the obligation without receiving a

15  reasonably equivalent value in exchange for the transfer or

16  obligation and the debtor was insolvent at that time or the

17  debtor became insolvent as a result of the transfer or

18  obligation."

19        Ms. Kalayjian moves to strike Plaintiffs' briefing on

20  § 274(a) because Plaintiffs explicitly sought leave to file a

21  supplemental brief on the basis of asserting § 273(a)(2)

22  arguments and yet dedicated much of the supplemental brief

23  permitted by the Court discussing § 274(a).  Dkt. Nos. 499,

24  504.  This was not the basis upon which supplemental briefing

25  was granted.

1    It is unnecessary for the Court to consider this

2    argument, given that Plaintiffs' motion has already been

3    granted on other grounds.  Accordingly, Ms. Kalayjian's motion

4    to strike is granted.

5    2.  Necessity of the Attachment.

6    Having found that the statutory requirements for an

7    order of attachment under CPLR § 6212(a) have been met, I now

8    proceed to examine whether Plaintiffs have shown that an order

9    of attachment is necessary, such that I should exercise my

10   discretion to grant this "extraordinary remedy" of attachment,

11   or if any other extraordinary circumstances exist for the

12   Court's consideration.

13   As already described in detail, Mr. Ghatanfard-whether

14   with or without Ms. Kalayjian's cooperation-enabled the deposit

15   of millions of dollars into Ms. Kalayjian's personal bank

16   accounts, in addition to giving her joint tenancy of the

17   Southampton House and enabling her to take 90% interest in OGR.

18   This all occurred during the pendency of this litigation, or,

19   in the case of the OGR transfer, two months after the jury

20   verdict against Defendants.

21   Further, in his May 4, 2023 deposition, Mr. Ghatanfard

22   testified that he was essentially insolvent, owning no assets

23   other than "some clothes and an old car."  Dkt. No. 420-11 at

24   6.  In other words, there is serious cause for concern that Mr.

25   Ghatanfard engaged in significant efforts to put his

1   substantial assets out of reach of Plaintiffs to recover on

2   their judgment.  As a result, Plaintiffs' only currently known

3   means of recovering any significant portion of the judgment

4   against Defendants is through Ms. Kalayjian's assets.  Mr.

5   Ghatanfard's arguably inconsistent statements at his

6   deposition, as well as Ms. Kalayjian's I'll say vague

7   statements, provide no comfort to the Court as to Plaintiffs'

8   chances of recovery on their judgment without the attachment.

9           Having found that an order of attachment is necessary,

10  I do not find that any extraordinary circumstances exist here

11  to nevertheless find that attachment is not warranted.  *See,*

12  *e.g., Iraq Telecom Limited*, 43 F.4th at 269, 272-73 (affirming

13  court's consideration of "extraordinary circumstances," which

14  included the effect of the attachment on a foreign economy and

15  interference with innocent third parties).

16          Accordingly, I find that an order of attachment on Ms.

17  Kalayjian is appropriate for the amount of $3,935,555.68, as

18  well as her joint tenancy interest in the Southampton House and

19  the ownership interest in OGR.  Also, to allow Ms. Kalayjian to

20  make necessary mortgage or tax payments and other living

21  expenses, the same restrictions imposed by the July 5, 2023 TRO

22  permitting Ms. Kalayjian to make normal-course transactions for

23  living expenses not to exceed $10,000 per transfer will be

24  maintained, together with the other carveouts that I previously

25  established.

1        B. Undertaking.

2        Under CPLR § 6212(b), Plaintiffs must provide an

3   undertaking:

4        "On a motion for an order of attachment, the plaintiff

5   shall give an undertaking, in a total amount fixed by the

6   court, but not less than five hundred dollars, a specified part

7   thereof conditioned that the plaintiff shall pay to the

8   defendant all costs and damages, including reasonable

9   attorney's fees, which may be sustained by reason of the

10   attachment if the defendant recovers judgment or if it is

11   finally decided that the plaintiff was not entitled to an

12   attachment of the defendant's property."

13        I bear in mind that, according to the text of the

14   statute as I have just quoted it, the undertaking is

15   essentially security for any fees, costs, and damages incurred

16   by the subject of the order of attachment in case it is

17   eventually determined that Plaintiffs were not entitled to the

18   attachment.  *See* CPLR § 6212(b).

19        The ultimate amount of the undertaking is at the

20   Court's discretion, as long as the amount meets the $500

21   statutory minimum.  *See, e.g., BSH Hausgerate*, 282 F. Supp. 3d

22   668, 672 n.2.  However, "[c]ourts frequently set the

23   undertaking as a fraction of a percent of the value of the

24   attachment."  *Yong Xiong He*, 2020 WL 6202423, at *16 (citing

25   cases ranging from 0.04% to 4.5%).

1          Plaintiffs suggest an undertaking of $13,000.  Ms.

2    Kalayjian notes that Plaintiffs' justification for that amount

3    leaves out her interest in the Southampton House or OGR, but

4    it's not clear to me that I have enough information also to

5    justify the $400,000 counter.

6          I am going to invite brief argument on this, counsel.

7    I'll just posit that I think that the $13,000 is way too

8    little, given the possible legal fees associated with this

9    issue.

10          I don't know if $400,000 is too great, however, and on

11   that that I'm particularly interested in hearing from counsel

12   for Ms. Kalayjian about what damages she may incur, given the

13   scope of the carveouts that I have already provided, in other

14   words, what can't she do, how is she being harmed by the TRO as

15   we are litigating this case so that I can quantify the correct

16   amount.

17          Let me turn first to Ms. Kalayjian's counsel.

18          Counsel.

19          MR. SHIFRIN:  Your Honor, as I said previously, these

20   are the entirety of her assets, liquid and illiquid alike.  If

21   they are attached, she is certainly harmed in her inability to

22   live her life fully and spend the money as she deems fit for

23   herself.  To me it strikes me as pretty comprehensive, the harm

24   that she is dealing with, having these assets.

25          THE COURT:  Let me just ask, is she planning to sell

1   the Southampton house?

2          MR. SHIFRIN:  I'm not aware of any plans to sell the

3   Southampton house, no.

4          THE COURT:  Is she planning to divest herself of her

5   interest in the restaurant?

6          MR. SHIFRIN:  No, she is not, your Honor.

7          THE COURT:  Thank you.

8          **I'll take those off of the table for just the moment.**

9          Right now she is living on 10,000, so that's $120,000

10  post tax.

11         What is she not able to do?

12         MR. GORDON:  Your Honor, if I may address that.

13         THE COURT:  That's fine.

14         MR. GORDON:  She would not be able to make any

15  investments in other businesses.  She likely would not be able

16  to take any kind of a meaningful vacation.  She likely would

17  not be able to spend on clothing, food, and other living

18  expenses.  I mean, she would likely not be able to perform any

19  improvements to the Southampton home should anything happen,

20  like that devastating flood.

21         I mean, $10,000, given the quality of life that she

22  had been living prior to the attachment and when -- and she

23  certainly was spending more than $10,000 a month.  If she ever

24  were to separate from Mr. Ghatanfard, I would speculate that

25  her -- whatever settlement she might have reached with him

 1    would have been well in excess of 10,000 a month.

 2              THE COURT:  Thank you.  Good.  Understood.

 3              Counsel for plaintiff, why is 13,000 the right amount?

 4              MR. KIRSCHENBAUM:  I think in our original brief,

 5    together with our TRO, we cited that there was sort of just a

 6    certain percentage range and 13,000 falls within that range.

 7              I think in terms of the issues that Ms. Kalayjian's

 8    counsel have raised right now, there is not -- these aren't

 9    really issues of damages.  I understand that it's uncomfortable

10    to not be able to do more things than you want to do with your

11    money.  But like your Honor said, there is not a specific

12    prospect on the table.  We in fact don't know anything about

13    her assets.  For all we know, she has plenty of money, in

14    excess of the restraint here, that she has full access to.

15    It's not clear to us what tangible damage at all there is, in

16    light of the Court's allowing her to use up to $10,000 and live

17    her everyday life, pay her taxes, etc.

18              THE COURT:  Thank you.  Good.

19              MR. GORDON:  Your Honor, may I just address the issue

20    of damages?  My apologies.

21              THE COURT:  That's fine.  Please go ahead.

22              MR. GORDON:  This has had a staggering irrevocable

23    impact on her life.  Because in addition to running a

24    restaurant, she has been dealing with the debilitating nature

25    of Mr. Ghatanfard's health, and she has been forced to spend

1  time and resources defending herself in this case, and that,

2  coupled with attending to Mr. Ghatanfard's health issues, and

3  running a major restaurant, and having to pay counsel and

4  having to make herself available to counsel, which takes her

5  away from the restaurant and from Mr. Ghatanfard, has had an

6  impact on her that you can't even put a price on.

7       THE COURT:  Understood.

8       Counsel, having considered the various arguments and

9  based on my review of the record, I believe that an undertaking

10  of $150,000 is appropriate, given the costs associated with

11  litigating this issue and the potential damages.

12       In setting this amount, let me just note one thing.  I

13  appreciate the arguments made by both sides, on plaintiffs'

14  side that they don't know that this is the full scope of

15  Ms. Kalayjian's assets; on defendant's side, this may be

16  limiting her ability to live the kind of life that she was

17  previously living; in other words, the $10,000 a month is

18  insufficient.  They are both fair points.

19       I will say one thing, which is that I set the $10,000

20  monthly limit without a lot of data from Ms. Kalayjian about

21  her needs.  I'm happy to consider an alternative proposal about

22  what that amount should be.  If she needs more money, please

23  confer with plaintiffs and write me.  I'm happy to consider

24  changing that amount.  My goal here is to keep her from

25  dissipating assets, but I appreciate that if these are her

1   assets from which she is living that I should take that into

2   account, and I would welcome more data.

3          MR. KIRSCHENBAUM:  Your Honor, a quick question.

4          THE COURT:  Yes.

5          MR. KIRSCHENBAUM:  Can that go both ways?  Inasmuch as

6   if she needs more money to live her life and we reach an

7   agreement, that that would then reduce the amount of the

8   required undertaking?

9          THE COURT:  Thank you.

10         I'll let the parties talk that over.  If you can reach

11  agreement on that, I'm happy to hear your proposals.

12         Let me just take up very briefly the application for

13  enforcement-related discovery.

14         I will just say the following.

15         C.  Enforcement-Related Discovery

16         Federal Rule of Civil Procedure 69(a)(2) provides: "In

17  aid of the judgment or execution, the judgment creditor . . .

18  may obtain discovery from any person-including the judgment

19  debtor-as provided in these rules or by the procedure of the

20  state where the court is located."  New York CPLR § 6220, in

21  turn, provides: "Upon motion of any interested person, at any

22  time after the granting of an order of attachment and prior to

23  final judgment in the action, . . . the court may order

24  disclosure by any person of information regarding any property

25  in which the defendant has an interest, or any debts owing to

1   the defendant."

2          I agree with Plaintiffs that some discovery is

3   warranted, given the serious concerns here about Mr.

4   Ghatanfard's intent to hide his assets from the judgment.  I

5   also don't believe I've seen an explanation from Ms. Kalayjian

6   on the identity of the unidentified account ending in -3510

7   that $1.4 million from the Southampton House refinancing was

8   purportedly deposited into.  *See* Dkt. No. 420-19.

9          Now, at the same time, plaintiffs have been pursuing

10   discovery to enforce the judgment against defendants, I have

11   heard from counsel for Ms. Kalayjian earlier today that there

12   is a large volume of other discovery that's happening in

13   parallel to this case.

14          As a result, while I appreciate some additional

15   discovery may be needed here, to the extent that the request is

16   that I grant carte blanche for all discovery of all types, I'm

17   not going to open the door to that right now.  If there are

18   particular avenues of discovery that you want to request in

19   support of these applications, what I'd ask you to do is to

20   discuss it with counsel for defendant and to seek leave from

21   the Court with more specificity as to what it is that you seek.

22          Again, I think that you are entitled to some discovery

23   under the rules.  I do want to, however, encourage the parties

24   to confer about the appropriate scope of the discovery, and the

25   request here is sort of, I'll call it, a little unclear about

1     this sweeping or not sweeping scope of discovery that

2     plaintiffs are requesting.

3            Go ahead, counsel.

4            MR. KIRSCHENBAUM:  Your Honor, if I may, just to get

5     out there exactly the discovery we are looking for and to get

6     it out there, if that's OK, so that we don't come back with a

7     discovery dispute about what the scope your Honor envisioned,

8     what we really need is simply the chain of cash, what are the

9     bank accounts that we could collect from, what are the cash

10    assets and other assets that could satisfy -- that would

11    satisfy this judgment if we were going to execute on it.

12           THE COURT:  Let me just ask -- and I apologize because

13    I know that these depositions were taken in the other case.

14    Are those questions that you pursued with Ms. Kalayjian in the

15    deposition?

16           MR. BUZZARD:  We know of at least -- just to get to

17    the nitty gritty, we know of at least two accounts that we

18    don't have any information about.  One is the Citibank account

19    that you referenced from which Ms. Kalayjian is paying the

20    mortgage on the Southampton property and into which there have

21    been millions dollars of transfers that came from Valbella At

22    The Park restaurant to Oak Grove Road, and then into

23    Ms. Kalayjian's personal Citibank account.  We know that there

24    is a string of transfers into that account, and we suspect that

25    there is substantial funds in that account.  That was one --

1    that account was the subject of one of our subpoenas.  We

2    attempted to get information about that account.  And

3    Ms. Kalayjian moved to quash that subpoena.  That is currently

4    before your Honor.  That's one issue.

5          The second is this unidentified account into which the

6    $1.4 million from the refinance went.  We are not sure where

7    that account is.  We asked Ms. Kalayjian about that account in

8    the information subpoena.  We did not get a response

9    identifying that account.  We would like to conduct discovery

10   of that account.  To the extent there are other accounts that

11   Ms. Kalayjian owns, we need to know what those are and where

12   they are.

13         THE COURT:  Thank you.

14         I'll hear from counsel for Ms. Kalayjian.  Any

15   concerns about that scope of discovery?  I understand that you

16   may take the position that they have already sought this.  But

17   anything else that you want to share?

18         MR. GORDON:  The only, I guess, qualification I would

19   like to make is in response to plaintiffs' information

20   subpoenaed to Ms. Kalayjian about these counts.  We objected to

21   those inquiries as being overbroad and unnecessary.  And

22   because the money was hers, they were not entitled to get the

23   information.

24         Similarly, I thought that they had sufficient

25   information regarding the Citibank account.  I may be wrong.

1   I'm happy to meet and confer with them to discuss discovery

2   with these parameters, i.e., the chain of bank accounts as

3   represented by Mr. Kirschenbaum.

4           THE COURT:  Thank you.

5           The scope of discovery that the parties are talking

6   about now sounds, I'll just say provisionally, to be within

7   bounds.  I do ask the parties to meet and confer about it and

8   to do your best to eliminate duplicative discovery that may

9   have been sought between the two actions.

10          Go ahead, counsel.

11          MR. KIRSCHENBAUM:  There was one more thing, your

12  Honor, which is, essentially, to the extent that there is

13  additional evidence or arguments that defendants intend to set

14  forth that have not been raised -- in other words, we think we

15  know what we are dealing with at this point, given debriefing

16  on the TRO and the depositions we have taken to date.

17          THE COURT:  Let me just pause you, and I apologize.  I

18  just want to end.  I have taken a lot of your time.

19          I see two different questions here.  One is discovery

20  in support of the attachment action, and two is discovery in

21  support of any potential future turnover proceeding that hasn't

22  yet been filed.  I just want to note that I understand that we

23  are talking now about bucket 1 and not yet discovery in bucket

24  2.

25          MR. KIRSCHENBAUM:  What I understand is that the

1    discovery I was referring to, which is the disclosures under

2    6220, is essentially a bridge between pocket 1 and pocket 2.

3    If defendants -- if there is going to be a turnover proceeding

4    with a trial, then if Ms. Kalayjian is going to make other

5    arguments than what we have heard today, or if she is going to

6    present other testimony than what we have seen to date, then

7    that's the type of discovery -- the second type of discovery.

8              THE COURT:  Thank you.

9              I'll hear from the parties on that.  I think that that

10   is all bucket 2, as I understand it.  In other words, those are

11   facts supporting their arguments in opposition to the turnover

12   action.  Let's leave it at that.

13             Counsel, thank you much for your time.  Thank you very

14   much for your briefing.  It was very thoughtful.

15             I just want to respond to one of the things that Ms.

16   Kalayjian's counsel says, which is basically the sensitivity to

17   the way that she lives her life.  I just say, I do recognize

18   that normal people do not document every little thing that they

19   do, so I appreciate that.  At this same time, I am required to

20   look at this in light of all of the, I'll call it, indicia of

21   fraud, and I emphasize, again, that my determinations here are

22   not the same as a determination on the merits based on the full

23   record.  Instead, I am simply reviewing the probability of

24   success based on the standard that I have already set forth.  I

25   hope that you will express that to your client.

1          Thank you all very much.  This proceeding is

2  adjourned.

3          (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25